No. 01-47C
(Senior Judge Bruggink)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JOSE L. ACEBAL, et al.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S OPPOSITION TO PLAINTIFF LINDSEY BLEDSOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KATHRYN A. BLEECKER
Assistant Director

Of Counsel:

ERIKA TURNER
Assistant General Counsel
Bureau of Prisons

DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

April 4, 2007

# TABLE OF CONTENTS


I. Statement of Facts ..... 3

A. USP Lewisburg, PA ..... 3

B. MDC Brooklyn, NY ..... 3

ARGUMENT ..... 5

I. Plaintiff's General Arguments Are Without Merit ..... 5

A. Program Statement 3420.09, Standards of Conduct, Is Not An Order To Work Overtime ..... 5

B. BOP Training Materials Are Not An Order To Work Overtime ..... 7

C. Correctional Services Rosters ..... 7

II. USP Lewisburg Pre-shift and Post-shift Overtime Claims Should Be Denied ..... 8

A. Day Watch Activities Lieutenant ..... 8

B. Evening Watch Activities Lieutenant During Period October 4, 1998-March 20, 1999 ..... 9

C. Segregation Unit ("SEG") Lieutenant ..... 11

D. G Block Lieutenant ..... 11

E. Evening Watch Activities Lieutenant During December 19, 1999 To May 20, 2000 ..... 12

III. USP Lewisburg Overtime Claim For Audits Should Be Denied ..... 14

IV. USP Lewisburg Overtime Claim For Attending Lieutenants' Meetings Should Be Denied ..... 15

V. MDC Brooklyn Pre-shift and Post-shift Overtime Claims Should Be Denied ..... 16

A. Lt. Bledsoe's Assignments and Claims ..... 16

B. Day Watch Operations Lieutenant and Day Watch SEC Lieutenant ..... 17

C. Morning Watch and Evening Watch Operations Lieutenants and SEC Lieutenants ..... 20

D. Admax Lieutenant ........ 22

E. Special Investigative Supervisor ("SIS") Lieutenant ........ 24

F. Special Housing Unit ("SHU") Lieutenant ........ 25

G. Lt. Bledsoe's Assignments Under Captain Ricky Schoenfelder ........ 25

VI. MDC Brooklyn Overtime Claim For Audits Should Be Denied ........ 28

VII. MDC Brooklyn Overtime Claim For Attending Lieutenants' Meetings Should Be Denied ........ 28

A. The Correctional Services Manual ........ 31

B. The MDC Brooklyn Institution Supplement re Duty Officer Guidelines ........ 31

C. Warden Dennis Hasty's Memoranda ........ 31

D. Overtime Authorization Forms ........ 32

E. All MDC Brooklyn Lieutenants Did Not Attend These Meetings ........ 34

F. E-Mails Re Lieutenants' Meetings ........ 35

1. October 25, 2000 E-mail of Lt. Vincent Wash ........ 36

2. April 12, 2001 E-mail of Deputy Captain James Betler ........ 37

3. May 30, 2001 E-mail of Associate Warden ("AW") James Sherman ........ 37

G. Department Head/Lieutenants' Meetings Under Captain Schoenfelder .. 41

CONCLUSION ........ 41

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .................... 41

Bishop v. United States,
72 Fed. Cl. 766 (2006) .................... passim

Bishop v. United States,
74 Fed. Cl. 144 (2006) .................... passim

Carlsen v. United States,
72 Fed. Cl. 782 (2006) .................... passim

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .................... 41

Doe v. United States,
372 F.3d 1347 (Fed. Cir. 2004), cert. denied,
544 U.S. 904 (2005) .................... passim

Florida Power & Light Co. v. United States,
375 F.3d 1117 (Fed. Cir. 2004) .................... 41

Gaines v. United States,
132 Ct. Cl. 408,
131 F. Supp. 925 (1955) .................... 6, 32

### STATUTES and REGULATIONS

5 U.S.C. § 5542(a) .................... 32

5 C.F.R. § 550.111(c) .................... 1, 5, 6, 41

5 C.F.R. § 550.112(b)(1)(I) .................... 2

Fed. R. Civ. P. 56(c) .................... 41

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOSE L. ACEBAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 01-47C |
| | ) | (Senior Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF LINDSEY BLEDSOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

In Carlsen v. United States, 72 Fed. Cl. 782 (2006), appeal pending, Fed. Cir. No. 2007-5011, this Court granted defendant's motion for summary judgment and ruled that the Bureau of Prison ("BOP") plaintiffs in that case were not entitled to compensation for overtime because they did not meet the requirements of the Federal Employees Pay Act ("FEPA"), 5 U.S.C. § 5542, and its implementing regulations. This Court's ruling was based upon the decision in Doe v. United States, 372 F.3d 1347 (Fed. Cir. 2004), cert. denied, 544 U.S. 904 (2005). In Doe, the Federal Circuit clarified the requirements for demonstrating a violation of the FEPA. The relevant Office of Personnel Management ("OPM") regulation requires that overtime be "ordered or approved . . . in writing by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c).[1] The Federal Circuit held plaintiffs must

---

[1] The relevant OPM regulation states:

> Overtime work in excess of any included in a regularly scheduled administrative workweek may be ordered or approved only in writing by an officer or employee to whom this authority has been specifically delegated.

5 C.F.R. § 550.111(c) (emphasis added).

demonstrate that they were "officially ordered or approved in writing as required by the regulation" to establish a FEPA violation. Id. at 1349.

In Carlsen, 72 Fed. Cl. at 793, this Court held that, under Doe, "the only orders that lead to compensable overtime are those that explicitly order or approve overtime in writing." This Court evaluated various documents to determine whether the BOP plaintiffs met this regulatory standard. This Court held, with one exception, that all of the various documents proffered by the plaintiffs did not meet the regulatory standard because the writings did not explicitly direct any plaintiff to work overtime. Id. at 792-98. Because the BOP employees were not officially ordered or approved in writing to work the overtime in question, this Court entered summary judgment in favor of the Government. Id.[2]

Lieutenant ("Lt.") Lindsey Bledsoe has not meet this regulatory standard. Doe, 372 F.3d at 1349. Therefore, summary judgment should be granted in favor of the Government, and his second amended complaint should be dismissed.

---

Small amounts of overtime, classified as de minimis, are not compensable, even if such overtime was officially ordered or approved. The pertinent regulation provides:

> If the head of a department reasonably determines that a preshift or postshift activity is closely related to an employee's principal activities, and is indispensable to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per daily tour of duty, he shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

5 C.F.R. § 550.112(b)(1)(i)(emphasis added). See Carlsen, 72 Fed. Cl. at 798-80.

[2] The exception involved the Post Orders for Activities Lieutenant, which the Court held required two Activities Lieutenants both to be present at the change of shifts at 2:30 p.m. Id. at 799. In this respect, the Court found that former Lieutenant Tucker's overtime was de minimis in nature. Id. at 798-800.

I. Statement of Facts

The facts are drawn from the parties' proposed findings of uncontroverted fact as well as from the appendices to their briefs, and briefly summarized here. Lt. Bledsoe's claims involve positions as: (1) GS-9 Lieutenant at the United States Penitentiary ("USP") Lewisburg, PA; and (2) GS-11 Lieutenant at the Metropolitan Detention Center ("MDC") Brooklyn, NY. In his motion for partial summary judgment, Lt. Bledsoe requests summary judgment as to only his Lieutenant position at MDC Brooklyn, but also addresses his Lieutenant position at USP Lewisburg. Because Lt. Bledsoe possesses no valid claim in either position, we address both and request that the Court enter summary judgment in favor of defendant.

A. USP Lewisburg, PA

Lt. Bledsoe was a GS-9 Lieutenant at USP Lewisburg from August 2, 1998 until May 20, 2000. Def. App. 2 (Dep. 5); Def. App. 41-42. USP Lewisburg is a high security facility which houses approximately 1,400 inmates. Def. App. 1106.

Lt. Bledsoe has three claims at USP Lewisburg. He claims five and one-half minutes of pre-shift overtime preparing for his daily activities, and five and one-half minutes of post-shift overtime, or a total of 11 minutes per workday. Def. App. 4 (Dep. 10-12).

He claims additional overtime for completing quarterly audits. Def. App. 7 (Dep. 22-25).

He claims overtime in attending Department Head/ Lieutenants' meetings and subsequent, closed Lieutenants' meetings at times outside of his scheduled shift, but does not specify particular meetings for which he allegedly was not compensated. Def. App. 8 (Dep. 27).

B. MDC Brooklyn, NY

Lt. Bledsoe has been a GS-11 Lieutenant at MDC Brooklyn since May 21, 2001. Def. App. 42. MDC Brooklyn is a detention center that houses approximately 2,800 inmates. Def.

App. 304.

At MDC Brooklyn, Lt. Bledsoe has served as: (1) Operations Lieutenant (Morning Watch, Day Watch, and Evening Watch); (2) Security ("SEC") Lieutenant; (3) Admax Lieutenant; (4) Special Investigative Supervisor ("SIS") Lieutenant; and (5) Special Housing Unit ("SHU") Lieutenant. Def. App. 307-08, 1335. The name of the Security Lieutenant was changed to East Activities Lieutenant, and Lt. Bledsoe has served as East Activities Lieutenant. Def. App. 1335.

Lt. Bledsoe has three claims at MDC Brooklyn. Prior to his shift, Lt. Bledsoe claims 5.5 minutes of overtime which includes passing through the grill or gates and picking up a radio battery at the Control Center. Def. App. 9-10 (Dep. 33-34). For Morning Watch and Evening Watch assignments, Lt. Bledsoe claims an additional three minutes of post-shift overtime which includes walking out of the institution. Def. App. 10 (Dep. 36). For Day Watch assignments, Lt. Bledsoe claims an additional about five minutes of post-shift overtime which includes walking out of the institution, without dropping off anything at the Control Center. Def. App. 10 (Dep. 37). Thus, the combined amount of overtime claimed is 8.5 minutes for Morning Watch and Evening Watch, and the combined amount of overtime claimed is 10.5 to 11.00 minutes for Day Watch. Def. App. 9-10 (Dep. 33-36).

Lt. Bledsoe claims overtime for completing quarterly audits. Def. App. 11 (Dep. 38).

