IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . . . . . . . . . . . . . . . . . . . . . . . X

GARY L. AARON, et al., DARYL A. AABERG, et al., CHARLES CARLSEN, JR., et al., JOSE L. ACEBAL, et al., FRIEDA ADKINS, et al., BUDDY J. ADELSBERGER, et al., ANGIE CRUZ ALDRIDGE, et al., MICHAEL ATTY, et al., JANINE A. BANKS, et al., DENNIS AVRIPAS, et al.,

Plaintiffs,

-against-

Nos. 00-315C, 00-454C, 00-617C, 01-47C, 01-313C, 01-314C, 01-480C, 02-35C, 03-446C, 03-2363C

THE UNITED STATES,

Defendant.

. . . . . . . . . . . . . . . . . . . . . . . X

80 29th Street
Brooklyn, New York

January 27th, 2004
9:31 a.m.

DEPOSITION of LINDSEY BLEDSOE, a Plaintiff, taken on behalf of the Defendant, pursuant to Notice, held at the above-mentioned time and place, before Maria Cirillo, a Notary Public of the State of New York.

APPEARANCES

ALAN BANOV AND ASSOCIATES
Attorneys for the Plaintiffs
1819 L Street N.W., Suite 700
Washington, D.C. 20036-3830
BY: ALAN BANOV, ESQ.

U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
1100 L Street N.W., Room 12046
Washington, D.C. 20005
BY: DOMENIQUE KIRCHNER, ESQ.,
Trial Attorney
RICHARD SCHROEDER, ESQ.

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons
Labor Law Branch
320 First Street N.W.
Room 818
Washington, D.C. 20534
BY: R. SUZANNE COURTNEY, ESQ.
Attorney-Advisor
Office of General Counsel



L. Bledsoe

LINDSEY BLEDSOE,
having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MS. COURTNEY:

Q State your name for the record.
A Lindsey Bledsoe.
Q Where do you currently reside?
A P.O. Box 320381, Brooklyn, New York 11232.
Q Mr. Bledsoe, my name is Suzanne Courtney. I am an attorney for the Bureau of Prisons. I want to go over a couple of general rules before we get started. The first is you need to keep your voice up when you are speaking so the court reporter can get everything down. You also need to wait for me to finish asking the question before you start to answer. And all your responses need to be verbal. No nodding of your head, shaking of your head, you need to answer yes or no. If you don't understand a question I have asked, let me know and I will either repeat it or rephrase it for you. If you need to take a



L. Bledsoe

break at any time, let me know. And while I am an attorney with the Bureau of Prisons I am not your attorney in this matter; do you understand what I have gone through with you?
A Yes.
Q Mr. Bledsoe, for which positions are you seeking additional pay in this lawsuit?
A My work as a counselor and a lieutenant.
Q The corrections counselor is bargaining unit?
A Okay, lieutenant.
Q The lieutenant position?
A Yes, ma'am.
Q And where have you held the position of lieutenant?
A At Lewisburg and at Brooklyn.
Q At Lewisburg were you a GS 9 lieutenant?
A Yes.
Q And you were a GS 9 throughout the time you were at Lewisburg?
A Yes.
Q Can you give me the dates you were



L. Bledsoe

at Lewisburg?
A August '98 until 2000. Until about May of 2000.
Q August '98 through May of 2000 would be your dates at Lewisburg?
A Yes.
Q And in May of 2000, did you then come to Brooklyn?
A Yes, ma'am.
Q And what was your GS level?
A 11.
Q So you have been at MDC Brooklyn since May of 2000 and you are currently employed here?
A Yes, ma'am.
Q The position at Lewisburg, the lieutenant, that was a supervisor position?
A Yes.
Q Who were you supervising?
A Correctional officers.
Q That is the same at MDC Brooklyn, you are supervising correctional officers?
A Correct.
Q When you were working at MDC

6

L. Bledsoe
Lewisburg, what shift were you working?
A I worked some morning and day watch and the evening watch.
Q Do you recall the shift time for evening watch, what the shift time was?
A 2:30 to 10:30 I think. 2 to 10:30.
Q And then you said you also worked some day watch?
A Yes.
Q Do you recall those hours?
A 6 to 2.
Q What post or position were you typically working at USP Lewisburg, is that activities lieutenant?
A Activities lieutenant and the SHU, special housing.
Q Did you work one more than the other?
A Probably activities a little more than the SHU.
Q Who was your supervisor at USP Lewisburg?
A Captain Lopez and Mr. Ey. Mr. Ey is the AW here. So I had him for like three months

7

L. Bledsoe
Q Was Mr. Ey a captain or AW at Lewisburg?
A He was a captain.
Q So when you started at Lewisburg in August '98 Captain Lopez was your supervisor?
A Yes, ma'am.
Q Do you recall when Captain Lopez left?
A I guess he left while I was here in Brooklyn. I just read it in the highlights. What happened he was my captain at Lewisburg. Mr. Ey came on, Captain Lopez got promoted AW and stayed there.
Q How long was Mr. Lopez your direct line supervisor at Lewisburg?
A Since I got there except for the last -- I left out in May probably until about February.
Q So from August '98 to February 2000?
A Yes.
Q And then Mr. Ey came on in February 2000?
A About that.

8

L. Bledsoe
Q Through the time you left in May?
A Correct.
Q Here at Brooklyn what shifts have you worked?
A Morning watch, day watch, all the shifts.
Q All the shifts?
A Yes.
Q Do you tend to work one shift more than the other since you have been here?
A I work mostly evening watch and morning watch.
Q Can you tell me the shift hours for evening watch?
A 4 to 12.
Q What about morning watch?
A 12 to 8.
Q And you said you sometimes work day watch but not as often as the other two shifts?
A Correct.
Q What is the day watch shift?
A 8 to 4.
Q What post or position are you working or have you worked here at MDC Brooklyn?

9

L. Bledsoe
A I was the SIS lieutenant and the options on morning watch and evening watch security lieutenant. They have something like the Admix really was in the SHU. I was an Admix they call but it is really a spinoff of special housing, we have high profile inmates.
Q Admix lieutenant?
A Yes.
Q Of those positions have you worked one more than the others?
A I don't think so, no.
MS. COURTNEY: Can I have that marked.
(Whereupon, a two-page document was received and marked as Bledsoe Deposition Exhibit 1 for identification, as of this date.)
Q Mr. Bledsoe, I am showing you what has been marked as Exhibit 1 to your deposition. Do you want to take a look at it and let me know when you are ready.
A Okay. I am ready.
Q Do you recognize this document, Mr. Bledsoe?

L. Bledsoe

A Yes.

Q Do you recognize this as a consent to representation that you filled out and signed on November 10th, 2000?

A Yes.

Q I direct you to the second page down towards the bottom where you are listing your positions?

A Yes.

Q Starting on the second line, correctional lieutenant GS 9, step 10, start date August 3rd, '98, is that your USP Lewisburg position?

A Correct.

Q And do you see the column that has average minutes per day overtime?

A Yes.

Q And you put down twenty; is that correct?

A Yes.

Q What were you including in the twenty minutes?

A Be more specific on that average time right there, take a look at it and think



L. Bledsoe

about the whole situation I would probably say it was more like probably about eleven minutes.

Q You say it is more like eleven minutes?

A Yes.

Q Total for the day?

A Yeah.

Q You see it says average minutes per day?

A Yeah, I know.

Q There is also right after it says average minutes per day overtime there is like an asterisk; if you go down to right under the positions you were writing in it says overtime first pre-shift and first post-shift only?

A Yes.

Q Are you saying now you think it is more like eleven minutes?

A Probably about eleven, yes.

Q What are you including is the eleven minutes both before your shift and after your shift?

A Yes, that is correct.

Q Can you tell me exactly which



L. Bledsoe

activities before your shift that you are including?

A Like picking up keys and radio and, you know, coming to try and get in the place, you know, the gates, go through a couple of gates and everything that are locked.

Q Is it fair to say that the eleven minutes, half of that is for the morning and half of that is for -- not the morning but the beginning of your shift and half is for the end of your shift?

A That is correct.

Q So five-and-a-half minutes in the morning, five-and-a-half minutes at the end of your shift, would that be correct?

A That is about correct.

Q I will just say at the beginning of your shift because I know you worked different shifts.

The beginning of your shift you are including in the five-and-a-half minutes picking up your equipment and then at the control center and then going to your post?

A Walking through the gates there and



L. Bledsoe

then picking up equipment and radio, yes.

Q Where were you picking up your keys and radio?

A Control center.

Q Did you also pick up your equipment at the control center while you were at Lewisburg or did you ever exchange it with another person?

A I had picked up for like batteries at the control center. The keys the lieutenant has them. But the end of the day when I turn them in at 10:30 there be a little crowd out there.

Q But let me start with the day watch shift.

A Okay.

Q That was 6 to 2 you said?

A Yes.

Q So you wouldn't be exchanging equipment, you would be picking it up at the control center, correct?

A The activities lieutenant would have. I would pick up a battery, something like that from control center. I have to get in early because of the gates, the doors and stuff we like

L. Bledsoe

one, two I think there is three, four, about three or four gates I had to go through.

Q But as activities lieutenant were you picking up keys and a radio at the control center?

A No.

Q Where would you get that?

A From the lieutenant.

Q Which lieutenant?

A Outgoing. I was coming, he wasout going.

Q There was a morning watch activities lieutenant at Lewisburg in the morning?