Lt. Bledsoe claims overtime for attending Department Head/Lieutenants' meetings and subsequent, closed Lieutenants' meetings at times outside of his scheduled shift. Def. App. 11 (Dep. 38). Specifically, Lt. Bledsoe claims overtime for attending 11 such meetings at times that allegedly were outside of his scheduled shift. Pl. Br. 23. For the meetings on July 31, 2000, November 28, 2000, and March 20, 2001, Lt. Beldsoe received compensatory time. Pl. Br. 23-

24; Pl. App. 146-52. For those three meetings, Lt. Bledsoe also seeks additional compensation at the overtime rate of pay. Pl. Br. 24.

## ARGUMENT

As the plaintiffs did in Carlsen, Bishop v. United States, 72 Fed. Cl. 766 (2006)(Bishop I), and Bishop v. United States, 74 Fed. Cl. 144 (2006)(Bishop II), Lt. Bledsoe points to various documents and asserts that they constitute a written order or approval to work overtime as required by OPM regulation, 5 C.F.R. § 550.111(c). In those cases, this Court examined the same type of documents as are presented by Lt. Bledsoe. Thus, this Court's rulings in Carlsen, Bishop I, and Bishop II control most, if not all, of the issues raised by Lt. Bledsoe. In addition, in March 2007, the Government provided Lt. Bledsoe with Overtime Authorization Forms regarding various Lieutenants' meetings for his completion to enable the correction of his time and attendance records and his receipt of compensation for working overtime.

### I. Plaintiff's General Arguments Are Without Merit

#### A. Program Statement 3420.09, Standards of Employee Conduct, Is Not An Order To Work Overtime

Lt. Bledsoe asserts that language in the Standards of Employee Conduct, which states, "Employees are to obey the orders of their superiors at all times," requires him to follow oral orders, and is a sufficient written order to work overtime under Doe. Pl. Br. 15. In Carlsen, 72 Fed. Cl. at 793, this Court rejected that same argument and held that "a statement in a manual announcing to employees that they must follow the orders of supervisors does not amount to a written order to perform overtime." As this Court held in Carlsen, 72 Fed. Cl. at 793, the written document at issue must "explicitly order or approve overtime in writing." In Doe, 372 F.3d at 1353, 1363, the Federal Circuit required the plaintiffs to demonstrate that the written order

expressly directed them to work overtime. The Federal Circuit interpreted OPM's controlling regulation, 5 C.F.R. § 550.111(c), and held that the document must contain "an express directive to work overtime:" "We have reviewed each of these [plaintiffs'] documents, and none of them includes an express directive to work overtime." 372 F.3d at 1363.

The Federal Circuit's interpretation of the OPM regulation was based upon the interpretation of the regulation in Gaines v. United States, 132 Ct. Cl. 408, 131 F. Supp. 925, 927 (1955). In Doe, 372 F.3d at 1353, the Federal Circuit discussed the Gaines decision and quoted the Court of Claims' holding that "any claim [for overtime under FEPA] must be based upon the performance of overtime services which were expressly authorized or approved in writing by an officer or employee to whom such authority has been specifically delegated."

The requirement of an express directive to work overtime derives from the purpose of 5 C.F.R. § 550.111(c). Where a written document contains an express directive to work overtime there is no question concerning whether the official directed the employee to work the overtime. Reasonable persons would agree that the employee had been directed in writing to work such overtime. Plaintiff's argument that he may meet his burden of proof by presenting documents that, at most, only implicitly necessitate working overtime undercuts the regulation's obvious purpose of ensuring that an authorized official has, in fact, issued a written order directing that the employee work overtime. The Federal Circuit's requirement of a written order that expressly directs the employee to work overtime is consistent with the purposes of the FEPA. As the Federal Circuit explained, one of the FEPA's purposes was "to control the government's liability for overtime"and "FEPA had the dual purpose of ensuring that employees received overtime compensation while adequately controlling the government's obligation to pay overtime so as not to subject the Treasury to unanticipated liabilities." Doe, 372 F.3d at 1361. Indeed, the Federal

Circuit emphasized that, in the House hearings, "Representative Miller elaborated on Congress' concern that there be adequate controls on the payment of overtime compensation: 'if I am a $6,000 executive I just can't come in the morning and say, 'I decided to stay at the office last night for 2 hours and therefore, I want $1.75 an hour.'" Id. The requirement that an employee demonstrate that he received a written order expressly directing him to work the overtime he claims fulfills FEPA's purpose of controlling the Government's liability for overtime compensation, and simultaneously ensuring that the Government official specifically ordered and authorized the overtime at issue in writing. Doe, 372 F.3d at 1353.

B. BOP Training Materials Are Not An Order To Work Overtime

Lt. Bledsoe argues generally that BOP employees are trained to be careful about key control and to be on time for duty. Pl. Br. 15-16. In Carlsen, 72 Fed. Cl. at 793, this Court addressed training materials and ruled that "they do not explicitly require work to be performed outside of normal shift hours." This ruling is controlling here. Moreover, Lt. Bledsoe has not demonstrated that any of the training materials identified were actually used in his own training.

C. Correctional Services Rosters

Plaintiff makes a cursory argument that the correctional services roster ordered Lieutenants to work uncompensated overtime before and after his shift. Pl. Br. 17. The rosters indicate to Lieutenants the shifts that they are assigned to work, the starting time and ending time for their shift, and the nature of their assignment, e.g., Morning Watch Operations Lieutenant, Activities Lieutenant, Training Lieutenant. There is no language contained in the rosters ordering Lieutenants to work uncompensated overtime before or after their assigned shift. There is not even any language that arguably is an inducement, encouragement, or expectation that Lieutenants will work overtime before or after their assigned shift. As in Carlsen, 72 Fed. Cl. at

794, the Court should hold that rosters "do not require employees to perform any duties before or after their shifts and therefore do not act as written orders for overtime."

We next address particular documents relating to USP Lewisburg and MDC Brooklyn.

## II. USP Lewisburg Pre-shift and Post-shift Overtime Claims Should Be Denied

### A. Day Watch Activities Lieutenant

At USP Lewisburg, Lt. Bledsoe was assigned as: (1) Activities Lieutenant, (2) Segregation ("SEG") Lieutenant, and (3) G Block Lieutenant.[3] Def. App. 1108-09. The SEG Lieutenant was also known as a Special Housing Unit Lieutenant Def. App. 1110. According to the USP Lewisburg Quarterly Roster for the period July 5, 1998 through October 3, 1998 (Exhibit B), Lt. Bledsoe's assignment was Day Watch Activities Lieutenant, 6:30 a.m.-3:00 p.m. Def. App. 1109, 1130. As Day Watch Activities Lieutenant, Lt. Bledsoe was relieved by the Evening Watch Activities Lieutenant, 2:45 p.m.-11:00 p.m. Id. There was a 15-minute period of overlap between the Day Watch Activities Lieutenant and the Evening Watch Activities Lieutenant, from 2:45 p.m.-3:00 p.m. Id.

Two Lieutenants were not required to be at the same place at the same time, with one Lieutenant working overtime. Def. App. 1109, 1130. In Bishop I, 72 Fed. Cl. at 777, the only Post Orders that the Court concluded required overtime were those listing tasks "at the beginning or end of each shift which inherently require the presence of two employees, one of whom is off-duty." Because of the overlap of shifts from 2:45 p.m.-3:00 p.m., that circumstance could not occur for Day Watch Activities Lieutenant. Def. App. 1109, 1130. Lt. Bledsoe claims 5.5 minutes post-shift overtime, including walking out of the institution, but he did not drop off

---

[3] There are no Post Orders available that cover Lt. Bledsoe's assignments at USP Lewisburg from August 2, 1998 to May 20, 2000.

anything at the Control Center on his way out. Def. App. 4, 6 (Dep. 10-12, 19). Lt. Bledsoe's relief was on duty beginning at 2:45 p.m. Def. App. 1109, 1130. Both Activities Lieutenants were on duty from 2:45 p.m.-3:00 p.m. Id. The 15-minute period of overlap of shifts was more than enough time for Activities Lieutenants to exchange information, keys and radio, and it was not required or necessary for Lt. Bledsoe to work any overtime. Def. App. 1111. Bishop II, 74 Fed. Cl. at 153 ("on an ordinary day it would take no more than five minutes to exchange keys and a radio for chits with another lieutenant, to count the keys, and discuss any important information relating to the previous shift"). Further, as Day Watch Activities Lieutenant, Lt. Bledsoe walked directly out of the institution without stopping at the Control Center to drop off the keys and radio. Def. App. 1111-12; Def. App. 5 (Bledsoe Dep. 14). His time spent "walking out of the institution after a shift is not an 'integral and indispensable part of the principal activities' of a lieutenant, and thus [is] not compensable as overtime." Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47.

Lt. Bledsoe also claims 5.5 minutes pre-shift overtime including walking through gates and picking up keys and a radio at the Control Center. Def. App. 4-5 (Dep. 10-12, 15). However, Lt. Bledsoe was to be in the key line at the Control Center at the start of his shift as Day Watch Activities Lieutenant, and was not required to work any pre-shift overtime. Def. App. 1111. Accordingly, Lt. Bledsoe's claim for overtime as Day Watch Activities Lieutenant also should be dismissed because he was not directed in writing to work any pre-shift or post-shift overtime.

B. Evening Watch Activities Lieutenant During Period October 4, 1998-March 20, 1999

During the period October 4, 1998 through March 20, 1999, Lt. Bledsoe was assigned as Evening Watch Activities Lieutenant. Specifically, according to the USP Lewisburg Quarterly

Roster, October 4, 1998 through January 2, 1999 (Exhibit C), Lt. Bledsoe was assigned as Evening Watch Activities Lieutenant, 2:45 p.m.-11:45 p.m. Def. App. 1109, 1136. According to the USP Lewisburg Quarterly Roster, January 3, 1999 through April 3, 1999 (Exhibit D), Lt. Bledsoe again was assigned as Evening Watch Activities Lieutenant, 2:45 p.m.-11:45 p.m. Def. App. 1109, 1142.

As Evening Watch Activities Lieutenant, Lt. Bledsoe relieved the Day Watch Activities Lieutenant, 6:30 a.m.-3:00 p.m. Def. App. 1109, 1142. There was a 15-minute period of overlap between the Day Watch Activities Lieutenant and the Evening Watch Activities Lieutenant, from 2:45 p.m.-3:00 p.m. Id. Two Lieutenants were not required to be at the same place at the same time, with one Lieutenant working overtime. Id.