A No, I wasn't working morning watch. I was working -- correction, at Lewisburg I was straight evening watch. I was working evening watch from 2 to 10:30 and from 6 to 2. There was a morning watch but it was operations. I was on morning watch shift.

Q I want to focus on the day watch when you are getting in at 6 a.m.?

A Okay.

Q Are you picking up the equipment at



L. Bledsoe

the control center then or are you simply picking up a battery?

A When I get in on day watch I be picking it up on the day time, yes. Because there is no morning watch activities lieutenant just operations but no activities.

Q So you would be picking up keys and radio when you came in at 6 a.m.?

A Yes.

Q But is it correct to say, and if I am not stating it correctly let me know, when you worked the evening watch you would just be picking up the battery?

A Correct.

Q Because you would be --

A Exchanging, uh-huh.

MR. BANOV: Please keep your voice up. Don't say uh-huh. Give a verbal response to what she says. Let her finish her question fully and she will try not to interrupt you. It makes for a bad record if the question and answer are interrupted. Keep your voice up.

A Sorry.



L. Bledsoe

Q So when you worked evening watch you would be picking up simply a battery?

A A battery, correct.

Q And when you got to your post would you then exchange equipment with the day watch activities?

A Correct.

Q When you worked the evening watch shift and you said that either started at 2 or 2:30?

A Correct.

Q Did you pick up a battery every day when you worked that shift?

A Some days I didn't.

Q On the days that you didn't what did you do, did you just simply proceed to the lieutenant's office?

A Correct.

Q And did they have batteries there?

A No.

Q Would you come back at a later time within your shift to pick up a battery?

A I would have to, yes.

Q Why did you not always pick up a



L. Bledsoe

battery when you worked the shift that started at 2 or 2:30?

A Well, sometimes might be a crowd out there, too long of a crowd. And I just come on in and come back later and get it.

Q So if you saw there was a long line on occasion you would simply go through the control center and stop back at a later time to pick up your battery?

A Correct.

Q So the five-and-a-half minutes for your pre-shift activity that we were talking about, does that include from picking up your equipment at the control center, going through all the secured gates until you get to your post?

A That is correct.

Q Where would your post be exactly, did you have an office?

A Yes.

Q And is that where you would start your day --

A Correct.

Q -- or your shift?

Do you have twenty-four hour keys?

L. Bledsoe

A Yes.

Q What did those keys provide access to?

A The padlock to the inmates, if we take them out on a trip, put a padlock on them and to the lieutenant's office and cuff keys.

Q So the keys that you said that you would pick up when you work on the day watch shift, what were those providing access to?

A To the housing units.

Q Now, at the end of the day the five-and-a-half minutes, what does that include?

A Waiting in line and then there was like -- there was certain amount that could leave out I don't know how much ten or twelve inside the gate and then you have to wait for it to open back up.

Q Are you including the time it takes you to get down to the control as well?

A No.

Q So what the five-and-a-half minutes is what, includes what?

A On what shift?

Q Are you saying it varies by shift?



L. Bledsoe

A Yes.

Q Let's take the day watch shift where you would be getting off at 2 or 2:30?

A There would be a little crowd out there just waiting for them to go through. Most of the time I would wait for the officers to go through and then I would go through later.

Q So you would on occasion wait for the officers cleared out before you went and got in line?

A Correct.

Q What were you having to return at the control center at 2 or 2:30 when you got off?

A On that shift right there the 6 to 2:30 I don't have anything to turn in. I just walk out. At 10:30 when I got off at night I have to turn those keys back in.

Q When you were leaving at end of the day watch there is not so much -- the line didn't really affect you because you weren't having to turn in equipment; is that correct?

A Correct. But on the evening watch it would affect me, correct.

Q So day watch you could simply walk



L. Bledsoe

out of the institution once you have been relieved?

A Correct.

Q And the evening watch, was there typically a wait to turn in equipment?

A They have a few officers getting off. I have to wait for them to turn in keys and radio and batteries. When they get done I would come up behind them and turn mine in. I usually leave late.

Q You usually left late?

A After they turned their stuff in I would leave.

Q Why did you leave late?

A Because they would be at control turning their stuff in and talking whatever had a little bit more equipment so I just waited.

Q So again you were waiting for the crowd at the control center to clear out?

A Turn their keys in, right, correct.

Q And at that point you would turn in your equipment which was keys and the radio?

A Correct.

Q So when you did leave on the



L. Bledsoe

evening watch, would you say that your estimate of five-and-a-half minutes would include the time it took you to get from your office and turn in your equipment?

A That is about correct.

Q Would it be maybe a little bit less when you were getting off the day watch since you don't have to wait to turn in equipment you were simply proceeding --

A It could be possible.

Q You just need to let me finish. It is going to mess her up.

A Okay.

Q When you left on the evening watch shift at Lewisburg, do you recall how many officers were typically in the control center?

A Two.

Q Were there typically two officers in the control center at all times at Lewisburg?

A On the 2:30 to 10:30 there was.

Q Do you not recall the other shifts how many there were?

A On the morning watch I am not for sure. It could have been one. I am not for

sure.
Q Were you ever docked pay because you were late for the shift while you were at Lewisburg?
A No.
Q Were you ever charged annual leave because you were late for your shift at Lewisburg?
A No.
Q Aside from the eleven minutes that you are claiming for Lewisburg to your pre-shift and post-shift daily activities, are there any other claims that you are making for your time at Lewisburg?
A They had me responsible for audits.
Q Anything else?
A That is it, no.
Q Can you explain to me what you are claiming with respect to audits?
A On the audits, I have to do the audits usually when I am off duty. It is almost impossible for me trying to do an audit while I am working. I have to be paying attention to what is going on. I can't be focusing on audits,





listening to radio, trying to monitor if an emergency jumps off. I do it better off duty. I come in on my days off sometimes or come in early.
Q Did your supervisor Captain Lopez or any other person in authority at Lewisburg instruct you to do your audits on your days off, your off duty hours?
A They didn't instruct but we had time to turn them in.
Q Can you give me just a little bit of background on the audits such as how often they were given, what the assignments were and the time period for turning them in?
A They were done quarterly. Every three months we had to do an audit. I got at Lewisburg I think they gave me two and turn around and gave me a third one, about the first five months I had like three audits. It lock shop, armory, emergency preparedness. The audits were probably about thirty pages worth of questions. I think the EPO was a thick one like fifty or sixty sheets in there.
Q So were you typically given your





audit assignment at the beginning of the quarter?
A It could be right towards the end, mid-quarter. I am saying you will get it sometime in the quarter, put it like that.
Q And how long were you typically given to complete the audit?
A Probably about -- I don't know, six, seven -- I don't know, six, seven weeks. I don't know, six, seven weeks.
Q Six, seven weeks?
A Yeah.
Q And how much time would you estimate per quarter that you spent on audits?
A At Lewisburg to be honest with you I think I spent about at least twelve hours.
Q Per quarter?
A Per quarter.
Q Did you ever write down how much time were you spending of your own on the audits?
A No, I didn't write it down.
Q So the twelve hours is a guess?
A It is probably the least. It is impossible to get an audit done on lunches. Most lieutenants come in on time off or come in early.





It was a program review, operations review, they want to make sure you get it down.
Q Did you ever work on your audits during your shift?
A I tried but you can't really get a lot accomplished. I did a little. Wasn't much.
Q Did you ever ask the captain whether or not you get comp time or overtime for the time you spent on your audits outside your shift?
A I think that was brought up and he just said do the best you can do.
Q What I am asking did you yourself ever ask him?
A No.
Q So when you say it was brought up are you saying it was brought up by someone other than you?
A Yes.
Q How do you know that someone else brought it up?
A I think it was at a meeting one of the guys had asked the captain are we going to get paid for this. And he just said do the best

L. Bledsoe

you can do or something like that. Some kind of answer.

Q The exchange never -- the captain never said that he wouldn't pay anyone comp time?

A No.

Q You need to wait for me to finish asking.

Do you recall whether or not the person that you are speaking about, the captain that you are talking about, was that Captain Lopez or Captain Ey?

A Captain Lopez.

Q Do you recall whether or not the subject of working on audits ever came with Captain Ey?

A No.

Q Do you recall what type of meeting that exchange took place at, was it a lieutenants meeting?

A Lieutenants meeting.

Q Was it a meeting that only the captains and lieutenants were in attendance or was there other staff there as well?

A Captains and lieutenants.



L. Bledsoe

Q So aside from the pre-shift and post-shift activities that we talked about at Lewisburg and the audits, is there anything else that you are claiming with respect to Lewisburg that we haven't discussed?

A No, that is it.

Q So you don't have any claims for lieutenants meetings at Lewisburg?

A I am sorry, the meetings, yes, the lieutenants meetings.

Q How often were those held?

A Once a month.

Q Were they mandatory meetings?

A They were mandatory. I think they gave out verbal saying you need to be there. You should be there. And kept a list of everybody who didn't show up.

Q If you were on annual or sick leave were you required to attend?

A If you were on sick leave you weren't required. I am not certain how they did it. I can't remember on the annual there.

Q What if it was your day off or before or after your shift?



L. Bledsoe

A You come in.

Q And you said it was a verbal instruction, you don't recall anything in writing?

A Correct.

Q Do you recall what time the lieutenants meetings were held?

A At Lewisburg?

Q Yes.

A Start at 8:00.

Q When you were working the day watch which was approximately 6 to 2 or 6 to 2:30 that would have been during your shift, correct?

A Correct.

Q So you would not have claims for the lieutenants meeting when you were working the day watch at Lewisburg?