The only Post Orders that the Court has concluded required overtime were those listing tasks "at the beginning or end of each shift which inherently require the presence of two employees, one of whom is off-duty." Bishop I, 72 Fed. Cl. at 777. Because of the overlap of shifts from 2:45 p.m.-3:00 p.m., that circumstance could not occur for Evening Watch Activities Lieutenant. Lt. Bledsoe claims 5.5 minutes pre-shift overtime, including walking through gates, picking up a radio battery at the Control Center, and obtaining his keys and radio from the Day Watch Activities Lieutenant. Def. App. 4-5 (Dep. 10-11, 13, 15-17). Lt. Bledsoe acknowledged that he was not required to pick up a radio battery prior to his shift and could pick up one during his shift. Def. App. 5 (Dep. 16-17). Further, the Day Watch Activities Lieutenant was on duty until 3:00 p.m. Def. App. 1109, 1136, 1142. Both Activities Lieutenants were on duty from 2:45 p.m.-3:00 p.m. Id. The 15-minutes period of overlap of shifts was more than enough time for Activities Lieutenants to exchange information, keys and radio, and it was not required or necessary for Lt. Bledsoe to work overtime. Def. App. 1111-12. Bishop II, 74 Fed. Cl. at 153

("on an ordinary day it would take no more than five minutes to exchange keys and a radio for chits with another lieutenant, to count the keys, and discuss any important information relating to the previous shift").

Lt. Bledsoe also claims 5.5 minutes post-shift overtime including walking out of the institution, and he dropped off the keys and radio at the Control Center on his way out. Def. App. 4, 6 (Dep. 10-12, 18-19, 21). However, Lt. Bledsoe was to be at the Control Center dropping off his keys and radio at his shift-ending time. Def. App. 1107-08. He was not directed in writing to work overtime as Evening Watch Operations Lieutenant. Accordingly, all of Lt. Bledsoe's claims for pre-shift or post-shift overtime as Evening Watch Operations Lieutenant during this period should be dismissed.

C. Segregation Unit ("SEG") Lieutenant

According to the USP Lewisburg Quarterly Roster for Lieutenants for March 21, 1999 to June 20, 1999 (Exhibit E), Lt. Bledsoe was assigned as SEG Lieutenant, 7:45 a.m.-4:15 p.m. Def. App. 1110, 1150, 1154. According to the USP Lewisburg Quarterly Roster, April 3, 1999 through July 3, 1999 (Exhibit F), Lt. Bledsoe again was assigned as SEG Lieutenant, 7:45 a.m.-4:15 p.m. Def. App. 1110, 1158, 1160. As SEG Lieutenant, Lt. Bledsoe did not relieve another Lieutenant when he arrived, and was not relieved by another Lieutenant at or before the end of his shift. Def. App. 1110. As SEG Lieutenant, Lt. Bledsoe picked up his keys and radio at the Control Center, and returned them to the Control Center before leaving the institution. Id. The SEG Lieutenant was required to be in the key line at the Control Center at the start of the shift. Id. The SEG Lieutenant was required to be at the Control Center dropping off keys and equipment at the end of the shift. Id. Accordingly, Lt. Bledsoe does not have any valid claims for pre-shift or post-shift overtime as SEG Lieutenant. Bishop II, 74 Fed. Cl. at 145; Bishop I, 72

Fed.Cl. at 777.

D. G Block Lieutenant

According to the USP Lewisburg Quarterly Roster for Lieutenants for September 19, 1999 through December 18, 1999 (Exhibit G), Lt. Bledsoe was assigned as G Block Lieutenant, 7:45 a.m.-4:15 p.m. Def. App. 1110-11, 1164, 1168. As G Block Lieutenant, Lt. Bledsoe did not relieve another Lieutenant when he arrived, and was not relieved by another Lieutenant at or before the end of his shift. Id. As G Block Lieutenant, Lt. Bledsoe picked up the keys and radio at the Control Center, and returned them to the Control Center before leaving the institution. Id. The G Block Lieutenant was required in writing to be in the key line at the Control Center at the start of the shift. Id. The G Block Lieutenant was required in writing to be at the Control Center dropping off keys and equipment at the end of the shift. Id. Accordingly, Lt. Bledsoe does not have any valid claims for pre-shift or post-shift overtime as G Block Lieutenant. Bishop II, 74 Fed. Cl. at 145; Bishop I, 72 Fed. Cl. at 777.

E. Evening Watch Activities Lieutenant During December 19, 1999 To May 20, 2000

According to the Quarterly Rosters, Lt. Bledsoe was assigned as Evening Watch Activities Lieutenant, 2:30 p.m.-10:30 p.m., during the period December 19, 1999 to May 20, 2000. Def. App. 1111, 1176, 1179, 1186, 1205. Lt. Bledsoe relieved the Day Watch Activities Lieutenant, 6:00 a.m.-2:30 p.m. Id. During this period (December 19, 1999-May 20, 2000), there was no period of overlap between the Day Watch Activities Lieutenant and the Evening Watch Activities Lieutenant. Id.

The incoming Evening Watch Activities Lieutenant, 2:30 p.m.-10:30 p.m., dropped off his chits at the Control Center and obtain the chits of the Day Watch Activities Lieutenant. Def. App. 1111-12. The Evening Watch Activities Lieutenant met the Day Watch Activities

Lieutenant, and exchanged chits for the keys and radio, and simultaneously received oral or written information. Def. App. 1112. As the 2:30 p.m.-10:30 p.m., Evening Watch Activities Lieutenant, Lt. Bledsoe would obtain his keys and radio directly from the Day Watch Activities Lieutenant, who simultaneously provided oral or written information. Id. The exchange of keys, radio and information between the two Lieutenants usually would not take more than a couple of minutes. Def. App. 1112. At the end of his shift, the Evening Watch Activities Lieutenant was to be at the Control Center turning in the keys and radio. Def. App. 1107-08.

As noted, during December 19, 1999 to May 20, 2000, according to the Quarterly Roster, Lt. Bledsoe was assigned as Evening Watch Activities Lieutenant, 2:30 p.m.-10:30 p.m., and he relieved the Day Watch Activities Lieutenant, 6:00 a.m.-2:30 p.m., without an overlap of their shifts. In Carlsen, this Court addressed an Activities Lieutenant position, without an overlap of shifts, and held that "Mr. Tucker's overtime [as an Activities Lieutenant] was de minimis based on the limited amount of time necessary for him to exchange information and equipment once per day and the administrative difficulty of recording that time." Bishop II, 74 Fed. Cl. at 146 n.2; Carlsen, 72 Fed. Cl. at 799-800. The Court should reach the same conclusion here. As in Carlsen, the USP Lewisburg Activities Lieutenants exchanged information and equipment once a day. Def. App. 1111-12. The exchange of information, keys and radio between Activities Lieutenants took only a couple of minutes, and it is not feasible to measure and track the amount of time spent outside of their shift. Id.

Although Lt. Bledsoe claims 5.5 minutes of post-shift overtime involving walking out of the institution and dropping off keys and radio at the Control Center, such time is not compensable. As Evening Watch Activities Lieutenant, Lt. Bledsoe was to drop off his keys and radio at the Control Center at the end of his shift, and was not required to work post-shift

overtime. Def. App. 1107-08. Accordingly, Lt. Bledsoe's claim for post-shift overtime also should be dismissed for failure to demonstrate a written order requiring that he work such post-shift overtime.

Further, Lt. Bledsoe's claim of 5.5 minutes of pre-shift overtime includes time walking through gates into the institution and picking up a radio battery at the Control Center, but he was not required to pick up a battery prior to his shift. Def. App. 5 (Bledsoe Dep. 16-17). This amount of overtime also is de minimus as a matter of law. BOP is "not required to pay overtime when the work takes ten minutes or less." Bishop II, 74 Fed. Cl. at 148 (citing 5 C.F.R. § 550.112(b)(1)(i)); Carlsen, 72 Fed. Cl. at 798.

III. USP Lewisburg Overtime Claim For Audits Should Be Denied

At USP Lewisburg, Lt. Bledsoe claims he worked at least 12 hours of overtime per quarter completing audits. Def. App. 7 (Dep. 24). This claim should be dismissed because Lt. Bledsoe has failed to demonstrate a written order directing him to work overtime on audits. Doe, 372 F.3d at 1349. Lt. Bledsoe testified that he worked on audits during his shift, but could not complete them and so he had to work overtime. Def. App. 7 (Dep. 22-25). The document Lt. Bledsoe provided indicates only that Lieutenants were assigned to audits and that there were deadlines for completing such audits. Def. App. 30. Lt. Bledsoe failed to demonstrate that any authorized, supervisory official directed in writing that he work overtime on audits. Def. App. 7 (Dep. 23). Lt. Bledsoe also never requested compensation for overtime work on the audits, and none was approved. Def. App. 7 (Bledsoe Dep. 25). Accordingly, this claim should be dismissed.

IV. USP Lewisburg Overtime Claim For Attending Lieutenants' Meetings Should Be Denied

At USP Lewisburg, combined Department Head/Lieutenants' meetings usually were held once a month, and followed by a closed Lieutenants' meeting. Def. App. 8-9 (Bledsoe Dep. 29-30), 55, 1114. The meetings usually began at 8:00 a.m. Def. App. 8 (Dep. 28). While assigned to Day Watch, Lt. Bledsoe attended such meetings during his duty hours. Def. App. 8 (Dep. 28). Lt. Bledsoe claims, however, also to have attended such meetings on his day off or outside of his scheduled shift, e.g., when he was Evening Watch Activities Lieutenant. Lt. Bledsoe testified that there were verbal instructions to attend these meetings, but he did not recall any written instructions to attend these meetings. Def. App. 8 (Dep. 28). Therefore, Lt. Bledsoe's claim for overtime at such meetings should be dismissed for failure to demonstrate a written order directing him to attend such meetings at times outside of his scheduled shift, e.g., on his day off, when off shift, or on leave. Id.; Def. App. 55, 1114. Doe, 372 F.3d at 1349.