A Correct. Unless it was -- I can't remember my days off. I had funny days off.

Q Do you recall what day of the week the meeting was held?

A I think they usually try to have them on Tuesday.

Q Did you ever ask for compensatory



L. Bledsoe

time or overtime for attending lieutenants meetings at Lewisburg?

A I think -- let me see -- I am not for certain. I can't remember that. I am not sure.

Q Do you recall whether or not you ever received compensatory or overtime for attending the lieutenants meetings at Lewisburg?

A I don't think I received it. I am not for sure.

Q Was the lieutenant's meeting at Brooklyn a combine -- strike that.

Was the lieutenants meeting at Lewisburg a combined department head meeting or was it simply lieutenants only?

A We had had to be there when they started the meeting. Started at 8:00 department heads and then the lieutenants meeting used to attend them both.

Q So it started at 8 a.m. as a joint meeting between the lieutenants and department heads?

A Correct.

Q Once that was over then lieutenants

L. Bledsoe

had what I assume to be their closed portion?
A Yes.
MR. BANOV: Let her finish the question before you answer.
A I am sorry.
Q Do you recall how long the meetings typically lasted?
A Usually started at 8 and usually was over around about, I don't know, 12, 12:30.
Q And that is both portions of the meeting were done by that time?
A I think, let me see, before the program review it was a little bit longer. The department heads meeting and then we had our meetings. Sometime they would go probably until about 2:00. And I think -- I can't remember if program review, after the program review the time kind of shrinks, shortens somewhat.
Q When was program review at Lewisburg?
A I think it was probably about February. I think it was February. February of 2000 I think.
Q So a couple months before you left?



L. Bledsoe

A Yes.
Q So do you recall for how long the lieutenants meetings were extending to more -- what did you say to 2:00 in the afternoon?
A Yes.
Q How long?
A Probably about 9 -- how many months you mean?
Q Yes, sir.
A Probably about seven, eight, nine months.
Q So you're saying for the seven to nine months prior to February 2000 the lieutenants slash department head meetings went roughly from 8 a.m. to sometimes in the afternoon 2?
A The department head meetings started at 8 and they usually over I say about 11:00, 11:30. And the lieutenants meeting probably from 11:30 to 2:00, 2:30, around that time.
Q When you attended the meetings, did you attend both portions of the meetings?
A Correct.



L. Bledsoe

Q Did you always attend both portions of the meetings?
A Yes, ma'am.
Q Just so I am clear, your claims at Lewisburg are the eleven-minute average for your pre-shift and post-shift, the time for your audits?
A Correct.
Q And then the lieutenants meetings slash department heads meetings on when you were either working evening watch or your day off or prior to your shift?
A Correct.
Q What I just listed, is that all your claims for Lewisburg?
A That is all I can remember at the time.
Q Now, I am going to talk about Brooklyn, your time at Brooklyn.
A Okay.
Q You said you are a GS 11 lieutenant?
A Correct.
Q Is it correct that you told me you



L. Bledsoe

work mostly evening watch and day watch?
A Mostly morning watch and evening watch.
Q I am going to direct you back to Exhibit 1 down to the last line that you filled out, correctional lieutenant GS 11 start date May 21st, 2000. The twenty-two minutes that you put down is your average minutes per day overtime?
A Yeah.
Q Is that -- was that your best estimate at the time?
A At the time, yes.
Q For Brooklyn?
A Correct.
Q Is that currently your best estimate?
A No. I am going to be honest with you, I am going to stay with eleven minutes, eleven here too.
Q The eleven minutes that you are talking about, does that include both the time before your shift and after your shift?
A Correct.
Q So can I roughly split it

34

L. Bledsoe

five-and-a-half minutes on either side?
A Yeah.
Q I am not trying to put words in your mouth. If you think it is heavier on one side as opposed to the other, that is fine. But would you say it is fair to split it?
A Yeah, you can split it.
Q So the five-and-a-half minutes before your shift, what do you include in that time?
A Just getting through the grill, the gates.
Q Do you have twenty-four hour keys here at Brooklyn?
A Yes, ma'am.
Q Have you always had twenty-four hour keys at Brooklyn?
A Correct.
Q What do those keys provide access to?
A Lieutenant's office.
Q Do you have to pick up equipment at the control center at the beginning of your shift?

35

L. Bledsoe

A Just a battery.
Q Do you always pick up a battery on your way in at Brooklyn?
A Correct.
Q So do you ever do like your practice was at Lewisburg, if the line is too long do you ever just come in and come back at a later time and get a fresh battery?
A Sometimes.
Q So a battery is the only equipment you have to pick up at the control center?
A Correct.
Q And sometimes if the line is too long you bypass the control center and come back at a later time?
A Correct.
Q So does the five-and-a-half minutes besides getting through the grills, does that include the time to pick up a battery for the times that you do stop at the control center?
A Repeat that please?
Q The five-and-a-half minutes you said you mainly include walking through the grills?

36

L. Bledsoe

A Yes.
Q Does it also include the time it takes for you to pick up a battery on the occasions that you pick up a battery on your way in as opposed to coming back at a later time?
A Yes.
Q The five-and-a-half minutes at the end of your shift, can you tell me what that includes?
A On that right there I stand corrected on that one. I would probably say about three minutes. Doesn't take that long on the relief.
Q Does it vary by shift maybe?
A Yes.
Q We are going to go shift by shift. When you are working evening watch you are getting off around midnight, would you say it is closer to three minute or five-and-a-half or something else?
A Probably about three minutes.
Q And is that simply walking back from your office to the control center or does it include dropping off --

37

L. Bledsoe

A Walking out, I am sorry.
Q When you get off at the end of the evening watch shift, do you have to drop off equipment?
A No.
Q So it is simply your time walking from your office out the door?
A And waiting on the elevator, yes.
Q When you work the morning watch shift you are getting off approximately 8:00?
A Yes.
Q Do you have to drop off equipment for that shift?
A No.
Q And how much time would you estimate that it takes you to walk out when you leave at the end of the morning watch shift?
A Probably about three minutes.
Q You said you sometimes worked the day watch shift so you would be getting off at approximately 4?
A Correct.
Q And how long would you say that took?

38

L. Bledsoe
A Probably about five minutes.
Q And for that shift you are again not dropping off equipment?
A Correct.
Q So all your equipment essentially kept on post and exchanged between lieutenants?
A Correct.
Q Aside from what we discussed that you do every day before your shift and after your shift, are there any other claims that you are making with respect to your time here at Brooklyn?
A Same as the lieutenants meeting and the audits.
Q You said lieutenants meetings and audits?
A Yes, ma'am.
Q Okay. Let's talk about the audits here at Brooklyn for a minute. Are those assigned every quarter as well?
A Correct.
Q And how many audits -- how many areas do you typically do an audit for here at Brooklyn?

39

L. Bledsoe
A One.
Q Has that consistently been the case since you came here in 2000?
A Correct.
Q When are the audits typically assigned?
A Sometimes within that quarter no certain date. I am saying it could be right in the middle. Try to give at least early or middle of the quarter not late.
Q And when are they due back?
A Before the quarter is over. Might be a week after the quarter sometimes. Usually during the quarter.
Q Is the area that you are conducting the audit for, does that typically change every quarter?
A Yes, ma'am.
Q For each quarter while you have been here at Brooklyn, how much time would you typically say that you spend on the audits outside of your shift?
A Probably about -- per quarter?
Q Yes.

40

L. Bledsoe
A I would say about seven.
Q Seven hours?
A Yeah, a quarter.
Q Are there some areas that the audit does not take as much time?
A Yes.
Q Can you give me an example?
A Okay. Just like when I was in the SIS office, okay, what they did was that is my area of responsibility, the SIS office. Since my area of responsibility that is where I am working at, I am right there, I can take care of it as I go along. Sometimes they will assign me an area of responsibility that I don't work. Then I have to, you know, go on my day -- when I get off of work or something. As I go along I can make corrections and monitor some stuff like in the SIS office. When I switched out they gave me this admin operations then -- I just got that in the last four or five months. And a combination of out of my area I have to go there.
Q Did you work more than one quarter in the SIS office?
A Yes, ma'am.

41

L. Bledsoe
Q And each quarter that you worked in the SIS office were you responsible for the audit of the SIS office?
A No. I think they switched it around about mid -- I would say about nine months in they gave it to me in my area of responsibilities, I think SIA was responsible for it.
Q When you were working in that SIS office and you had that area of your assigned audit, how long -- how many hours outside of your shift would you estimate that you spent for that?
A I would probably say -- probably seven.
Q Did you ever work on your audits during your shift?
A When I was assigned like the SIS, you know, that is my area of responsibility where I work out at, then I can work and just check and monitor things and make adjustments and turn the paperwork in.
Q Did that lessen the amount of time you would have to spend outside of work on the audits?

L. Bledsoe

A Correct.

Q Did anyone at Brooklyn ever tell you that you had to complete your audits outside of your shifts?

A No.

Q Did you ever ask -- let me back up for a second.

I don't think we did the supervisors here. Who has been your captain since you have been here at Brooklyn?

A Captain LoPresti and Deputy Captain Betler.

Q Has Captain LoPresti been here since you arrived in May of 2000?

A Correct.

Q And has Mr. Betler been the deputy captain since then as well?

A I think he has been gone now probably for about eight or nine months.

Q So he was here from the time you arrived in May of 2000 up until about April or May of last year?

A Um, correct.