Lt. Bledsoe points to language in the Correctional Services Manual addressing Lieutenants' meetings and argues it required his attendance at combined Department Head/Lieutenants' meetings and subsequent, closed Lieutenants' meetings. Pl. Br. 18-19, 20; Pl. App. 172-73, 181; Def. App. 1113-14, 1196-98, 1199-1200. The manual states that "a lieutenants' meeting will be held monthly. . . ." Pl. App. 172-73; Def. App. 1113-14, 1196-98, 1199-1200.[4]

In Bishop I, 72 Fed. Cl. at 778, the Court rejected the argument that the Correctional Services Manual required overtime in that it required Lieutenants to attend Lieutenants' meetings outside of their duty hours. The Court held "the manual only states that these meetings will be

[4] Contrary to plaintiff's assertion, Pl. Br. 20, n.9, BOP provided information about its policies regarding Lieutenants' meetings in the Correctional Services Manual for the period between 1994-1997. Def. App. 1112-13.

held" and "the manual goes on to state that 'Executive staff, Department Heads, and other interested persons should be encouraged to attend.'" Id.; Def. App. 1197. This ruling is controlling here. There was no written order directing Lt. Bledsoe to attend USP Lewisburg Department Head/Lieutenants' meetings or subsequent, closed Lieutenants' meetings outside of his duty hours. Accordingly, his claim for overtime for attending such meetings should be dismissed. Doe, 372 F.3d at 1349.

## V. MDC Brooklyn Pre-shift and Post-shift Overtime Claims Should Be Denied

### A. Lt. Bledsoe's Assignments and Claims

At MDC Brooklyn, Lt. Bledsoe worked as Operations Lieutenant and Security ("SEC") Lieutenant. Def. App. 307-08. Operations Lieutenants and SEC Lieutenants obtained their keys and radio in the same manner. Def. App. 310, 1120-21. That is, they obtained their keys and radio directly from the Lieutenant whom they relieved and did not obtain them from the Control Center. Id. Admax Lieutenants also obtained their keys and radio directly from the Lieutenant whom they relieved and did not obtain them from the Control Center. Def. App. 310-11. Under Captain Salvatore Lopresti, Lt. Bledsoe also worked as Admax Lieutenant, Special Investigative Supervisor ("SIS") Lieutenant, and Special Housing Unit ("SHU") Lieutenant. Def. App. 307-08.[5]

Under Captain Lopresti, Operations Lieutenants and SEC Lieutenants worked the same three shifts: (1) Morning Watch, midnight-8:00 a.m.; (2) Day Watch, 7:45 a.m.-4:15 p.m.; and (3) Evening Watch, 4:00 p.m.- midnight. Def. App. 309. Under Captain Lopresti, Lt. Bledsoe worked all three shifts as Operations Lieutenant: (1) Morning Watch, midnight-8:00 a.m.; (2) Day Watch, 7:45 a.m.-4:15 p.m.; and (3) Evening Watch, 4:00 p.m.- midnight. Def. App. 307-

[5] We address his assignments under Captain Ricky Schoenfelder separately below.

08. Under Captain Lopresti, Lt. Bledsoe also worked as Day Watch SEC Lieutenant, 7:45 a.m.-4:15 p.m. Def. App. 309.

Effective the quarter March 28, 2004-June 28, 2004, the time of the Day Watch for Operations Lieutenants and SEC Lieutenants was changed such that the shifts were as follows: (1) Morning Watch, midnight-8:00 a.m.; (2) Day Watch, 7:30 a.m.-4:00 p.m.; and (3) Evening Watch, 4:00 p.m.- midnight. Def. App. 309. Under Captain Lopresti, after March 28, 2004, Lt. Bledsoe worked as: (1) Day Watch, 7:30 a.m.-4:00 p.m., Operations Lieutenant; (2) Day Watch, 7:30-4:00 p.m., SEC Lieutenant; and (3) Evening Watch, 4:00 p.m.-midnight, Operations Lieutenant. Def. App. 308.

For all shifts, Lt. Bledsoe claims 5.5 minutes of pre-shift overtime which includes passing through the grill or gates and picking up a radio battery at the Control Center. Def. App. 9-10 (Dep. 33-36). For Morning Watch and Evening Watch, Lt. Bledsoe also claims three minutes post-shift overtime which includes waiting for the elevator and walking out of the institution. Def. App. 10 (Dep. 36-37). For Day Watch, Lt. Bledsoe claims "probably about five minutes" post-shift overtime which includes waiting for an elevator and walking out of the institution. Def. App. 10-11 (Dep. 38). His combined amount of overtime claimed is 8.5 minutes for Morning Watch and Evening Watch, while the total amount of overtime claimed for Day Watch is about 10.5 minutes. Def. App. 9-10 (Dep. 33-38).

B. Day Watch Operations Lieutenant and Day Watch SEC Lieutenant

Plaintiff relies only on the Post Orders for Operations Lieutenant. Pl. App. 86-95.[6] The only Post Orders that the Court has concluded required overtime were those listing tasks "at the

---

[6] Defendant is filing copies of Post Orders in a separate sealed appendix pursuant to the Protective Order.

beginning or end of each shift which inherently require the presence of two employees, one of whom is off-duty." Bishop I, 72 Fed. Cl. at 777.

Under Captain Lopresti, Lt. Bledsoe does not have any valid claims for overtime as Day Watch Operations Lieutenant or as Day Watch SEC Lieutenant during the period prior to March 28, 2004, because of the overlap of shifts. There was 15 minutes of overlap at 7:45 a.m.-8:00 a.m. between the Morning Watch Operations Lieutenant's shift and the Day Watch Operations Lieutenant's shift. Def. App. 309. Similarly, there was 15 minutes of overlap at 4:00 p.m.-4:15 p.m. between the Day Watch Operations Lieutenant's shift and the Evening Watch Operations Lieutenant's shift. Id. SEC Lieutenants had the same shifts. Id. Thus, there was 15 minutes of overlap at 7:45 a.m.-8:00 a.m. between the Morning Watch SEC Lieutenant's shift and the Day Watch SEC Lieutenant's shift. Id. Similarly, there was 15 minutes of overlap at 4:00 p.m.-4:15 p.m. between the SEC Lieutenant's shift and the Evening Watch SEC Lieutenant's shift. Id. There was no requirement that two Lieutenants be at the same place at the same time, with one Lieutenant working overtime. Id. Thus, during the period prior to March 28, 2004, Lt. Bledsoe's claim for overtime as Day Watch Operations Lieutenant or Day Watch SEC Lieutenant fails for want of a written order directing that he work any pre-shift or post-shift overtime. Bishop I, 72 Fed. Cl. at 777.

Effective March 28, 2004, the shift time for Day Watch Operations Lieutenant and SEC Lieutenant changed to 7:30 a.m.-4:00 p.m. Def. App. 309. The Day Watch Operations Lieutenant and SEC Lieutenant overlapped with the prior shift Lieutenants from 7:30 a.m.-8:00 a.m., but did not overlap with the Evening Watch Operations Lieutenant and the SEC Lieutenant, who worked 4:00 p.m.-midnight. Id. Thus, it was only necessary for the Day Watch Operations Lieutenant and the SEC Lieutenant to exchange the keys, radio, and oral or written information

once a day at 4:00 p.m., with one Lieutenant possibly off duty. Id. In Carlsen, this Court addressed a similar Lieutenant assignment and held that "Mr. Tucker's overtime [as an Activities Lieutenant] was de minimis based on the limited amount of time necessary for him to exchange information and equipment once per day and the administrative difficulty of recording that time." Bishop II, 74 Fed. Cl. at 146 n.2; Carlsen, 72 Fed. Cl. at 799-800. The Court should reach the same conclusion here. As in Carlsen, after March 27, 2004, Day Watch Operations Lieutenants and SEC Lieutenants exchanged information and equipment, without an overlap in shifts, only at 4:00 p.m. Def. App. 309. The exchange of information, keys and radio between the Lieutenants took only a couple of minutes, and it is not feasible to measure and track the amount of work time outside of their shift. Def. App. 310-11.

In any event, Lt. Bledsoe's claimed total amount of overtime for Day Watch is about 10.5 minutes, which is comparable to the amount of overtime determined to be de minimis in Carlsen, 72 Fed. Cl. at 799 (overtime ranging from 11.5 to 6.5 minutes was de minimis).

Plaintiff argues, but Lt. Bledsoe did not testify, that Lieutenants were required to remain at the institution after their Day Watch shift ended and wait for the inmate count to clear. Pl. Br. 14, 25. This argument fails for want of a written order requiring that Lieutenants stay after their shift had ended and wait for the count to clear. In Carlsen, 72 Fed. Cl. at 785, this Court addressed this same argument and ruled "there is no documentary evidence that [the employee] was directed to stay under these circumstances." There, as here, plaintiff failed to cite "a rule that employees getting off shift must remain in the building until a good count is completed." Id. Accord Bishop II, 74 Fed. Cl. at 154.[7] Plaintiff has not demonstrated that there was any written

[7] In Bishop II, 74 Fed. Cl. at 154, FCI Otisville Captains also testified that there was no requirement that employees remain at the institution until a good inmate count was completed.

order directing Lieutenants to remain in the institution during inmate counts or until a good count was completed. Def. App. 308. There was no written order directing Lieutenants not to leave the institution until there was a clear count of the inmates. Id.

C. Morning Watch and Evening Watch Operations Lieutenants and SEC Lieutenants

As Morning Watch Operations Lieutenant, Lt. Bledsoe did not drop off chits at the Control Center. Rather, he met the Evening Watch Operations Lieutenant and obtained the keys and radio from him without swapping chits. Def. App. 310, 1120-21. At the same time, the Evening Watch Operations Lieutenant may have provided verbal or written information. Id. Similarly, as Morning Watch SEC Lieutenant, Lt. Bledsoe did not drop off chits at the Control Center. Id. Instead, he met the Evening Watch SEC Lieutenant and obtained the keys and radio from him without swapping chits. Id. At the same time, the Evening Watch SEC Lieutenant may have provided verbal or written information. Id.

Similarly, as Evening Watch Operations Lieutenant, Lt. Bledsoe did not drop off chits at the Control Center. Def. App. 310, 1120-21. Instead, he met the Day Watch Operations Lieutenant and obtained the keys and radio from him without swapping chits. Id. At the same time, the Day Watch Operations Lieutenant may have provided verbal or written information. Id. Similarly, as Evening Watch SEC Lieutenant, Lt. Bledsoe did not drop off chits at the Control Center. Id. Instead, he met the Day Watch SEC Lieutenant and obtained the keys and radio from him without swapping chits. Id. At the same time, the Day Watch SEC Lieutenant may have provided verbal or written information. Id.