Q Who is currently the deputy



L. Bledsoe

captain?

A Mike Ward.

Q Did you ever ask Captain LoPresti whether or not you could get comp time or overtime for the time you are spending on your audits outside of your shift?

A No.

Q Did you ever ask Deputy Captain Betler whether you can receive comp time or overtime for the time you spend on audits after your shift?

A No.

Q Have you ever asked Deputy Captain Ward whether or not you can receive comp time or overtime for the time you spent on audits outside of your shifts?

A No.

Q Why have you never asked them?

A I never brought it to my attention but basically they say turn it in on time. The only way I can get it done is doing it on my own time. I am just saying they want it in so I have to get it in on my own. It is impossible to do an audit if you are not assigned to the area to



L. Bledsoe

do the papers.

Q Going to the lieutenants meetings here at Brooklyn that is another area that you are claiming for, correct?

A Yes.

Q How often are lieutenants meetings held here?

A Once a month.

Q Do you recall what day of the week they are typically held?

A Tuesday.

Q And that is a combined lieutenant, department head meeting?

A Correct.

Q And do you recall what time of the day they start?

A Usually at about 1.

Q There is a department head meeting that starts at 1 with the lieutenants present and then after that a lieutenants meeting?

A Yes.

Q How long do the meetings typically last?

A Department heads meetings usually



L. Bledsoe

go from about, I don't know, 2:30, something like that. And some days they have changed the time, every now and then they will have them at 8 or 9.

Q Has Warden Zenk been the warden since you have been here?

A I have had three wardens since I have been here.

Q Which wardens have you been under?

A Warden Holder I only had him for like four months. And then I had Warden Hasty and Mr. Zenk.

Q Is there any difference or was there any difference in the length of the lieutenants meetings under -- the department heads meetings under the various wardens?

A I think at Warden Hasty when we had him we were getting ready to do our program review, they kept adjusting the date. And compared to Warden Zenk I think when Warden Zenk got here the program review was over.

Q So under Warden Zenk how long would you say the meetings typically lasted and when I say "the meetings" I mean the whole meeting, the department head and the lieutenant portion?

L. Bledsoe

A Probably about three-and-a-half hours.

Q And under Warden Hasty, and I am not asking you to guess, if you can recall, how long department head meetings were typically under Warden Hasty?

A Department head or lieutenant meeting?

Q Both, combined together.

A Probably about the same. About the same.

Q And under Warden Holder, do you recall how long the meetings, the combined meetings were under Warden Holder?

A I can't remember that.

Q Who directed you to attend lieutenants meetings here at Brooklyn?

A The captains, the AW.

Q What did the captain tell you about attendance at lieutenants meetings?

A They would say it is like mandatory.

Q Captain LoPresti told you that lieutenants meetings were mandatory?



L. Bledsoe

A He would say some meetings were like, you know, this you have to be here for this one. He didn't say all. Mr. Sherman was here, he basically said attend them all.

Q Mr. Sherman was associate warden?

A Yes, ma'am.

Q Do you recall the time period that Mr. Sherman was here?

A I can't.

Q He is not currently here; is that correct?

A No, he made warden somewhere.

Q What do you recall what Mr. Sherman said about lieutenants meetings?

A Basically said on the e-mail he says, you know, showing lack of interest, we need to be there, we couldn't call off. If we do call off we need to call the captain and contact him. And say if you were on annual leave, something like if you were on annual you were around this area you had to show up unless you were on annual leave out of town or something.

MS. COURTNEY: Can you mark this.

(Whereupon, a one-page document was received and marked as Bledsoe Deposition Exhibit 2 for identification, as of this date.)



L. Bledsoe

Q Mr. Bledsoe, I am showing you what has been marked Exhibit 2 to your deposition; you want to take a look at that and let me know when you are ready.

(Witness is perusing the exhibit.)

A Okay, I am ready.

Q Do you recognize this document, Mr. Bledsoe?

A Something from Mr. Sherman. It says it right there.

Q Is this an e-mail from Associate Warden James Sherman a copy of which you also brought in today to the deposition?

A Yes.

Q The e-mail is dated May 30th, 2001, subject mandatory lieutenants meetings?

A Yes.

Q Is that the e-mail you were referring to early in your testimony?

A Correct.

Q Are lieutenants meetings currently mandatory here at MDC Brooklyn?



L. Bledsoe

A Yes.

Q Are all of them mandatory or some of them mandatory?

A Well, right now I guess some of them. It depends like I think we have a program review we get. You know, process getting ready for another program review and they will be saying it is mandatory.

Q What do you mean by mandatory lieutenants meetings?

A Well, as time get closer to the program review paperwork and they want lieutenants to be there and they won't take exceptions being none. No excuses just show up.

Q In the e-mail dated May 30th, 2001 from James Sherman, was this the first e-mail of this kind from Mr. Sherman stating that lieutenants meetings were mandatory or was it simply a reaction to a drop in attendance?

MR. BANOV: Objection. Multiple part. Can you separate it, please.

Q You can answer if you understand.

A Want to repeat the question for me

L. Bledsoe

now.

Q Okay. Do you recall receiving e-mails similar to the May 30th, 2001 e-mail, do you recall receiving similar e-mails from Mr. Sherman?

A I don't remember that.

Q Was this the first e-mail from Sherman regarding the mandatory nature of the lieutenants meetings?

A It could be possible but I know he has to sit down and make verbal warnings you have to be there.

Q Can you give me the context in which he gave the verbal instructions, were they in meetings?

A Yeah, lieutenants meetings you need to be there.

Q Do you recall whether or not those verbal instructions were before or after the e-mail?

A Before.

Q And do you recall whether or not those instructions came directly from Mr. Sherman?



L. Bledsoe

A They were coming from everyone, Mr. Sherman, Captain LoPresti and Captain Betler.

Q At the time of this e-mail, were those instructions coming from everyone that you just listed, Mr. Sherman, Mr. LoPresti and Mr. Betler?

A Correct.

Q Do you recall who the warden was at that time, was that Mr. Hasty?

A Correct.

Q Do you recall whether or not directions came from Mr. Hasty?

A I know Mr. Hasty was coming in on meetings, sitting down and talking to us about the program review, discussed it.

Q Did Mr. Hasty ever discuss whether or not lieutenants meetings were mandatory?

A I don't remember.

Q Can I direct you on the e-mail about midway down where it says the only exceptions are you are on annual leave and out of the area, emergency leave or sick leave I still need to be notified in advance of your planned absence. Is that your understanding that if you



L. Bledsoe

were on annual leave and out of the area or on sick leave lieutenants meetings were not mandatory for you?

A Hang on, excuse me. Correct.

Q Is that your understanding of this e-mail?

A From my understanding if you were on annual leave and you were in the area you still had to show up.

Q And was that your understanding when you first got here at MDC Brooklyn?

A I don't remember when I first got here. I can't remember.

Q You don't recall whether or not when you first got here what the instructions were with respect to attending lieutenants meetings?

A I am not for certain, you know, like they were more enforceable on certain meetings compared to others. You have to be here and this one we having a meeting. They would just say we having a meeting next Tuesday as compared this is mandatory and then like say program review was coming they were sending e-mails and



L. Bledsoe

sit down with the books and discussing, everybody had a notebook, a binder what their area of responsibility was, checking off, make sure things were done.

Q Is it fair to say that not all of the lieutenants meetings since you have been here at MDC Brooklyn were mandatory?

A Correct.

Q Looking at the e-mail, the first line where it says "recently I noted a major drop in attendance of the mandatory lieutenants meetings," do you recall that being the case at the time?

A Let me correct something here. As far as lieutenants meetings they are all mandatory. But some people just don't show up. I am just saying -- I mean I think all the meetings were mandatory, if you don't show up for this then they want to know why. And then what happened where were you, this and that. In fact, I think a couple of lieutenants faced some discipline action, they didn't give them an agenda for attending lieutenants meeting.

Q Have lieutenants ever been

L. Bledsoe

disciplined for not attending a lieutenants meeting?
A No.
Q Is your understanding of mandatory that you just have to give an explanation of why you were not attending if you chose not to attend?
A Correct.
Q And you said people just don't show up?
A Correct.
Q Do you know people who have not shown up because it was their day off?
A I haven't showed up at some of the meetings myself to be honest.
Q But it was your day off?
A Not my day off because I worked an odd shift, you know what I mean? Like if they have meetings and I am working 12 to 8 and have a meeting at 1:00 I am sleeping. So I am just -- on my day off some days you come in. You work, you come in.
Q Are there any other occasions when you would not attend a lieutenants meeting other



L. Bledsoe

than it is contrary to the shift you were working?
A Unless like my day off.
Q Mr. Bledsoe, how far do you live away from the institution?
A I live -- I stay in Dayton Manor. In fact, I took a cab to get here today.
Q How do you typically get to work?
A On a train.
Q How long does that usually take you?
A About twenty-five minutes. However on my days off I be in New Jersey. I be over my friend's house in New Jersey.
Q On your days off when there is a lieutenants meeting you would be in New Jersey and it is fair to say you would sometimes not come in because it was far to come?
A It is fair to say. Sometimes I will come in.
Q On the times that you would come in for lieutenants meetings from New Jersey, how long approximately does it take?
A I ride the bus and catch the train.