For Morning and Evening Watch, Lt. Bledsoe claims 5.5 minutes of pre-shift overtime which includes passing through the grill or gates and picking up a radio battery at the Control Center, but acknowledged that he sometimes picked up a battery during his shift and was not

required to pick one up prior to his shift. Def. App. 9-10 (Dep. 33-34); Def. App. 308. For Morning and Evening Watch, Lt. Bledsoe claims three minutes post-shift overtime which includes waiting for an elevator and walking out of the institution. Def. App. 10 (Dep. 36). Thus, for Morning and Evening Watch, the combined amount of overtime claimed by Lt. Bledsoe is 8.5 minutes. Def. App. 9-10 (Dep. 33-36).

His claimed overtime for Morning Watch and Evening Watch is clearly de minimis. BOP is "not required to pay overtime when the work takes ten minutes or less." Bishop II, 74 Fed. Cl. at 148 (citing 5 C.F.R. § 550.112(b)(1)(i)); Carlsen, 72 Fed. Cl. at 798. This ruling controls Lt. Bledsoe's claim for Morning Watch and Evening Watch, where he claimed a total of 8.5 minutes. Id. This amount of overtime "is per se de minimis." Carlsen, 75 Fed. Cl. at 800.

This Court also addressed an assignment like this one in Bishop II, 74 Fed. Cl. at 153-55, and held that Lt. Shea's overtime as Operations Lieutenant was de minimis based upon the limited amount of time necessary for him to exchange information and equipment and the administrative difficulty of recording that time. The Court should reach the same conclusion here for the Morning Watch and Evening Watch Operations Lieutenant, and the Morning Watch and Evening Watch SEC Lieutenant assignments. Id.

Further, Lieutenants are not entitled to compensation for activities which are not "an integral and indispensable part of the principal activities" of a Lieutenant. Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47. At MDC Brooklyn, the Operations Lieutenants and SEC Lieutenants did not swap chits to obtain their keys and radio and instead obtained the keys and radio directly from Lieutenants on the prior shift without swapping chits. Def. App. 310, 1120-21. Their time spent walking into the institution prior to the start of a shift, without dropping off chits at the Control Center, is not an "integral and indispensable part of the principal

activities" of a Lieutenant, and thus, is not compensable as overtime. Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47. Thus, Lt. Bledsoe's claim for 5.5 minutes of pre-shift overtime which includes passing through the grill or gates and picking up a radio battery at the Control Center must be reduced by the time he spent walking to the Control Center and the time spent picking up a radio battery at the Control Center and then walking to the Lieutenants' office, because there is no written order requiring that he pick up a battery prior to the start of his shift, and he could pick one up later. Def. App. 9-10 (Bledsoe 33-34); Def. App. 308. Doe, 372 F.3d at 1349.

D. Admax Lieutenant

The Admax Lieutenant assignment was created after September 11, 2001. Def. App. 309. Shifts for Admax Lieutenants initially were 12 hours including four hours of overtime pay. Def. App. 309. Based on his assignment card, during the period September 16, 2001 to December 15, 2001, Lt. Bledsoe was assigned as Admax Lieutenant, Evening Watch, 8:00 p.m. - 8:00 a.m., a 12 hour shift, including four hours of overtime pay. Def. App. 307, 309, 900. Effective the quarter December 16, 2001-March 16, 2002, shifts for Admax Lieutenants were as follows: (1) Morning Watch, midnight-8:00 a.m.; (2) Day Watch, 7:45 a.m.-4:00 p.m.; and (3) Evening Watch, 4:00 p.m.-midnight. Id. Based on the Quarterly Roster for the period December 16, 2001-March 16, 2002 (Def. App. 931-935), Lt. Bledsoe was assigned as Admax Lieutenant, Morning Watch, midnight-8:00 a.m. Def. App. 307, 900, 933.

Like Operations Lieutenants and SEC Lieutenants, Admax Lieutenants did not use chits to obtain their keys and radio. Def. App. 310-11. An incoming Admax Lieutenant went directly to the Special Housing Unit and obtained the keys and radio from the Admax Lieutenant whom they relieved. Id. The exchange of keys, radio and information between Admax Lieutenants

usually took a couple of minutes. Id. A relieved Admax Lieutenant walked directly out of the institution and did not drop off keys, radio, or chits at the Control Center. Id.

As noted above, Lt. Bledsoe's claimed total amount of overtime for Morning Watch and Evening Watch is 8.5 minutes. Def. App. 9-10 (Dep. 33-36). Specifically, for Morning Watch and Evening Watch, Lt. Bledsoe claims 5.5 minutes of pre-shift overtime which includes passing through the grill or gates and picking up a radio battery at the Control Center, but acknowledged that he sometimes picked up a battery during his shift and was not required to pick one up prior to the shift. Def. App. 9-10 (Dep. 33-34). For Morning Watch and Evening Watch, Lt. Bledsoe claims three minutes post-shift overtime which includes waiting for an elevator and walking out of the institution. Def. App. 10 (Dep. 36). His overtime is clearly de minimis. BOP is "not required to pay overtime when the work takes ten minutes or less." Bishop II, 74 Fed. Cl. at 148 (citing 5 C.F.R. § 550.112(b)(1)(i)); Carlsen, 72 Fed. Cl. at 798. This amount of overtime "is per se de minimis." Carlsen, 75 Fed. Cl. at 800.

Also, Lt. Bledsoe's claim would have to be reduced by the time he spent performing activities that are not compensable. Lieutenants are not entitled to compensation for activities which are not "an integral and indispensable part of the principal activities" of a Lieutenant Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47. Admax Lieutenants did not swap chits to obtain their keys and radio and instead obtained the keys and radio directly from the Admax Lieutenant on the prior shift without swapping chits. Def. App. 310. Their time spent walking into the institution prior to the start of a shift, without dropping off chits at the Control Center, is not an "integral and indispensable part of the principal activities" of a Lieutenant, and thus, is not compensable as overtime. Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47. Thus, Lt. Bledsoe's claim for 5.5 minutes of pre-shift overtime, which includes passing

through the grill or gates and picking up a radio battery at the Control Center, must be reduced by the time he spent walking to the Control Center and the time spent picking up a radio battery at the Control Center and then walking to the Lieutenants' office because there is no written order requiring that he pick up a battery prior to the start of his shift, and Lt. Bledsoe testified he could pick one up later. Def. App. 9-10 (Dep. 33-34). Doe, 372 F.3d at 1349.

E. Special Investigative Supervisor ("SIS") Lieutenant

According to MDC Brooklyn Quarterly Rosters, during the period March 31, 2002-September 27, 2003, Lt. Bledsoe was assigned as SIS Lieutenant. Def. App. 307-08. As SIS Lieutenant, Lt. Bledsoe did not relieve another Lieutenant when he arrived, and was not relieved by another Lieutenant at or before the end of his shift. Def. App. 312, 1121. As SIS Lieutenant, Lt. Bledsoe turned in his key at the Control Center for a key to his office. Id. The SIS Lieutenant was to be in the key line at the Control Center at the start of his shift. Id. The SIS Lieutenant was to be at the Control Center dropping off keys and any equipment at the end of their shift. Id. Lt. Bledsoe has not demonstrated that a written order directed him to work pre-shift or post-shift overtime. Accordingly, Lt. Bledsoe does not have any valid claims for pre-shift or post-shift overtime as SIS Lieutenant Bishop II, 74 Fed. Cl. at 145; Bishop I, 72 Fed. Cl. at 777.

Moreover, on June 19, 2003, former MDC Brooklyn Warden Michael Zenk directed in writing that all staff "may not work outside their scheduled hours of work without approval or compensation." Def. App. 86-87, 108. In his memorandum, Warden Zenk also directed all staff "to cease any such activity" and that "all overtime must be requested and approved, in writing, **by your supervisor and appropriate associate warden, in advance of being worked.**" (Emphasis in original). Id. Lt. Bledsoe testified that, on about June 19, 2003, he received and read a copy of Warden Zenk's June 19, 2003 memorandum, and Warden Zenk discussed it at

Lieutenants' meetings. Def. App. 19-20 (Dep. 71-74). The minutes for the Department Head/Lieutenants' meeting on June 24, 2003 state that Warden Zenk stated that: "Staff must be compensated for work performed outside of their scheduled hours of work. Staff must get approval in writing of all such time from their first line supervisor and appropriate associate warden, in advance of being worked. It is imperative that we follow the policy regarding portal-to-portal and the issues associated with staff being properly compensated for their work time." Def. App. 114d. Lt. Bledsoe testified that, based upon Warden Zenk's memorandum, he understood "that BOP policy allows you time within your shift to travel from the control center to your post." Def. App. 20 (Dep. 74-75).

F. Special Housing Unit ("SHU") Lieutenant

According to MDC Brooklyn Quarterly Rosters, Lt. Bledsoe was assigned as SHU Lieutenant, Day Watch, 7:30 a.m.-4:00 p.m., for the period March 28, 2004-June 26, 2004. Def. App. 308, 1121. As SHU Lieutenant, Lt. Bledsoe did not relieve another Lieutenant when he arrived, and was not relieved by another Lieutenant at or before the end of his shift. Def. App. 311-12. As SHU Lieutenant, Lt. Bledsoe obtained his keys and radio at the Control Center and turned them in there at the end of his shift. Id. The SHU Lieutenant was to be in the key line at the Control Center at his shift-starting time. Id. The SHU Lieutenant was to be at the Control Center dropping off his keys and radio at the end of his shift. Id. Lt. Bledsoe has not demonstrated that any written order directed him to work pre-shift or post-shift overtime as SHU Lieutenant. Accordingly, Lt. Bledsoe does not have any valid claims for pre-shift or post-shift overtime as SHU Lieutenant. Bishop II, 74 Fed. Cl. at 145; Bishop I, 72 Fed. Cl. at 777.

G. Lt. Bledsoe's Assignments Under Captain Ricky Schoenfelder

Under Captain Schoenfelder, Lt. Bledsoe's assignments have been similar to those under

Captain Lopresti. He has worked as Operations Lieutenant on all three shifts (Morning Watch, Day Watch, and Evening Watch). Def. App. 1335-36. He also has worked as SEC Lieutenant Id. Captain Schoenfelder changed the name of the SEC Lieutenant to East Activities Lieutenant, and Lt. Bledsoe has worked as East Activities Lieutenant. Id. In all of these assignments, Lt. Bledsoe obtained his keys and radio from the Lieutenant whom he relieved, who simultaneously passed on oral or written information. Id. Lt. Bledsoe in turn would pass on the keys, radio and oral or written information to his relief. Id.