L. Bledsoe

Probably looking at the commute itself probably from catching the bus and train possible about an hour and half.
Q Would it be approximately the same amount of time going back to New Jersey from the institution after the meeting?
A It probably be a little bit longer because of the traffic.
Q Have you ever received compensatory time or overtime for attending lieutenants meetings at MDC Brooklyn? All my questions unless I say otherwise we are talking about Brooklyn.
A I think I received three hours since I have been here.
MS. COURTNEY: Mark that, please.
(Whereupon, a three-page document was received and marked as Bledsoe Deposition Exhibit 3 for identification, as of this date.)
Q Mr. Bledsoe, I am showing you what has been marked Exhibit 3 to your deposition. If you want to take a look at it and let me know when you are ready.



L. Bledsoe

(Witness is perusing the exhibit.)
A Yeah, I am ready.
Q Do you recognize this as the first page as being time and attendance slip for you dated August 13th, 2000?
A Correct.
Q And do you see under week one comp leave earned 4.2 hours?
A Yes, ma'am.
Q Turn to the second page, do you see that is an overtime authorization form?
A Yes.
Q And do you see that the purpose listed is to attend the mandatory lieutenants meeting?
A Correct.
Q And were you paid overtime or compensatory time for this?
A Compensatory time.
Q That authorized supervisor can you tell me whose signature that is, if you know?
A I think that is Mr. Betler.
Q Would that be deputy captain?
A Correct.

58

L. Bledsoe

Q And whose signature is that for Warden Holder's?
A Mr. Wunderle.
Q Wunderle?
A Yes.
Q And the signature to the left of Mr. Wunderle's, can you tell me whose signature that is, if you know?
A I don't know who that is.
Q Under time verified directly above that signature I was just directing you to it says VJW?
A I think that is Vincent Walsh.
Q And what capacity would Mr. Walsh be initialing?
A Might have been acting captain.
Q Direct you to the third page and you and some other people -- this is an overtime authorization not just for you but for other people as well?
A Correct.
Q Do you recall how these forms are typically circulated?
A They would pass them around at the

59

L. Bledsoe

meetings and they would be typed. This right here, this form -- I am sorry, correction. I think after the meeting was over with, then they would tell us, you know, I did I typed this up you need to go ahead and sign this.
Q Who would typically get one of these forms started, was it whoever volunteered, was it someone in a particular position?
A Usually the admin lieutenant.
Q Have you ever served as admin lieutenant?
A No.
Q I am sorry, that is a GS 9?
A The admin lieutenant?
Q Is that a 9 or 11?
A Right now they got a 9 and 11 in there, both of them. I guess a large compliment.
Q So you're saying typically the admin lieutenant would start these forms and circulate them for people to sign on this page?
A Correct.
Q Could you have filled out one of these forms yourself if you didn't see a form going around?

60

L. Bledsoe

A You mean type one of these up?
Q Correct.
A I could have started it with permission of the captain, you know, and everybody who attended and typed it but just for me out of the clear blue sky I wouldn't do it.
Q Do you recall times where one of these forms didn't get circulated and you attended outside of your duty hours, did you ever ask anyone for overtime or comp time?
A Yeah. We had a couple of meetings where the form never got circulated and bought up and say oh, we will type one up later. Since I have been here at MDC Brooklyn I am just saying I could be wrong but since all the meetings I attended that is all I ever got was four hours.
Q But the times that you said that people -- that a form wouldn't be circulated, are you telling me that someone said they were going to do it and maybe didn't?
A Correct.
Q Do you recall how often that occurred?
A I think it occurred quite often to

61

L. Bledsoe

be honest with you.
Q And you're saying it was the admin lieutenant who said I am going to type it up?
A But per deputy captain, you know, he said type one up and he said I take care of it and all this. Make sure everybody who is here.
Q On the times that one wasn't typed up and circulated, did you ever follow up with either -- did you ever follow up with the admin lieutenant and say where is the form?
A No, I didn't. I just come to the meetings just to keep them off my back. I just didn't want to hear the fuss. I attended meetings and whether I got paid or comp time or overtime I didn't really sweat it.
If I wanted time off, you see, I have thirteen hundred hours sick leave, if I have an emergency situation I would just burn it. I really didn't sweat getting paid or comp time because I had other things to do than chasing these guys around. They know what they have to do. I shouldn't have to chase them about attending the meeting. Everybody basically said the same they just showed up keep them happy. As

L. Bledsoe

far as getting paid comp time you get it, you get it, if not, oh well. And that is the way I personally looked at it attending these meetings half the time -- since I have been here, I could be wrong, I am just saying since I have been at Brooklyn the only time I got was these four hours. You might be able to find another one, it is possible. I am just saying I looked at my check stubs and only saw four hours, four hours, four hours, four hours and that was it.

Q Do you have any reason to believe that the time that you signed on there was incorrect, the amount of time?

A You know, they switched as far as the time there have been e-mail last minute changes and we have had them new time, new time if it says 7:30, it is 7:30 then it is correct.

Q Do you ever recall the times that you filled these out, do you ever recall the times being incorrect?

A No.

Q So on the occasions where these were not circulated, it was your choice not to pursue the matter with either the admin



L. Bledsoe

lieutenant or deputy captain?

A Basically I just gave up and that is what it was. I just gave up asking them.

Q Just so I am clear you could have filled out one of these forms yourself, you just chose not to?

A I never really asked. The captain says for me to do my own overtime, they prefer not either another lieutenant or the captain. But I am just saying I just pass on overtime and say here I wouldn't do it.

Q Is that typical for any type of overtime authorization putting aside lieutenants meetings, let's say you took an inmate to the hospital and the forms they fill out for that thing saying hospital duty with inmate Smith, who typically does those forms?

A Lieutenant.

Q Which lieutenant?

A The operations or the admin lieutenant. It could be whoever is on the desk at the time.

Q So whoever actually worked the shift or hours would then come and go to another



L. Bledsoe

lieutenant being the admin or ops lieutenant and informs him of the hours worked?

A Correct.

Q And asks for the overtime authorization?

A Yes.

Q So the procedure is to come to work, to ask another lieutenant to fill out your overtime for you as opposed to you filling it out yourself?

A Telling your hours -- if I worked overtime, had to take an inmate to the hospital at 8:00 and got back at noon then I would tell the operations lieutenant I just got back, took inmate Joe, put the inmate's name on there, took Joe to the hospital and lieutenant would type of overtime and then captain and AS signs off on it.

But for the lieutenants meetings itself that was an issue where most lieutenants would prefer, you know, admin lieutenant, the average lieutenant would not just go in there and type up for the lieutenants meetings. We prefer the admin lieutenant or deputy captain. Since I have been around I never saw a lieutenant just go



L. Bledsoe

ahead and type it up for himself for the lieutenants meetings.

Q You said there were times that the admin lieutenant said he was going to do it and didn't do it?

A Yes.

Q And on those occasions you chose not to pursue the matter further by either going to the admin lieutenant or deputy captain; is that correct?

A Correct. Just gave up.

Q Do you recall whether or not it is a particular admin lieutenant who has not filled out the forms or has it just varied?

A It has varied.

MS. COURTNEY: Can you mark that.

(Whereupon, a two-page document was received and marked as Bledsoe Deposition Exhibit 4 for identification, as of this date.)

Q Mr. Bledsoe, I am showing you what has been marked as Exhibit 4 to your deposition, you want to take a look at it and tell me when you are ready.

L. Bledsoe

(Witness is perusing the exhibit.)

A Okay.

Q Ready?

A Yes.

Q Do you recognize this as an overtime authorization form?

A Yes, ma'am.

Q On the second page do you see your name, date, times and signature?

A Yes, ma'am.

Q On the first page do you see that it is dated November 28th, 2000?

A Yes.

Q And do you see the purpose is to attend the monthly scheduled lieutenants meeting?

A Correct.

Q And under reason work cannot be accomplished during regular tours of duty, the reason given is the meeting was held on either on scheduled days off or time off?

A Yes.

Q And under -- whose signature is that, the first signature on the page it says -- the typewritten says S. LoPresti captain slash J.



L. Bledsoe

Sherman AW, do you recall which person signed or initialed that?

A Captain LoPresti.

Q Going down at the bottom where it says approved, is that Warden Hasty's signature?

A Correct.

Q Under time verified, can you tell me whose initials those are?

A I am not for certain. But I think that might be Lieutenant Snyder at the time.

Q And would Lieutenant Snyder likely have been acting as admin lieutenant for that quarter or at that time?

A Correct.

Q And this overtime authorization was completed prior to Mr. Sherman's e-mail, correct?

A Correct.

Q And just so we are clear, this overtime authorization, did you receive three hours of compensatory time?

A I signed up for it. I don't know if I -- it was keyed in.

Q Do you recall ever signing up like this and it not showing up on your time and



L. Bledsoe

attendance?

A I am not for sure.

MS. COURTNEY: Can you mark that, please.

(Whereupon, a two-page document was received and marked as Bledsoe Deposition Exhibit 5 for identification, as of this date.)

Q Mr. Bledsoe, I am showing you what has been marked Exhibit 5 to your deposition; want to take a look at it and let me know when you are ready.

(The witness is perusing the exhibit.)

A I am ready.

Q Do you recognize this as an overtime authorization form dated March 20th, 2001?

A Yes.

Q And on the second page do you see where you signed up for compensatory time that you did on March 20th, 2001 from 1 p.m. to 4 p.m.?

A Yes.



L. Bledsoe

Q Is that your signature on that page?

A Yes.

Q On the front page, do you see that the purpose of this form was to attend a mandatory lieutenants and department head meeting?

A Yes.

Q And is that Captain LoPresti's signature directly under the purpose and reason? It says warden or authorized supervisor.