Our arguments for these assignments are essentially the same as those detailed for assignments under Captain Lopresti. See pages 17-25. Even if this Court were to conclude that Lt. Bledsoe was required to work overtime and it was required in writing, it is clearly de minimis. Lt. Bledsoe's combined pre-shift and post-shift overtime claim for Morning Watch and Evening Watch is 8.5 minutes, while his total claim for Day Watch is about 10.5 minutes. Def. App. 9-10 (Dep. 33-36). BOP is "not required to pay overtime when the work takes ten minutes or less." Bishop II, 74 Fed. Cl. at 148 (citing 5 C.F.R. § 550.112(b)(1)(i)); Carlsen, 72 Fed. Cl. at 798. Further, this Court addressed an assignment like these in Bishop II, 74 Fed. Cl. at 153-55, and held that Lt. Shea's overtime as Operations Lieutenant was de minimis based upon the limited amount of time necessary for him to exchange information and equipment and the administrative difficulty of recording that time. The Court should reach the same conclusion for Lt. Bledsoe's assignments as Operations Lieutenant, SEC Lieutenant, and East Activities Lieutenant. Further, Captain Schoenfelder has stated:

> I have seen two Lieutenants exchange keys (including counting the keys), radio, and information in two to three minutes. I also have seen two Lieutenants take three to five minutes to exchange keys (including counting the keys), radio and information. The amount of time involved depends upon how much time Lieutenants engage

> in personal communications, chatting about family and other matters. The amount of time also depends upon Lieutenants' personalities, some being talkative while others are not. It would have been extremely difficult, if not impossible, to measure and record the number of minutes Lieutenants' spent exchanging keys, radio and information, excluding minutes spent on personal matters. Since the amount of time spent could vary each day, such measurements would have to be attempted daily, each time the shift changes . . . . I have not required Lieutenants to remain after the end of their shift to pass on information and they are free to leave at the end of their shift. All of the information that needs to be conveyed from one shift to another already is included in the Lieutenants' log and other written documents. Lieutenants know where these documents are kept. For example, the Lieutenants' log is accessible to Lieutenants on the computer in the Lieutenants' office, and also in hard copy.

Def. App. 1338-39.

Lieutenants also are not entitled to compensation for activities which are not "an integral and indispensable part of the principal activities" of a Lieutenant. Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47. At MDC Brooklyn, Operations Lieutenants, SEC Lieutenants, and East Activities Lieutenants did not swap chits to obtain their keys and radio and instead obtained the keys and radio directly from the Lieutenant on the prior shift without swapping chits. Def. App. 1336. Their time spent walking into the institution prior to the start of a shift is not an "integral and indispensable part of the principal activities" of a Lieutenant, and thus, is not compensable as overtime. Carlsen, 74 Fed. Cl. at 148; accord Bishop I, 72 Fed. Cl. at 46-47. Further, their time spent picking up a radio battery at the Control Center and then walking to the Lieutenants' office also is not compensable as overtime, because there is no written order requiring that a Lieutenant pick up a battery prior to the start of the shift, and Lt. Bledsoe testified he could pick one up later. Def. App. 9-10 (Bledsoe Dep 33-34); Def. App. 1335. Doe, 372 F.3d at 1349.

VI. MDC Brooklyn Overtime Claim For Audits Should Be Denied

At MDC Brooklyn, Lt. Bledsoe claims that he worked 7 hours of overtime a quarter completing audits. Def. App. 11 (Dep. 40). This claim should be dismissed for failure to demonstrate a written order directing him to work overtime on audits. Lt. Bledsoe testified that he worked on audits during his shift, but he could not complete them during his shift. Def. App. 11 (Dep. 40). Lt. Bledsoe testified that no one told him to complete his audits outside of his shift. Def. App. 12 (Dep. 42). The documents that Lt. Bledsoe provided do not contain any written order directing overtime. Def. App. 31-32. Lt. Bledsoe has failed to demonstrate that any supervisory official directed in writing that he work overtime on audits. Lt. Bledsoe also never requested compensation for his alleged overtime work on audits, and none was approved. Def. App. 12 (Dep. 43). Accordingly, this claim should be dismissed. Doe, 372 F.3d at 1349.

VII. MDC Brooklyn Overtime Claim For Attending Lieutenants' Meetings Should Be Denied

MDC Brooklyn combined Department Head/Lieutenants' meetings usually were held monthly and followed by closed Lieutenants' meetings. Def. App. 312. Lt. Bledsoe claims overtime for attending 11 such meetings at times when he allegedly was not scheduled to work, i.e., the meetings on: (1) June 27, 2000; (2) August 14, 2000; (3) September 19, 2000; (4) October 31, 2000; (5) June 27, 2001; (6) July 24, 2001; (7) August 23, 2001; (8) January 22, 2002; (9) September 17, 2002; (10) June 24, 2003; and (11) July 22, 2003. Pl. Br. 23. During this period, Lt. Bledsoe reported to Captain Lopresti. Def. App. 304.

For two of these dates, Lt. Bledsoe was compensated for attending the meetings. Specifically, on June 24, 2003, Lt. Bledsoe was SIS Lieutenant, 7:45 am.-4:15 p.m. Def. App. 319, 612. The meeting was held during his duty hours, and he was compensated. Id. Plaintiff apparently relied upon the Quarterly Roster, and failed to consider the Daily Roster showing Lt.

Bledsoe's assignment for that day. Id. Second, on August 14, 2000, Lt. Bledsoe initially was Operations Lieutenant, Morning Watch, midnight-8:00 a.m., but was assigned to work eight hours of overtime that same day from 8:00 a.m.-4:00 p.m. Def. App. 315-16, 384, 390, 871-73. Plaintiff failed to consider his own Overtime Authorization Form for August 14, 2000, demonstrating he was compensated for overtime on that date. Id.

For three of the dates, MDC Brooklyn Daily Rosters are not available, i.e., (1) June 27, 2000, (2) June 27, 2001, and (3) July 24, 2001. Def. App. 43, 315, 317-18. Thus, it is not possible to determine what shift Lt. Bledsoe worked on those dates or whether he was on his day off. Id. Plaintiff, in making his claim of non-payment, relied upon MDC Brooklyn Quarterly Rosters in attempting to determine Lt. Bledsoe's actual shift on particular days. See Pl. Proposed Findings Nos. 51, 55, 56; Pl. App. 97, 101. However, the Quarterly Rosters do not indicate his shift on a daily basis. Def. App. 315, 317-18. In order to determine his assignment on a particular date, one must consult the Daily Roster. Id. Accordingly, Lt. Bledsoe has not demonstrated that he attended these three meetings at times that were outside of his scheduled shift or on his day off.

For six of these dates, we agree that available records indicate that Lt. Bledsoe was not compensated for attending such meetings: (1) September 19, 2000, (2) October 31, 2000, (3) August 23, 2001, (4) January 22, 2002, (5) September 17, 2002, and (6) July 22, 2003. However, Lt. Bledsoe failed to certify on an Overtime Authorization Form that he attended such meetings on overtime. Def. App. 313-14.

The procedure for obtaining compensation was that such forms were completed and submitted by Lieutenants. Def. App. 313-14, 380-81, 416-17, 447-48. The Captain or Deputy Captain signed off on such forms and they were submitted to the Associate Warden and Warden

for approval. Id. Lt. Bledsoe did not submit such forms for these meetings and never brought to Captain Lopresti's attention his failure to be compensated for attending such meetings. Def. App. 314; Def. App. 17 (Bledsoe Dep. 65). Thus, no compensation was approved for his attendance at these particular meetings. However, on other occasions, Lt. Bledsoe certified on Overtime Authorization Forms that he had worked overtime in attending such meetings, e.g., July 31, 2000 (Def. App. 380-81), November 28, 2000 (Def. App. 416-17), and March 20, 2001 (Def. App. 447-48).

In addition, on June 19, 2003, MDC Brooklyn Warden Zenk directed in writing that all staff "may not work outside their scheduled hours of work without approval or compensation." Def. App. 86-87, 108. In his memorandum, Warden Zenk also directed all staff "to cease any such activity" and that "all overtime must be requested and approved, in writing, **by your supervisor and appropriate associate warden, in advance of being worked**." (Emphasis in original). Id. On or about June 19, 2003, Lt. Bledsoe received and read a copy of Warden Zenk's June 19, 2003 memorandum. Def. App. 19-20 (Bledsoe Dep. 71-74). At the Department Head/Lieutenants' meeting on June 24, 2003, Warden Zenk disseminated his June 19, 2003 memorandum and stated among other things that, "Staff must be compensated for work performed outside of their scheduled hours of work." Def. App. 114d. Lt. Bledsoe attended the June 24, 2003 meeting, and also testified that Warden Zenk discussed his memorandum at Lieutenants' meetings. Def. App. 114b; Def. App. 19-20 (Dep. 71-74).

Lt. Bledsoe's claim for overtime for attending these Department Head/Lieutenants' meetings also fails because he has failed to demonstrate a written order directing him to attend the particular meetings at issue. Under Captain Lopresti, Lieutenants were not required in writing to attend the Department Head/Lieutenants' meetings and subsequent, closed

Lieutenants' meetings at times when they were not on duty, e.g., on their day off, when they were off shift, or when they were on leave. Def. App. 312-13. There also were never any consequences for Lieutenants who did not attend these meetings. Def. App. 313. The Chart, which is attached to Captain Lopresti's declaration, demonstrates that Lieutenants often did not attend such meetings at times when they were not on duty, e.g., when they were on leave, on their day off, or on their off shift. Def. App. 329-50. Further, the documents plaintiff cites did not direct Lt. Bledsoe to work the overtime that he claims for these Lieutenants' meetings.

A. The Correctional Services Manual

Lt. Bledsoe again relies upon language in the Correctional Services Manual and contends that it requires all Lieutenants to attend the monthly Lieutenants' meetings. Pl. Br. 18-19, 20; Pl. App. 172-73, 181; Def. App. 113-14, 1196-1200. As in Bishop, 72 Fed. Cl. at 778, this Court should reject the argument that the Correctional Services Manual required that Lieutenants work overtime by requiring them to attend Lieutenants' meetings outside of their duty hours.