A That is Warden Hasty down at the bottom.

Q I am talking the one towards the top, the first signature?

A Yes, I think that is Captain LoPresti.

Q And then you just said that is Warden Hasty's signature on the bottom under approved?

A Correct.

Q Under time verified and you see typewritten SL, do you have any idea who that is?

A No, I don't. I can't remember.

L. Bledsoe

Q That wouldn't be Mr. LoPresti again, would it?
A No.
Q Is it fair to say it likely is whoever was the admin lieutenant at the time?
A Yes.
Q You said earlier that there were times that these were not circulated or the person who was supposed to be doing them didn't, correct?
A Correct.
Q Can you tell me how many times that happened?
A I can't remember.
Q So you never kept a written record either in a calendar or journal of the times that you attended lieutenants meetings either on your day off or before or after your shift and were not compensated?
A Correct.
Q So it is the case that you can't tell us how many meetings that you attended and were not compensated for?
A That is correct.



L. Bledsoe

Q Aside from the pre- and post-shift that I discussed, I am talking about Brooklyn, the audits and lieutenants meeting, are there any other claims that we have not discussed with respect to Brooklyn?
A No, that is it.
Q Lieutenant Bledsoe, do you recall any discussions at the department head or lieutenants meetings about people doing work on their own time?
A I mean like lieutenants discussing or captains brought it to our attention? I don't understand.
Q Let me start with the department head part of the meeting, do you recall it ever being discussed at a department head meeting that people were not to be doing work on their own time?
A Recently, yes.
Q I am sorry, what do you mean by "recently"?
A The warden did do a memo not too long ago about, you know, when your time is up here, time for you to leave. Something that came



L. Bledsoe

out I forgot where it came from. He made sure everyone received one. But that is probably within the last couple of months I think.
Q Do you recall -- so you do recall the subject being brought up at department head meetings?
A Yes, ma'am.
Q Has the same subject ever been discussed at a lieutenant meeting?
A Yes.
Q Can you tell me the substance of that discussion?
A When your time is up it is time to leave unless you are going to talk -- let me see, what was it? Basically at the end of the shift you have to leave.
Q And do you recall when that discussion in the lieutenants meeting took place?
A I can't recall. I can't.
Q Can you say whether or not it was within the past year?
A Yes.
Q Can you recall something to that effect being said earlier in your time here at



L. Bledsoe

Brooklyn?
A No.
Q Can you recall who said that when your time is up it is time to leave?
A It was, um, I think it was Warden Zenk.
Q Do you recall whether or not you have ever heard Warden Zenk say the substance of that on more than one occasion?
A I think it was something in writing. He had something out in writing, that is all. He may have mentioned it on a couple of occasions.
Q Has the captain ever discussed doing work on your own time, if you recall?
A I don't recall.
Q Who is your current associate warden?
A Mr. Ey.
Q Do you recall Mr. Ey ever discussing this matter?
A He may have, I just don't remember.
Q I am going to show you what was marked as Exhibit 1 to Mr. Tacconi's deposition.

L. Bledsoe

I want you to take a look at it and tell me if this is the memo from the warden that you are talking about.

(Witness is perusing the exhibit.)

A Yes.

Q So this is the memo -- and did you say it was dated June 19th, 2003?

A Correct.

Q And it was sent to all staff so you would have received it on or about June 19th, 2003?

A Correct.

Q Do you recall whether or not you read it at that time?

A Yes, I did.

Q I am going to have you take a look at this again. I am directing you down to the third paragraph where it says while I appreciate the time and effort staff put forth to make sure the job is done right it is imperative that we follow the policy regarding portal-to-portal in issue associated so staff can be properly compensated for their work time.

Is it your understanding that the



L. Bledsoe

part that says policy regarding portal-to-portal allows you time within your shift to travel from the control center to your post?

A Yes.

Q I am sorry?

A Yes.

Q So it is your understanding that the policy regarding portal-to-portal allows you time within your shift to pick up equipment and travel to your duty post; is that correct?

A Correct.

Q And on the other side of that at the end of your shift the policy regarding portal-to-portal allows you time within your shift to travel to the control center and turn in your equipment at the end of the day?

A Yes.

MS. COURTNEY: Let's take a five minute break -- I am sorry, we are not going to take a break.

Q If I can direct you to the second paragraph, the second sentence says, while I recognize that it may at times be necessary to work beyond your scheduled hours to accomplish



L. Bledsoe

particular tasks federal law provides that you are to be compensated for the time worked.

It is your understanding that you can request overtime or comp time for doing things like staying to do your audits?

A Yes.

Q That is your understanding now?

A As of this memo, yes.

Q So prior to receiving this memo you're saying it was not your understanding that you could ask for time?

A Correct.

Q But you also told me early with respect to the audits you never asked either the captain or deputy captain for time, correct?

A Right.

Q I am showing you what has been marked as Exhibit 6 to Mr. Tacconi's deposition; if you just want to take a quick look through it and let me know when you are ready.

(Witness is perusing the exhibit.)

A Okay.

Q Do you recognize this as the notice of deposition?



L. Bledsoe

A Yes.

Q Have you seen this document before today?

A Yes, ma'am.

Q Do you recall when you first saw this document?

A I have got one -- I received one in the mail not long ago. And I think I might have one from previous mail because in the summer I am sure.

Q Do you see after the blue page there is a document request?

A Yes.

Q When you received this did you review the document request?

A Yes.

Q And did you bring in all of the documents that you felt were responsive to this request?

A Yes.

Q Aside from the document, the earning leave statements that you brought in, do you have any other earning leave statements other than those?

L. Bledsoe

A No.

Q So you received earnings leave every two weeks, correct?

A Correct.

Q Is it the case that you don't keep a copy?

A I shred most of them.

Q Do you keep any calendars or notebooks with respect to your working at MDC Brooklyn?

A Just on a monthly -- I just on my house note a little something like that. Planned events.

Q You're saying you write on a calendar at home?

A Yes.

Q What sort of information would you put on there about your work here at MDC Brooklyn?

A When I worked overtime or something like that or some kind of thing to do that month like a meeting. That is about it.

Q Are you saying you would put on there when you worked overtime?



L. Bledsoe

A OT, evening watch or morning watch something like that.

Q Are you talking about overtime that you know of in advance or overtime --

A Yeah.

Q Or after the fact you write overtime?

A After the fact.

Q Do you have your current calendar?

A Yeah.

Q And do you have any past calendars?

A It is at home hanging on the wall.

Q That is your current calendar, do you have any from years past?

A No.

Q So you don't still have your 2003 calendar anywhere?

A No.

MS. COURTNEY: We are going to ask for a copy of the calendar and hold the deposition open pending that being produced.

MR. BANOV: If you have any notes of the 2004 calendar regarding overtime



L. Bledsoe

bring it to me and make copies of them.

Q I am going to direct you a little further back there is a page that has like Exhibit 14 in the corner. If you can just kind of take a look at this letter and tell me whether or not it looks familiar to you.

A It looks familiar.

Q Do you recall receiving a letter similar to this?

A Yes, ma'am.

Q Did you keep a copy of that?

A Yes.

Q And I ask that that be produced as well.

MR. BANOV: You have it, give it to me and I will look at it and I will decide whether to produce it or not.

Q When you are talking about the overtime that you would note on your calendar, would that be overtime that you were compensated for like working at the hospital?

A Yes, ma'am.

Q Would it include overtime that you weren't compensated for?



L. Bledsoe

A No.

Q Would you note on the calendar when you attended a lieutenants meeting on your day off?

A No.

Q So is it your practice to make notes of your overtime and then throw out your calendar at the end of the year?

A Correct.

Q And has that been the time both while you were here at Brooklyn and Lewisburg?

A Correct.

Q And that has been your practice as well?

A Yes.

Q So there are no other activities we haven't discussed for which you are seeking compensation in this case?

A Can I make a comment? No, that is it.

Q I mean just want to make sure the lieutenants meetings, the audits and pre- and post-shift and that was at both Brooklyn and Lewisburg?

82

L. Bledsoe
A Yes, that is it.
Q Do you know who any of the other plaintiffs in this case are?
A This paper?
Q Aside from the paper, based on your own personal knowledge.
A No.
Q So you never discussed the case with anyone else?
A No.
Q Have you attended any meetings with any of the other plaintiffs in the case?
A Department heads meetings with the names right here?
Q No. Meetings about this case where this case was discussed, did you attend any meetings?
A No.
Q Have you ever filed for bankruptcy?
MR. BANOV: Objection, relevance. You can answer.
Q You can answer.
A No.
MS. COURTNEY: I have no more

83

L. Bledsoe
questions.
EXAMINATION BY
MR. BANOV:
Q You have in front of you Exhibit Number 1, your consent form, I don't have copies of the exhibit but I will show you your questionnaire.
MS. KIRCHNER: Anything you show him has to be marked.
MR. BANOV: This is the original. I am not going to have this one marked. If you want to make a copy of it we will make it.
MS. KIRCHNER: If you want to show me which you have maybe I can hand you a copy.
MR. BANOV: Do you have this questionnaire?
MS. KIRCHNER: I probably have an incomplete copy.
Let's take a quick break.
(Whereupon, a short recess was taken.)
MS. KIRCHNER: You can mark this

84

L. Bledsoe
for Mr. Banov, please.
(Whereupon, a multi-page document was received and marked as Bledsoe Deposition Exhibit 6 for identification, as of this date.)
Q Let me show you what has been marked as Defendant's Exhibit 6, do you recognize this document?
A Yes.
Q And what is that?
A Questionnaire that I had filled out.
Q Did you sign and date it?
A Yes.
Q Look at the end of this document, can you tell when you signed and dated?
A November 16th, 2000.
Q If you turn please to page number 6, do you see item number 7 where you start answering at MDC Brooklyn, do you see that?
A Yes.
Q What captain are you referring to there?
A Captain LoPresti.