B. The MDC Brooklyn Institution Supplement re Duty Officer Guidelines

Plaintiff asserts that a MDC Brooklyn Institution Supplement announces that Department Head meetings are held each Friday afternoon and Tuesday morning. Pl. Br. 19 (citing Pl. App. 194-99). Plaintiff is incorrect, and the document he cites refers to an "Executive Staff meeting," not a Department Head meeting or a combined Department Head/Lieutenants' meeting. Pl. App. 197. There is no MDC Brooklyn Institution Supplement that addresses Lieutenants' meetings or combined Department Head/Lieutenants' meetings. Accordingly, the Duty Officer Guidelines do not require Lieutenants to work overtime.

C. Warden Dennis Hasty's Memoranda

MDC Brooklyn Warden Hasty issued two memoranda, dated August 17, 2000 and April

18, 2001, stating the time for the combined Department Head/Lieutenants' meeting was 1:00 p.m. on the "last pay week Tuesday of the month." Def. App. 143-44. However, those memoranda, like the FCI Otisville Institution Supplement on meeting times considered by the Court in Bishop, did not require the attendance of Lieutenants at such meetings. Bishop I, 72 Fed. Cl. at 778. Warden Hasty's memoranda merely cite the name of the meeting, the day of the month, and the time. Def. App. 143-44. They are "not a written order for attendance by all lieutenants, irrespective of schedule." Bishop I, 72 Fed. Cl. at 778.

D. Overtime Authorization Forms

Plaintiff argues that MDC Brooklyn sometimes issued written orders to Lt. Bledsoe and other Lieutenants to attend specific Lieutenant meetings. Pl. Br. 23. Plaintiff points to various Overtime Authorization Forms (Pl. App. 146-52), that were signed after Lieutenants worked the overtime, and argues that these forms are written orders to Lt. Bledsoe and others to attend Lieutenants' meetings. Pl. Br. 23. The overtime forms may constitute an approval of overtime worked and, as such, they resulted in the Lieutenants receiving compensation for such overtime hours. FEPA provides for overtime compensation for "hours of work officially ordered or approved in excess of 40 hours in an administrative work week." 5 U.S.C. § 5542(a) (emphasis added). Gaines, 132 Ct. Cl. at 927 ("any claim for overtime under FEPA must be based upon the performance of overtime services which were expressly authorized or approved in writing by an officer or employee to whom such authority has been specifically delegated)(emphasis added). Because such overtime was approved in writing, employees were compensated.

Plaintiff's argument that the overtime forms themselves constituted a prior written order to work overtime is unsupported. Pl. Br. 23. Consideration of the forms demonstrates that they are not written orders to work overtime, as plaintiff argues; instead, they were written approvals

that resulted in compensation for employees after the overtime was worked.

For example, the Overtime Authorization Form, dated July 31, 2000, bears the signatures of seven Lieutenants, including Lt. Bledsoe, indicating that they worked the overtime hours stated. Pl. App. 147-48; Def. App. 380-81. The form also bears the signature of a supervisor and of Associate Warden William ("B.") Wunderle, for Warden Carlyle Holder. Id. As stated in the form, such overtime was "not authorized in advance by Warden," but was "approved" after it was completed. Id.

The Overtime Authorization Form, dated November 28, 2000, bears the signatures of six Lieutenants, including Lt. Bledsoe, indicating that they worked the overtime hours stated. Pl. App. 149-50; Def. App. 416-17. The form also bears the signatures of Captain Lopresti and Warden Hasty. Id. As stated in the form, such overtime was "not authorized in advance by Warden," but the overtime was "approved" after it was completed. Id.

Similarly, the Overtime Authorization Form, dated March 20, 2001, bears the signatures of four Lieutenants, including Lt. Bledsoe, indicating that they worked the overtime hours stated. Pl. App. 151-52; Def. App. 447-48. The form also contains the signatures of Captain Lopresti, and Warden Hasty. Id. As stated in the form, such overtime was "not authorized in advance by Warden," and was "approved" after it was completed. Id.

In Bishop I, 72 Fed. Cl. at 779, the Court consider Overtime Authorization Forms and held, "while these forms are plainly authorizations for overtime, what they prove is that Lt. Shea received compensatory time for his overtime work." Such Overtime Authorization Forms indicate that the overtime hours were "approved" and compensated. Although the forms did not order Lieutenants to work the overtime hours in question before they were performed, the forms

were completed and the overtime was "approved" after the work was done.[8]

E. All MDC Brooklyn Lieutenants Did Not Attend These Meetings

Minutes from the MDC Brooklyn meetings consistently show Lieutenants absent from Lieutenants' meetings when the meeting was held on their day off or outside of their scheduled shift, or for other reasons. Def. App. 329-50. Further, for department heads, it was common practice that if a department head had the day off, they would simply send someone from their department to attend as the acting department head. Def. App. 117 (Zenk Dep. 42-43).

A chart furnished by the Government lists the meeting dates, times and the "Lieutenants Not Attending" the meetings. Def. App. 329-50. Lieutenants not attending on their day off or on their off shift or for other reasons are identified. Id. Further, during the period May 2000 to February 2005, Lt. Bledsoe did not attend the following Department Head/Lieutenants' meetings:

(1) December 26, 2000 (day off);
(2) January 23, 2001;
(3) February 20, 2001 (day off);
(4) October 29, 2001 (off shift);
(5) November 27, 2001 (day off);
(6) February 29, 2002 (training);
(7) March 19, 2002 (day off);
(8) August 22, 2002;
(9) October 28, 2002 (day off);
(10) January 21, 2003 (day off);
(11) February 25, 2003 (day off);
(12) March 18, 2003 (day off);
(13) April 29, 2003 (day off);
(14) May 27, 2003 (training);

[8] Lt. Bledsoe requests additional overtime pay for the overtime hours that were approved in his Overtime Authorization Forms, and for which he already received compensatory time. Pl. Br. 24. "[C]ompensatory time is awarded on a one-for-one hourly basis while overtime is paid out at one and a half times the hourly wage basis subject to a cap." Bishop I, 72 Fed. Cl. at 781. Lt. Bledsoe requests the half time difference between the compensatory time he received and overtime pay. Pl. Br. 24. There is no evidence indicating that Lt. Bledsoe requested overtime pay, as opposed to compensatory time, for these same hours. Bishop I, 72 Fed. Cl. at 782.

(15) August 19, 2003 (day off);
(16) September 20, 2003 (off shift);
(17) October 28, 2003 (off shift);
(18) November 28, 2003 (off shift);
(19) December 23, 2003 (off shift);
(20) January 20, 2003 (off shift);
(21) February 17, 2004 (off shift);
(22) April 17, 2004 (S/L);
(23) August 31, 2004 (training);
(24) September 28, 2004 (A/L);
(25) December 21, 2004 (off shift); and
(26) February 15, 2005 (off shift).

Def. App. 331-50. Lt. Bledsoe admitted that he did not attend some MDC Brooklyn Department Head/Lieutenants' meetings. Def. App. 15 (Dep. 54-55). In deposition, he first testified that only some of these meetings were "mandatory," but then asserted that all of the meetings were mandatory, but "some people just don't show up." Def. App. 14 (Dep. 52-53). Lt. Bledsoe testified that he did not attend some of the meetings because he worked an "odd shift" and was sleeping, or because it was his day off. Def. App. 15 (Dep. 54-55). Lt. Bledsoe stated that he was not aware of any Lieutenants being disciplined for not attending the meetings. Def. App. 14-15 (Dep. 53-54). Lt. Bledsoe further explained his understanding of "mandatory" is "you just have to give an explanation of why you were not attending if you chose not to attend." Def. App. 15 (Dep. 54).

Therefore, all MDC Brooklyn Lieutenants were not required to attend these meetings. Further, MDC Brooklyn Lieutenants were not required to attend the meetings at times when they were not on duty, e.g., when on leave, on their day off, or not on their scheduled shift.

F. E-Mails Re Lieutenants' Meetings

Lt. Bledsoe relies upon three e-mails he argues are written orders directing that all Lieutenants attend these meetings. Pl. Br. 19, 22. We address each e-mail in turn.

1. October 25, 2000 E-mail of Lt. Vincent Wash

Lt. Bledsoe argues that this e-mail amounts to a written order directing all Lieutenants to attend a Department Head/Lieutenants' meeting on October 31, 2000, and that he attended that meeting. Pl. Br. 19. We agree that, based upon the minutes, Lt. Bledsoe attended the meeting on October 31, 2000, and that, based upon the Daily Roster, the meeting was outside of his scheduled shift. Def. App. 316, 402. However, the October 25, 2000 e-mail of Lt. Wash simply stated: "This is just to inform you that there is a scheduled Department Head/Lieutenants meeting on 31 October 2000, at 1:00PM. Deputy Captain Betler has requested that you notify him of your intended agenda item prior to the start of the meeting." Pl. App. 142.[9] The e-mail did not direct all Lieutenants to attend the meeting. Id. Five MDC Brooklyn Lieutenants did not attend the October 31, 2000 meeting. Def. App. 316, 333, 402-07. In Bishop I, 72 Fed. Cl. at 779, this Court reviewed similar e-mails and found that they did not direct Lieutenants to attend Department Head/Lieutenants' meetings at times when they were not on duty. The Court should reach the same conclusion with regard to the October 25, 2000 e-mail of Lt. Wash. The e-mail does not "explicitly order any employees to attend these meetings or work overtime." Bishop I, 72 Fed. Cl. at 779.

---

[9] Plaintiff argues that Lt. Wash acted for Warden Zenk in sending this e-mail. Pl. Br. 20. There is no evidence that Lt. Wash acted for Warden Zenk in sending the e-mail. Def. App. 85-86 (Zenk). Moreover, as Warden Zenk stated, those Lieutenants who were on duty at the time of the meeting were required to attend the Department Head/Lieutenants' meetings and subsequent, closed Lieutenants' meetings, unless there was an unusual situation that required them not to be present, but Lieutenants who were not on duty at the time of these meetings were not required to attend these meetings. Def. App. 84-85. Lieutenants who, for example, were on their day off, on leave, or on their off-shift were not required to attend these meetings. Id. Lieutenants who were not on duty at the time of these meetings could voluntarily attend the meetings. Id. It was a Lieutenant's choice whether to attend the meetings when he was not on his scheduled shift. Id.