85

L. Bledsoe
Q Do you recall when Captain LoPresti told you to be at a lieutenants meeting?
MS. COURTNEY: Can you read the whole section into the record, please.
A At MDC Brooklyn I was told by the captain to be at the lieutenants meeting at 1 p.m. once a month, meeting lasts until 4 p.m.
Q And below that?
A Also at USP Lewisburg captain told us to be at the lieutenants meetings at 8 a.m. meetings always lasted three hours. I missed one meeting at Lewisburg. At Lewisburg from August 3rd, '98 to May 20th, 2000.
Q Do you recall what Captain LoPresti told you regarding lieutenants meetings?
A He said lieutenants need to show up.
Q And do you recall when he said that?
A Said it at several meetings. I don't know any specific dates.
Q And what captain at Lewisburg told you to be at lieutenants meetings?
A Captain Lopez.

L. Bledsoe

Q On page 8 reference to Paul Rothbaum unit manager?
A Yes.
Q What institution was that at?
A FCI Fairton, New Jersey.
MS. COURTNEY: Objection to the extent that this is referring to his position as a correctional counselor at Fairton.
Q What did Paul Rothbaum say -- you say ordered me to work before shift, what did he say in that respect?
A Told us to be down at the unit at 7:30.
MS. COURTNEY: I continue to object to the entire line of questioning to the extent that is referring to the correctional counselor position.
Q And is that Louise or Louis? I can't read that. Is the name below Rothbaum somebody Lopez?
A Um, Louie Lopez. He was a captain slash AW. He was the captain in Lewisburg then he got promoted AW at Lewisburg.



L. Bledsoe

Q Did he order you to work before your shift began?
A Said you need to be there in your assigned area before the shift.
Q Did Paul Rothbaum's orders have any influence on you when you reported for work at Lewisburg?
MS. COURTNEY: Objection. It is outside the scope of the lawsuit and it is completely different institution.
Q Go ahead and answer.
Did Mr. Rothbaum's orders have any influence on your reporting to work at MDC Brooklyn?
MS. COURTNEY: Objection. Outside the scope of the lawsuit.
A Yes.
Q Did Louie Lopez' orders to you at Lewisburg influence you on reporting to work at MDC Brooklyn?
MS. COURTNEY: Objection, irrelevant.
A Yes.
Q Page 9 trying to figure out which



L. Bledsoe

position this applies to. Can you look at the entire questionnaire and tell us what this section for part B job information applies to, which position are you talking about here?
A Right here in the middle FCI Fairton. That is correctional counselor at FCI Fairton.
Q Are you saying that the job information for position two on page 9 is referring to Fairton?
A I am sorry.
Q Take your time.
A No, that is correctional lieutenant and immediate super was Captain Billy Ey. That was at Lewisburg.
Q So position two, the position you had as lieutenant at Lewisburg?
A Correct.
Q And page 10 do you see under 5B you have different times there for activities before your shift?
A Yes.
Q And your testimony here today can you explain why you put these times down here?



L. Bledsoe

A I was as a counselor, correctional counselor, I was picking up the mail. We had to be down the unit at 7:30 to get equipment radio and keys but swing past the mail room to pick up our mail and plus had to check on, see if we had any injury reports to take down to the unit, the housing unit.
Q Is this at Lewisburg?
A It was at Fairton.
Q Page 10 refers to Fairton?
A Yes. Page 9, section B2 pre-shift activities.
Q What position are you referring to?
A I am sorry, made a mistake, that was at Fairton.
Q Are you saying position two here is Fairton?
A I got kind of confused on that part.
Q The minutes you put down on here page 10, you said that is Fairton?
A Correct.
Q What position are you referring to on page 11?

L. Bledsoe
A I am not sure.
Q Looking at page 15 can you tell us what position this section is referring to, section 4, part C, job information for position three, what is that referring to here?
A Lewisburg.
Q Okay. Which part of this questionnaire refers to any claims you have regarding MDC Brooklyn?
A I don't know if I put it on here for Brooklyn. Let me see something, let me check. I didn't think I put down for Brooklyn.
Q And you started work for Brooklyn when?
A August of -- correction, May of 2000.
Q So that was six months before you filled this out, the questionnaire?
A Right.
MR. BANOV: Do you have a copy please of the second supplemental?
MS. KIRCHNER: You can use that to mark.
MR. BANOV: Can you please mark



L. Bledsoe
this as the next exhibit 7 I guess.
(Whereupon, a multi-page document was received and marked as Bledsoe Deposition Exhibit 7 for identification, as of this date.)
Q Let's go back if we could to Exhibit Number 6, the questionnaire which is right there. And can you please tell us which section deals with Lewisburg?
MS. COURTNEY: Objection. Asked and answered. He referred to starting on page 15 position 3.
Q I am asking about page 4, what position is on page 4?
MS. COURTNEY: Starting on page 3 you mean and continuing?
MR. BANOV: Yeah.
Q Are you talking about here starting on page 3 and continues on 4, 5, 6, 7, 8?
A That was at Fairton.
Q Looking then to page 10, does page 10 refer to Lewisburg?
MS. COURTNEY: Objection, leading.
A This was at Fairton. Yeah, it was



L. Bledsoe
at Fairton.
Q Fairton?
A Yes.
Q And then what position are you referring to then pages 15 -- look on page 16?
A 16?
Q Yes. What position is this?
MS. COURTNEY: Objection. Asked and answered.
Q Is this Lewisburg?
A Yes.
MS. COURTNEY: Leading.
MR. BANOV: He testified already before.
Q Let me ask you this. You testified before that at Lewisburg pre-shift overtime claim was for about five-and-a-half minutes going from the control center to the office and about five-and-a-half minutes going from the office to the control center; can you please explain why you put these times down here on page 16?
A When I was coming in the morning or leaving you have to go through the gates and I



L. Bledsoe
would just wait for the officers to leave, they line up. And I turn my stuff in at night at 10:30 have officers leave and turn in their keys and radio. I had to turn my radio and keys in so I had to just wait. My keys and radio.
Q I am asking you to explain the difference in the time that you have down at page 16 with the testimony today?
A Yes, I just cut the time in half looking at it and reduction in time.
Q Why did you do that?
A To be honest with you I just benefit of the doubt considering the officers and just reduce it so.
Q Look please on page 17, how much time did you indicate there for total post-shift time?
A Fifteen minutes. Okay, twenty-three minutes I had took -- I look at that and I reconsidered it and shot that in half.
Q Shot that in half?
A Yes.
Q Why did you do that?
A Hang on a second. That was

L. Bledsoe

probably about reasonable.
Q I can't hear.
A I reduced it probably within reason twenty-three minutes I just took a look and thought about the whole situation and just reconsidered.
Q Do you recognize Deposition Exhibit Number 7?
A Yes.
Q And what is that?
A Questionnaire.
Q Is that BOP3 second supplemental backpay questionnaire?
A Yes.
Q Did you complete this?
A Yes, I did.
Q And look on page 19, please, you see when you signed that?
A March 11th, 2003.
Q Look on page 3, please, do you see question 2A, can you read it into the record what you wrote in your handwriting which says "my supervisor"?
A My supervisors always told me to



L. Bledsoe

pick up my equipment at 7:30 same as the ops memo number 214-95. I was early and picked up my keys before 7:30.
Q What supervisors always told you to pick up your equipment at 7:30?
A That was Rothbaum. Yeah, Mr. Rothbaum.
Q Any other supervisor besides Mr. Rothbaum?
A I think Mr. Lopez he had told us to be on our post. He said be there at 6, he wants you on the post at 6, Captain Lopez at Lewisburg.
Q Can you go to page 5, please, what position does this apply to?
A Correctional counselor.
Q And that was at what institution?
A FCI Fairton, New Jersey.
Q You see number two?
A Yes.
Q Read the record "I was told"?
MS. COURTNEY: Objection to the testimony regarding his position at Fairton.
A Read it?



L. Bledsoe

Q Claiming at that time it is evidence, it is value for the rest of the case.
A I was told to be at post before 7:30 a.m., we argued this issue off and on.
Q Who told you to be at your post before 7:30 a.m.?
A That was Mr. Rothbaum, unit manager.
Q And who did you argue with issues off and on?
A Mr. Rothbaum.
Q What was the argument essentially?
A We was telling him that at 7:30 we can be picking up the mail, stop past pick up the incident reports and then make it down to the unit. But Mr. Rothbaum said no, you need to be down in the unit at 7:30 .
Q On page 3, number 6, can you read into the record what your answer is number 6?
MS. COURTNEY: Same objection as before.
A Told by the unit manager to be in the housing unit at 7:30 a.m., had to walk a block to my unit same -- sum of two blocks.



L. Bledsoe

Q What manager are you referring to there?
A Mr. Rothbaum.
Q Page 6 what position are you referring to here?
A At Lewisburg lieutenant.
Q Question number 2, can you read it into the record, your answer that you wrote?
A Did you pick up keys or equipment from control center on your way to your assignment.
Q Please explain the basis for your answer, what did you write after that?
A Told to be on post at scheduled time, no credit for picking up equipment. That is my problem.
Q Who told you to be on the post at your scheduled time?
A That is Mr. Lopez, captain.
Q What exactly did Captain Lopez say in this regard?
A I think they brought it up at a meeting that could we pick the keys up at 6:00 or whatever and then be on your way down. He

L. Bledsoe

said you need to be on your post at 6:00.