2. April 12, 2001 E-mail of Deputy Captain James Betler

Plaintiff argues that this e-mail amounts to a written order "urging" all Lieutenants to attend a Department Head/Lieutenants' meeting on April 16, 2001. Pl. Br. 22-23.[10] Deputy Captain James Betler's e-mail stated: "On Monday April 16, 2001, at 2:00 PM, the monthly Department Head/Lieutenants Meeting is scheduled. Please ensure you attend and that you turn in your agenda items by 4:00PM on Friday April 13, 2001." Pl. App. 144. There are no minutes of Department Head/Lieutenants' meeting on April 16, 2001, and one may not have been held. Def. App. 335. Lt. Bledsoe does not claim to have attended a meeting on April 16, 2001. Thus, the Court need not determine whether this particular e-mail was a written order to work overtime. Further, the e-mail does not state that Lieutenants who were not on duty (e.g., on their days off or not on their scheduled shift) were required to attend this meeting. Pl. App. 144.

3. May 30, 2001 E-mail of Associate Warden ("AW") James Sherman

Plaintiff argues that this e-mail was a written order "urging" all Lieutenants to attend Department Head/Lieutenants' meetings even at times when they are not on duty, e.g., on their day off, when they are off shift, and when they are on leave. Pl. Br. 22. AW Sherman's e-mail explains that it was written because, on May 29, 2001, only "five Lieutenants" attended the Department Head/Lieutenants' meeting. Pl. App. 143; Def. App. 127-28. Indeed, one of those five Lieutenants, Lt. Douglas White, was not on his scheduled shift at the time of the meeting; Lt. White completed an Overtime Authorization Form and was compensated for attending the May 29, 2001 meeting. Def. App. 232. Of the approximately 20 Lieutenants employed by MDC Brooklyn at that time, only five attended the May 29, 2001 meeting, and one

---

[10] Plaintiff mistakenly refers to James Betler as Captain. Pl. Br. 22. Mr. Betler was a Deputy Captain. Def. App. 12 (Bledsoe Dep. 42). Salvatore Lopresti was the Captain. Def. App.304.

of them – Lt. White – was on overtime. Def. App. 127-28, 133, 232. In this context, AW Sherman's e-mail stated: "due to your lack of interest, all Lieutenant's [sic] are now required to request approval through me prior to you not attending these meetings." Pl. App. 143; Def. App. 127-28.[11]

The next Department Head/Lieutenants' meeting was held on June 27, 2001. Def. App. 317, 451-53. Based on the minutes, 15 Lieutenants, including Lt. Bledsoe, attended that meeting. Id. No Daily Roster is available for June 27, 2001, and it is not possible to determine what Lt. Bledsoe's assignment was that day. Def. App. 43, 315. Thus, it is not possible to determine whether Lt. Bledsoe attended the June 27, 2001 meeting during his duty hours or whether he worked overtime. Id.

If Lt. Bledsoe had worked overtime, he could have obtained compensation for attending the June 27, 2001 meeting by completing an Overtime Authorization Form. Def. App. 313-14. Both Lt. Douglas White and Lt. William Moran did so and were compensated for attending this meeting outside of their scheduled shift. Def. App. 317, 454-55.

Further, the May 30, 2001 e-mail was not a written order directing that all Lieutenants were required to attend Department Head/Lieutenants' meetings, because seven MDC Brooklyn Lieutenants did not attend the next meeting, which was held on June 27, 2001, and there were no consequences for those Lieutenants who did not attend. Def. App. 317, 451-53.

The May 30, 2001 e-mail of AW Sherman directed Lieutenants "to request approval through me prior to you not attending these meetings." Pl. App. 143. Lieutenants were not

---

[11] AW Sherman's e-mail also stated: "As per the Correctional Services Manual, Lieutenant's [sic] are required to attend these meetings." Pl. App. 143. However, as demonstrated above, the Correctional Services Manual did not require all Lieutenants attend these meetings, and it also did not require that Lieutenants who were not on their scheduled shift at the time of the meeting attend such meetings.

required to attend the meetings and could notify the Captain and/or the AW. Def. App. 313. Former MDC Brooklyn Captain Lopresti stated that his instructions to Lieutenants were the same after AW Sherman's May 30, 2001 e-mail:

> At MDC Brooklyn, Associate Warden Sherman issued one e-mail to Lieutenants regarding Department Head/Lieutenants' meetings. Exhibit 112. After his May 30, 2001 e-mail (Exhibit 112), my instructions to Lieutenants were unchanged. I continued to tell Lieutenants that they were not required to attend Department Head/Lieutenants' meetings or the subsequent, closed Lieutenants' meetings when they were not on their scheduled shift, but if they did so I would sign-off on compensatory time. I continued to tell Lieutenants that it was their choice whether to attend these meetings when they were not on duty. There were never any consequences for Lieutenants who did not attend these meetings at times when they were not on duty, e.g., when they were on their day off, on their off-shift, or on leave. I never gave them any warnings, any written or oral discipline, or any adverse performance evaluations. There also were no adverse consequences for Lieutenants who did not turn in agenda items prior to the Department Head/Lieutenants' meetings. My message to Lieutenants was always the same -- you are not required to attend these meetings when you are not on duty; it is your choice whether to attend when you are not on your scheduled shift.

Def. App. 321-22.

After the May 30, 2001 e-mail, Lieutenants continued not to attend these meetings. At the July 24, 2001 meeting, only six Lieutenants attended. Def. App. 456. In July 2001, Lieutenants' attendance at the meeting was not significantly different than it was at the time of the May 29, 2001 Department Head/Lieutenants' meeting when only five Lieutenants, one of whom was working overtime, attended. Def. App. 232, 450. AW Sherman's May 30, 2001 e-mail was not a written order requiring that all MDC Brooklyn Lieutenants attend these meetings.

In sum, Lt. Bledsoe has failed to demonstrate that the May 30, 2001 e-mail of AW Sherman was a written order that expressly directed all Lieutenants to attend Department

Head/Lieutenants' meetings at times when they were not on duty, e.g., on their day off, when they were off shift, or when they were on leave.

Lt. Bledsoe also has failed to demonstrate that the May 30, 2001 e-mail was a written order directing all Lieutenants to attend the meetings for which he now requests compensation, i.e., the meetings on: (1) June 27, 2001; (2) July 24, 2001; (3) August 23, 2001; (4) January 22, 2002; (5) September 17, 2002; and (6) July 22, 2003.[12] After Mr. Sherman's May 30, 2001 e-mail, Lt. Bledsoe did not attend the following Department Head/Lieutenants' meetings among others: (1) October 29, 2001 (off shift); (2) November 27, 2001 (day off); (3) February 29, 2002 (training); (4) March 19, 2002 (day off); (5) August 22, 2002; (6) October 28, 2002 (day off); (7) January 21, 2003 (day off); (8) February 25, 2003 (day off); (9) March 18, 2003 (day off); (10) April 29, 2003 (day off); (11) May 27, 2003 (training); (12) August 19, 2003 (day off); (13) September 20, 2003 (off shift); (14) October 28, 2003 (off shift); (15) November 28, 2003 (off shift); (16) December 23, 2003 (off shift); (17) January 20, 2003 (off shift); and (18) February 17, 2004 (off shift). Def. App. 320-21.

As Lt. Bledsoe testified, he did not attend some Department Head/Lieutenants' meetings because he worked an "odd shift" and was sleeping, or because it was his day off. Def. App. 15 (Dep. 54-55). Lt. Bledsoe was not aware of any Lieutenants being disciplined for not attending these meetings. Def. App. 14-15 (Dep. 53-54). Lt. Bledsoe explained that his understanding of "mandatory" was "you just have to give an explanation of why you were not attending if you chose not to attend." Def. App. 15 (Dep. 54). AW Sherman's e-mail provided that Lieutenants

[12] As noted above, Lt. Bledsoe was on his scheduled shift and was compensated for attending the meeting on June 24, 2003. Def. App. 319, 612. For two of these meetings, it is not possible to determine whether Lt. Bledsoe worked overtime by attending the meeting because there is no Daily Roster for those dates, i.e., the meetings on: June 27, 2001, and July 24, 2001.

notify him of their reasons for not attending. Pl. App. 143. Accordingly, his e-mail was not a written order expressly directing all Lieutenants to attend the meetings or directing Lieutenants who are not on duty to attend the meetings.

G. Department Head/Lieutenants' Meetings Under Captain Schoenfelder

In his motion, Lt. Bledsoe did not claim that, under Captain Schoenfelder (February 2005 - present), he had received a written order to attend specific Department Head/Lieutenants' meetings at times outside of his scheduled shift and was not compensated for his overtime in attending the meetings. In his affidavit, Captain Schoenfelder states that, during his tenure, such meetings generally were not mandatory, but, on occasion, he has indicated that he wanted all Lieutenants to attend a particular meeting. Def. App. 1340. Captain Schoenfelder also states that he routinely excused Lieutenants from attending even mandatory meetings for any reason, and there were never any adverse consequences for Lieutenants as a result of their not attending such meetings. Id. For example, Captain Schoenfelder directed Lt. Mundo to issue an e-mail regarding a Department Head/Lieutenants' meeting on April 26, 2005, stating "all Lieutenants must attend if not on scheduled annual leave or sick leave." Pl. App. 144A; Def. App. 1340. According to the minutes and the Daily Roster, eight Lieutenants, including Lt. Bledsoe, who was off shift, did not attend the April 26, 2005 Department Head/Lieutenants' meeting. Def. App. 1340-41, 1492. There were no consequences for those Lieutenants who did not attend the meeting. Id. In sum, Lt. Bledsoe has no valid claims for overtime at these meetings under Captain Schoenfelder.

## CONCLUSION

For all these reasons and based upon our response to plaintiffs' proposed findings of undisputed fact, and our proposed findings of undisputed fact, the Court should deny Lt.

Bledsoe's motion for partial summary judgment and grant the Government's motion for summary judgment with regard to plaintiff Lt. Bledsoe. In sum, Lt. Bledsoe has failed to meet his burden of demonstrating that written orders "expressly" directing him to work the overtime hours he allegedly worked were issued by an officer or employee to whom this authority was specifically delegated. Doe, 372 F.3d at 1349, 1353, 1363; 5 C.F.R. § 550.111(c). Accordingly, summary judgment should be entered in favor of the Government. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." (quoting Fed. R. Civ. P. 56(c))); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Florida Power & Light Co. v. United States, 375 F.3d 1117, 1124 (Fed. Cir. 2004).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Kathryn A. Bleecker
KATHRYN A. BLEECKER
Assistant Director

s/Domenique Kirchner
DOMENIQUE KIRCHNER
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, D.C. 20530
Tele: (202) 307-0290
Attorneys for Defendant

Of Counsel:
ERIKA TURNER
Assistant General Counsel
Bureau of Prisons
April 4, 2007