Q Did Captain Lopez say something about no credit for picking up equipment or that is your problem?

MS. COURTNEY: Objection, leading.

Q Did he make any statements to this regard?

A It was at a meeting he made a comment like that, Captain Lopez.

Q And can you explain why you put six minutes for question number 4?

A Sometime come in the morning time to pick up keys it would be a little crowded out there and I had to wait to pick up the keys and radios. A little slower officers in the control center.

Q How much time did you typically have to wait in line?

A Six minutes or something like that. Five or six minutes.

Q And at the end of the shift, how long did you wait in the key line?

A I put down fourteen minutes but usually I would just wait about six, seven



L. Bledsoe

minutes until the officers leave and then I just go up there and wait, they hand their keys and equipment to turn in. I just wait. Get in line and wait.

Q What position are you referring to on page 7?

A Lieutenant.

Q At?

A At Lewisburg.

Q Is it the same institution that you have in position number 2?

A Wait a minute, let me see something. I am sorry, this is position 2 is at Lewisburg. Three this is at Brooklyn.

Q Look on page 7 the answer you gave to number 2 where you wrote down "must be," read that in the record?

A Lieutenant must be on post before time indicated on roster.

Q Why did you write that?

A I think somebody made that up. Somebody made a comment at a meeting or something, that we had to be there on time everyone, all staff.



L. Bledsoe

Q Do you recall the name of the position of the person who made that statement?

A I think Mr. Betler might have made a comment like that. Maybe Captain Betler.

Q Do you serve under a post orders? Have you served under any post orders in MDC Brooklyn?

A Yes.

Q Did those post orders indicate when you are supposed to be on your duty post?

A Yes.

Q Do you have any copies of those post orders?

A I don't have copies. I can get copies.

Q If you can get copies we appreciate it.

Did you serve under any post orders under Lewisburg?

A Yes.

Q Did those post orders indicate when you should be on your duty post?

A Yes.

Q Do of the post orders at Lewisburg



L. Bledsoe

indicate how long you should stay at your duty post before leaving?

A I am not sure.

MS. COURTNEY: Objection. The document speaks for itself.

Q Do the post orders at Brooklyn indicate how long you have to be at your post?

MS. COURTNEY: Objection. The document speaks for itself.

MR. BANOV: We don't have a document to show us this.

A We have starting time and when your shift ends.

Q And can you explain on page 7 here why you wrote down sixteen minutes under number 4?

A At the time I was thinking I spend that much time waiting for keys and I slash the time down.

Q Why did you do that?

A Just reduced the time. Reconsidered, put it like that.

Q Why did you put six minutes for waiting in key line at the end of your shift

102

L. Bledsoe

number 5?
A When I get off work sometimes -- when I get off work I have to turn in my -- I guess waiting for the elevator come up out of there.
Q Do you know how many officers are normally in the control center at MDC Brooklyn?
A On what shift?
Q Any shift.
A Varies.
Q Explain how many officers are in the control center on different shifts?
A On day watch there is three, evening watch three and then morning watch there is two. But sometimes they will pull that number three.
Q Sometimes they?
A Pull number three out of control and reassign him to a post. So be two officers up in there.
Q On which shift?
A Can be any shift. On day watch and evening watch.
Q They pull the third officer out of

103

L. Bledsoe

the control center, does it affect the time for staff to go through the key line?
A Yes, it does.
Q And how would that have an impact on the time in the control line?
A Number three officer is the one who issues the keys and radios, body alarms and stuff. If he gets pulled the number two would have to issue it and then take number two usually scan the cameras and monitor doors. So it would cause problems there. And the number three person just responsible to issue passing out keys and most of the time the number three person doesn't have much time then.
Q You said something before about the time you spent on your off days or off hours doing audits, do your managers know that you worked on your off days or after hours to do audits?
MS. COURTNEY: Objection, ambiguous.
A Yes, they saw me in civilian clothes. Yes, they know I was working.
Q Did you tell them what you were doing?

104

L. Bledsoe

A Yes, I told them.
Q Did they have any comments about your working on your off days or after hours?
A They didn't say nothing.
Q Do you wish to clarify any of your answers to questions that I have asked you or Ms. Courtney asked you?
A The only thing that I would have to say did I ever ask my captain about getting paid for overtime and comp time. I didn't ask him because somebody else asked him. And they give him some kind of answer like it was a direct answer, you know, you signed this and we will take care of it and you get the comp time. And somebody made a comment one time, comp time? And say yeah, that is what we gonna give you and that was it.
Q Do you know who asked the captain about that, do you recall?
A I think it was Lieutenant Lang.
Q At what institution was this?
A Right here.
Q MDC Brooklyn?
A Correct.

105

L. Bledsoe

Q And who was Lieutenant Lang talking to, what captain?
A I think Captain Betler, deputy captain.
Q Anything else you want to say?
A That is it.
MR. BANOV: Okay.
FURTHER EXAMINATION BY MS. COURTNEY:
Q Mr. Bledsoe, did you give truthful answers to all of your questions that I asked you today?
A Yes, ma'am.
Q I want you to take a look at Deposition Exhibit 6 which is a questionnaire, the big one.
A Okay.
Q Did you find filling out this questionnaire to be confusing?
A Somewhat.
Q Did you think the testimony that you gave today in response to my questions are more accurate than the questionnaire?
A I am not for sure.

L. Bledsoe

Q Okay. If I can get you to go to page 9 in Exhibit 6.
A Okay.
Q And I believe you told Mr. Banov you thought this was for Fairton?
A Yes.
Q Under number 2 where it says name and position of your immediate supervisor?
A Yes.
Q Did you write Captain Bill Ey?
A Correct.
Q Was Captain Bill Ey your supervisor at FCI Fairton?
A No.
Q Can I also ask you to look at page 15?
A Okay.
Q And I believe you told Mr. Banov that these pages referred to your time at Lewisburg?
A Okay.
Q Under number 2 where it says name and position of your immediate supervisor, does it say Captain LoPresti?



L. Bledsoe

A Correct.
Q Was Captain LoPresti your supervisor at Lewisburg?
A No, he wasn't.
Q Go to number 4 where it talks about the shift and dates, on shift you have 5/20/2000 through 6/18/2000 and then 6/19/2000 to present?
MR. BANOV: What page?
MS. COURTNEY: I am still on page 15.
Q Is it correct to say those are not the dates that you were at Lewisburg?
A Correct.
Q Are you sure about what positions are being referred to on the various pages of this questionnaire?
A I might have one, two questions mixed up.
Q Okay. Can I have you take a look at Deposition Exhibit 7, it is the other questionnaire. If I can have you look at page 6.
A Page 6?
Q Yes. I believe this position 2 I believe you told Mr. Banov this refers to your



L. Bledsoe

time at Lewisburg?
A Okay.
Q Is that correct, that is what you told Mr. Banov?
MR. BANOV: Objection. His testimony speaks for itself. Go ahead answer the question.
A I told him it was for Lewisburg?
Q Correct.
A Correct.
Q Do you recall telling me that when you were at Lewisburg you would occasionally -- the only thing you would pick up is the battery and on occasion you bypass the control center and came back at a later time based on the line?
A Correct.
Q So you weren't waiting in the key line every day at Lewisburg; is that correct?
A Not every day.
Q And there were days at the end of your shift when you would not have to go to key line, you could simply exit the institution?
A Correct.
Q Do you feel that the responses you



L. Bledsoe

gave to my questions are more accurate than this questionnaire?
A I am not sure.
Q The conversation that you were talking about with Mr. Banov where another lieutenant had a conversation with the deputy captain, were you present for that conversation?
A In reference to?
Q Do you actually hear the conversation or was it relayed to you by another person?
A I was sitting right there. Anything I brought up it was not no second hand information. I was sitting there.

(Continued on the following page.)

L. Bledsoe

MS. COURTNEY: I have no know further questions but we are holding it open pending collection of further documents.

(Time noted: 12:04 p.m.)

______________________

LINDSEY BLEDSOE

Subscribed and sworn to before me this ____ day of _________, 2004.

______________________________

Notary Public



INDEX TO TESTIMONY

| | Page | Line |
|---|---|---|
| Examination by Ms. Courtney | 3 | 6 |
| | 105 | 9 |
| Examination by Mr. Banov | 83 | 3 |

INDEX TO BLEDSOE DEPOSITION EXHIBITS

| Description | Page | Line |
|---|---|---|
| 1 Two-page document Consent to representation | 9 | 13 |
| 2 One-page document e-mail 5/30/01 | 47 | 24 |
| 3 Three-page document T&A pay period 16 8/13/00 | 56 | 17 |
| 4 Two-page document overtime authorization 11/28/00 | 65 | 17 |
| 5 Two-page document overtime authorization 3/20/01 | 68 | 4 |
| 6 Multi-page document Questionnaire | 83 | 25 |
| 7 Multi-page document Questionnaire | 90 | 25 |

INDEX TO REQUESTS

| | Page | Line |
|---|---|---|
| Copy of his 2004 calendar | 79 | 20 |



CERTIFICATION

I, MARIA CIRILLO, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness. I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this _____ day of February, 2004.

__________________________