IN THE UNITED STATES COURT OF FEDERAL CLAIMS

. . . . . . . . . . . . . . . . . . . . . . . . X

GARY L. AARON, et al., DARYL A. AABERG, et al., CHARLES CARLSEN, JR., et al., JOSE L. ACEBAL, et al., FRIEDA ADKINS, et al., BUDDY J. ADELSBERGER, et al., ANGIE CRUZ ALDRIDGE, et al., MICHAEL ATTY, et al., JANINE A. BANKS, et al., DENNIS AVRIPAS, et al.,

Plaintiffs,

Nos. 00-315C, 00-454C, 00-617C, 01-47C, 01-313C, 01-314C, 01-480C, 02-35C, 03-446C, 03-2363C

-against-

THE UNITED STATES,

Defendant.

. . . . . . . . . . . . . . . . . . . . . . . . X

80 29th Street
Brooklyn, New York

January 30th, 2004
1:50 p.m.

DEPOSITION of WILLIAM HARRY EY, JR., the Non-Party witness, taken on behalf of the Plaintiffs, pursuant to Notice, held at the above-mentioned time and place, before Maria Cirillo, a Notary Public of the State of New York.

A 1250

W. Ey, Jr.

of time from 12/28/03 to 3/27/04?

MS. KIRCHNER: Objection.
Ambiguous, confusing, compound.

Q Go ahead.

A For the most part. They are given a quarterly assignment if something was to happen, i.e., a staff member gets hurt, he can't work his post. We need to fill that post and it is a critical post such as the control center then we get with the union, we reassign other staff members that are qualified to work those posts. But for the most part this is their quarterly assignment, yes.

Q You are familiar with post orders, are you not?

A Yes, I am.

Q And you have served post orders, right?

A Yes.

Q What generally are post orders?

A They are an outline of procedures to help the staff member work a particular post telling them the basic ins and outs of what they should be looking for and what they should be

W. Ey, Jr.

doing. It is a guideline, you know, they are not in stone but gives them a guideline to what they should be doing and when they should be doing it.

Q Just a guideline?

A Just a guideline.

Q Why is it called order?

A I don't know, you have to ask somebody. They come up with that many years ago.

Q Did you ever discipline an employee for not following a post order?

A Have I?

Q Yes.

A No.

Q Have you seen any employees disciplined at any institution for not following a post order?

A Yes.

Q What institution?

A Terre Haute, Lewisburg, Cumberland.

Q And what did the employees do on those occasions where they didn't follow the post orders?

A They violated security procedures.

Q And those procedures were engraved

W. Ey, Jr.

in stone, right?

A No, they are guidelines.

Q Let me show you Exhibits 21, 22 and 23. I know these predated your arrival here. These are dated March 19th, 2000 but are you familiar with what these are in general?

A Yes.

Q And tell us generally what Exhibits 21, 22 and 23 are.

A 21 are specific post orders for the operations lieutenant. 22 are the specific post orders for the activities lieutenant prepared for day watch. And 23 activities lieutenant special orders.

Q I notice on Exhibit 21 it says shift at the top 12 a.m. to 8 a.m.?

A Yes.

Q I see 12 a.m. count time?

A Yes.

Q Does this post order indicate that the employee was supposed to begin the midnight count at 12 a.m. midnight?

MS. KIRCHNER: Objection, ambiguous.

A Well, this post order specifies a

W. Ey, Jr.

count time will start at that time. The lieutenant doesn't count.

Q That person, the lieutenant assists with the responsibility of taking the count?

A No.

Q What role, if any, does the operations lieutenant have under this post order with respect to the midnight count?

A He is here to insure that they are conducting the counts. And if there is a bad count of course he would take appropriate procedures to insure that all the inmates are here. There are certain things that we have to do. But for the most part he is here to insure that all the officers are here and the count is being conducted in an orderly and professional manner and that is it.

Q How many counts are held at the MDC Brooklyn in a twenty-four hour period?

A There are five counts.

Q Are they at certain times?

A Yes, very specific times. Actually there are six on the weekends.

Q During the weekdays when are the

W. Ey, Jr.

five?

A 12:01 we actually say. Then 3 a.m., 5 a.m.. There is a 4:00 p.m. and then there is a 10 p.m.

Q And the weekends there is six?

A There is one during the day at 10:30 a.m. on the weekends.

Q So what, if anything, would the morning watch lieutenant do with respect to the midnight count under the post order which is Exhibit 21?

A Like I said he would assume his duties at 12. And let me clarify this. If you pulled a correctional officer's post orders it is going to say 12 a.m. As I said these are guidelines. The count doesn't start until the control center announces the count to start. It may start at 12:01. It may start at 12:05. It may start at 12:30. It depends on if they moved inmates around. If there is something else going on. It is not in stone.

Once the count starts then the operations lieutenant is in his office. If they have a bad count or he may go out and walk around

W. Ey, Jr.

and make sure they are counting correctly while the count is conducting. Counts ordinarily take anywhere from thirty minutes to an hour depending on how fast the people are that are counting. Everybody does it at their own pace. You have to back up the count. There is a lot of little things that go into this. So because it says 12 don't think it is going to happen at 12:00 because that is not the way it happens.

Q Would the operations lieutenant on the morning shift have to be at his post at some point before or during the midnight count?

A His post is in the institution. So would he have to be in the institution? Yes.

Q But this is a post for operations lieutenant, right?

A Right.

Q And where does the operations lieutenant normally go as part of his job?

A You are sitting in it. This institution is his post. He is the warden after hours. His post could be the break room, it could be the lieutenant's office, it could be in the front lounge, it could be the control center,

W. Ey, Jr.

it could be wherever he would like it to be as long as he is within the confines of this institution.

Q Let me ask you this, wouldn't the operations lieutenant on this shift be required to be at the lieutenant's office at some point at or during the midnight count?

MS. KIRCHNER: Objection, compound.

A That would be his call. It is not required.

Q I read the normal routine paragraph here in the first paragraph on Exhibit 21 and it says, among other things, on the third sentence proceed to lieutenant's office and receive any pertinent information from the evening watch lieutenant, pass on any relevant information to the oncoming shift, et cetera.

At what point under this post order would the operations lieutenant engage in that task?

MS. KIRCHNER: Objection, compound.

A I can't speak for the lieutenant. He can do it at the beginning of his shift upon arriving immediately. He could meet the evening

W. Ey, Jr.

operations lieutenant needs in order to do his job?

A Yes, that is true.

Q It makes sense for the operations lieutenant to get those keys earlier on during the shift, early in the shift?

A At the beginning of his shift, yes.

Q Especially because the operations lieutenant has to go around the institution to different places he would need to have those keys before he can do that, right?

A Yes.

Q Then on page 3, it says, 8 a.m. pass on any pertinent information to the day watch operations lieutenant, turn in all equipment, relieved of duty. MDC Brooklyn didn't expect the operations lieutenant to do all of that at one time, right?

A Pass on pertinent information and turn in all equipment. Well, they are exchanging equipment. As far as passing on information I think they can walk and talk at the same time so, yeah.

Q And then after that they would

W. Ey, Jr.

still have to go to the control center to leave, right?

A Yes, that is true.

Q Would the operations lieutenant on the morning watch have to drop off anything at the control center on the way out?

A Shouldn't have to.

Q Back in 2000 do they?

A Shouldn't have to. I mean they should just exchange the stuff and that would have been good. Shouldn't have to.

Q And page 4 is a post order for operations lieutenant for 7:45 to 4:15 shift?

A Yes.

Q And then page 7 is a post order for operations lieutenant from 4 p.m. to 12 a.m.?

A Yes.

Q And on this 4 to 12 shift under 4:00 p.m. it has a paragraph starting, report for duty in the proper uniform, et cetera?

A Yes.

Q Did the Bureau of Prisons expect this lieutenant to do all of the things in that paragraph at 4:00?

MS. KIRCHNER: Objection, compound.

A Yeah, it doesn't look like a lot to me. All he has to do is exchange the information, exchange the keys and radio out and go to roll call.

Q Get cuffs and a radio and go to the lieutenant's office?

A First of all lieutenants usually have their own cuffs. So that is in case they don't. And exchange the radios that is a matter of me handing a radio to you and you taking it.

Q They obtain the radio at the control center?

A No.

Q Do they get batteries at the control center?

A They get the batteries as they need them.

Q Isn't it smart for them to get batteries each time they come on, extra battery?

A Is it smart?

Q Yes.

A Not if they don't need them.

Q Does somebody in the control center

test the batteries before they give them to the people that need them?

A Yes. They show a green light if they are charged. They are in a charger, they only give them batteries that are charged.

Q And at 4:00 there is an official stand up count?

A Right.

Q So there is a count at 4 p.m. that you mentioned?

A Right.

Q And this indicates here that apparently at 4:00 that the operations lieutenant will begin the evening watch paperwork; is that correct?

MS. KIRCHNER: Objection. Confusing, ambiguous.

A As I said I will say it again. These are guidelines. They can start the paperwork when they need to start the paperwork. As far as starting the paperwork is they type the lieutenant's log when they need to during their shift. They can go after the 4:00 count starts and go and take the count. They can take one

W. Ey, Jr.

later on in the day. It is up to them.

Q Let me ask you, have you told any lieutenants at MDC Brooklyn that their post orders are just guidelines?

A I don't have to tell them, they tell staff that all the time. As a lieutenant you are trained to tell the correctional officers these are not in stone, these are guidelines.

Q I am asking you, have you told any lieutenants --

A Have I told them?

Q -- at MDC Brooklyn that they are guidelines?

A No.

Q Have you told any lieutenants at MDC Brooklyn these are just suggestions and not engraved in stone?

A No.

Q Well, is there any problems that you think with lieutenants at MDC Brooklyn all believe that these were just guidelines and not orders?

A I hope they believe that.

Q You hope that they believe?

W. Ey, Jr.

A Right, because they are guidelines. They are trained when they are young lieutenants, it doesn't have to be at Brooklyn, that post orders are just guidelines. They are not engraved in stone. That is the bureau standard.

Q Is there a document that says that?

A No, it is just good correctional practice.

Q Have you seen any documents that describes the overall purpose of post orders?

A Other than the post orders?

Q Other than the post orders themselves. Is there a description in the BOP personnel manual that describes post orders?

A Correctional services manual 5500-10 I think now.

Q 5500-10?

A Yes.

Q What is your recollection about what it says about post orders?

A It describes what should be in a post order, how many sections are in a post order because there is more than one. And what generally should be in -- applied into the post

W. Ey, Jr.

order.

Q You drafted post orders?

A Oh, yes.

Q Don't you want the employees covered by the post orders to follow those post orders?

MS. KIRCHNER: Objection, ambiguous.

A I want them to follow the post orders as a guideline, yes.

Q Did anybody ever tell you that in this deposition you should indicate that post orders are just guidelines and not firm orders?

A No.

Q When did you develop the idea that they are just guidelines?

A When I was a young correctional officer in 1988 Talladega, Alabama.

MR. BANOV: Off the record.

(Discussion off the record.)

Q Do you recognize Exhibit Number 28?

A It is an e-mail but I have not seen it before.

Q Do you recognize Exhibit Number 30?

A Once again an e-mail from the old

W. Ey, Jr.

deputy captain.

Q You have never seen it before?

A No.

Q Have you seen Exhibit 31 before?

A Yes, I have seen this when I first arrived.

Q What is Exhibit 31?

A It is Warden Hasty's schedule of meetings throughout the week.

Q Did Warden Hasty hold department head meetings generally at 1 p.m. on Tuesday?

A Yes, every other -- on payday weeks.

Q Every other Tuesday?

A Every other Tuesday, yes.

Q And then the last pay week Tuesday of the month he would have a combined department head lieutenants meetings?

A Yes.

Q And were department heads required to attend both of those meetings?

A If they were scheduled working at that they were. If they were on duty.

Q If they were not scheduled to work,

W. Ey, Jr.

were they required to appear at those meetings?

A No, they were not. They have somebody fill in for them.

Q A secretary took down the attendance at the department head meetings at MDC Brooklyn?

A Yes. The warden's secretary does that, yes.

Q And the secretary indicates who is present and who is absent among the department heads?

A Yes.

Q So you're saying that if a department head meeting was held at a time when a department head was not normally scheduled to work he or she wouldn't have to attend that meeting?

A That is true.

Q And that has been true all during your presence at MDC Brooklyn?

A Yes.

Q Do you recognize Exhibit 32?

A It is an e-mail from the AW that I replaced.

W. Ey, Jr.

Q Are you aware of anyone who has stood in the key line at MDC Brooklyn or to make note of the arrival times of non-bargaining unit employees?

A No.

Q At MDC Brooklyn have you kept track of your subordinates' time and attendance?

A Yes.

Q How so?

A By their T&A, their 71s when they arrive and when they go on annual leave. This type of thing.

Q Have you stood at the lobby of the control center to notice when they arrive?

A No.

Q Have there been any kind of discipline or penalties of any of the non-bargaining unit staff under your supervision who have arrived after the start of their shift at MDC Brooklyn?

A No.

Q Do you have the authority to schedule overtime at MDC Brooklyn?

A I have the authority to approve it,

yes. Schedule it, yes.

Q And anybody else have the power to schedule or approve overtime?

A The other associate wardens.

Q And the warden?

A The warden he authorizes and approves it.

MR. BANOV: I have a lot more. I have a lot more. What I would like to do really is adjourn this deposition for today so I can get Warden Zenk.

MS. KIRCHNER: I am not going to agree to that. We are here to finish his deposition.

MR. BANOV: Well, then we are going to be here for a lot longer.

MS. KIRCHNER: Before we started Mr. Ey's deposition you estimated an hour-and-a-half. We are here to finish his deposition. So please ask whatever other questions you have.

MR. BANOV: One of these days your inflexibility is going to come back and bite you in the behind and it just did.

would support my clients' contention in this case? Any facts that would support their claims in any way?

A I am not aware of any, no.

MR. BANOV: Okay. I am going to stop here for the day. And as I said I have a lot of questions I could ask you if I wanted to be thrifty about it but not sufficient time allowed for all the questions I need to ask. I will excuse you for today and they can ask you questions, not ask you questions, whatever it is. I want the warden next.

MS. KIRCHNER: I will not agree to a continuation. I will just ask a couple of questions of the witness.

I am directing your attention to Exhibit 21 could you just read the note on the last page of Exhibit 21 into the record.

MR. BANOV: It speaks for itself. You are wasting time. I object, this is wasting time.

THE WITNESS: There will be no

W. Ey, Jr.

additions or deletions to this post orders without the written authorization of the captain. Post orders are issued as a guideline for supervisors assigned to the post orders and are not intended to describe in detail all of the supervisor's responsibilities. Supervisors assigned to the posts are expected to use good judgment and initiative in all situations not specifically covered in these instructions.

MS. KIRCHNER: I think he has excused you.

MR. BANOV: I have no further questions today.

(Continued on the following page.)

IN THE U.S. COURT OF FEDERAL CLAIMS

---

GARY L. AARON, et al,

Plaintiffs,

- against -

THE UNITED STATES OF AMERICA,

Defendant.

---

July 21, 2004

9:17 a.m.

CONTINUED DEPOSITION of WILLIAM H. EY, JR., a non-party witness herein, pursuant to Notice, held at The Metropolitan Detention Center, 80 29th Avenue, Brooklyn, New York, before Dana A. Daufeldt, Certified Shorthand Reporter, Registered Professional Reporter, and a Notary Public of the State of New York.

Ey

Q. Post orders.

A. Excuse me? This is a post order, yes.

Q. Ops lieutenants?

A. Yes.

Q. 8:00 a.m.?

A. 7:45, okay.

Q. Before that, the post orders in that exhibit, first one is 12:00 a.m. to 8:00 a.m.?

A. That's right.

Q. At midnight, where is that employee supposed to be?

A. At midnight, where is he supposed to be?

Q. Yes.

A. In the institution.

Q. Where in that institution is that lieutenant supposed to be?

A. Where in the institution?

Q. Yeah.

A. He would be -- probably at 12:00 he would be in the lieutenant's office I would imagine or on his way there.

Q. Is it a 12:00 a.m. count time?

Ey

A. 12:01, yeah, 12:00, yeah.

MS. KIRCHNER: Alan, please be sure you speak directly into the phone.

MR. BANOV: I am trying to. I am doing the best I can.

Q. The operations lieutenant at midnight on that shift is supposed to be in the lieutenant's office?

A. He doesn't necessarily have to be in the lieutenant's office, but he needs to be in the institution.

Q. He is supposed to be in the lieutenant's office at midnight?

A. Excuse me?

Q. I thought you said he was supposed to be in the lieutenant's office at midnight.

A. You said where would he be, I said probably in the lieutenant's office.

Q. Look to those post orders in that same exhibit, the post order for the operations lieutenant of the 4:00 p.m. to midnight shift, the third post order in that group of exhibits.

A. Okay. I got it.

Q. Turn, please, Mr. Eye, to the Page 9

Ey

at the bottom.

A. Okay.

Q. "Notify the morning watch lieutenant of any pertinent information."

A. Yes.

Q. Where is the operation lieutenant supposed to be at that time?

A. Where is he supposed to be?

Q. Yes.

A. Talking to the lieutenant who was coming on working morning watch.

Q. The lieutenant would have to be communicating at that time with the lieutenant who is on the 4:00 p.m. to midnight shift, right?

A. Yes.

Q. The employee who is leaving then, after advising the morning watch lieutenant of any pertinent information, is that employee supposed to go to the control center and leave?

MS. KIRCHNER: Objection. Ambiguous.

A. They would brief each other, okay, and change equipment. Then once he was briefed he would leave through the control center, yes.

Q. At that point he would turn in

Ey

whatever equipment or keys he had, right?

A. No. Because they would exchange equipment on post.

Q. But you still have to walk from a duty post to the control center after briefing the incoming morning watch lieutenant?

A. That is true.

Q. The exchange of information --

A. I didn't hear. Sorry.

Q. They have exchanged that information, are the employees not on shift?

MS. KIRCHNER: We did not hear your last question. Please repeat your last question.

Q. At the time that information is exchanged, are those lieutenants not on a regular shift?

MS. KIRCHNER: Objection. Ambiguous.

A. When they exchange information, okay, they both are on the clock until they exchange their equipment.

Q. How could that be if one of their shifts ends at midnight, the other one begins at midnight?

Ey

A. As I said before in my last deposition, these post orders are guidelines. They are not written in stone and at times can vary.

If somebody comes in, you know, and they relieve each other, it doesn't take more than a couple of minutes to exchange information and equipment as long as there is not an emergency going on.

Q. In a couple of minutes. It might occur at 12:00 or 12:03 or 12:05, right?

A. It could.

Q. Now, if employees do not arrive at their duty post before the beginning of their shift, wouldn't the BOP discipline them?

MS. KIRCHNER: Objection. Ambiguous.

A. If they were extremely late and didn't call anybody, yes. But if they were just coming to work and they were a little late and they didn't notify anybody, they would be listed AWOL, yes. But if they were just exchanging information, you know, that would be within a couple of minutes.

Q. What do you mean by "extremely late"?

Ey

A. Not to my knowledge.

Q. How would they know not to leave their post too early?

MS. KIRCHNER: Objection. Vague and ambiguous, compound.

A. I think you are confusing the issues here a little bit. What I mean by that is when you say "post", for instance, the unit manager, I will use them as an example. They have a unit, okay; and that is their area of responsibility.

But throughout the whole day, that unit manager does not remain in that unit. He has other things he has to do. He moves around, goes to other departments, goes to meetings, does a lot of other things.

He does not have to remain in that unit until 4 o'clock. He could be standing in the front entrance at 4 o'clock. That is perfectly acceptable. He knows that. He knows that through years of experience and through being a supervisor.

Lieutenants know. They don't have to be in the lieutenants' office. As a matter of fact, we encourage them not to be in the

Ey

lieutenants' office. We encourage them to be out moving around, walking around. They can be anywhere in the institution. They can meet their relief down front if they wanted to. That is their decision.

Q. Are there department heads who are supposed to keep their offices open a certain period of time during the day?

A. Let me think.

Q. Like the Chaplin maybe?

A. No. Department heads, no. They have subordinates who work for them that can remain there. So I can't think of anyone as a department head that has to remain there until right at 4 o'clock for instance.

Q. Lieutenants you say exchange keys and equipment, don't have to drop off keys or equipment at a control center; is that correct?

A. Not if they are being relieved.

Q. If they are being relieved, they don't need to drop it off at the control center?

A. No, they do not. They exchange wherever they are at within the institution.

Q. Are there other employees who

Ey

Q. At the bottom, you have the authority to schedule the overtime at MDC? You said, "I have the authority to approve it".

MS. KIRCHNER: Do you have the authority to schedule it?

Q. He said, "I have the authority to approve it", right? The question is: Who else has the authority to approve overtime at MDC Brooklyn?

A. The warden.

Q. Anybody else?

A. Other AWs.

Q. Anybody else?

A. That's it.

Q. Okay. Have you been involved in scheduling overtime for any non-bargaining unit employees at MDC Brooklyn?

A. Have I been?

Q. Yes.

A. Yes.

Q. Examples, please?

A. Lieutenant that is to work overtime because somebody called in sick and we don't have enough people, the captain can get with me and I

Ey

tell him, "Yeah, that's fine. Go ahead."

You want another example?

Q. That would be a situation where somebody has to come in on their off day?

A. Not necessarily. That could be after their prior shift that they just worked.

Q. Staying longer?

A. Yes. We call them a double.

Q. So how are they compensated for the time they spent in overtime work on such an occasion?

A. Time and a half.

Q. And is that also for employees who are GS-12 and above?

A. No. GS-12s, it is a little different situation. If it is scheduled prior to the week, then I have to authorize it. If it comes up during the week, it would be something that they call me up and say, "Hey, sir, I would like to stay over because I have some work to do", then they get compensated by comp time.

Q. What about the situation you talked about where someone is sick and can't come in and you ask someone, "Can you please stay over, work

Ey

Let me suggest, Domenique, you can excuse Mr. Ey. How about if we take a break here? Norberto is going to take the other depositions. You have to hang up and call back in five minutes.

MS. KIRCHNER: Alan, I have one question for the witness.

MR. BANOV: What is that?

MS. KIRCHNER: Are you finished?

MR. BANOV: No. I had other questions.

MS. KIRCHNER: Are you finished speaking?

MR. BANOV: Yes.

EXAMINATION BY
MS. KIRCHNER:

Q. Could you turn to Exhibit 21? You have in front of you the post orders for the operations lieutenant for the 12 o'clock a.m. to 8 o'clock a.m. shift; is that correct?

A. That is correct.

Q. Okay. Does that post order require the operations lieutenant for that shift to be in the lieutenant's office at 12 o'clock a.m.?

Ey

A. No.

MS. KIRCHNER: No more questions.

Okay, Alan. We will do what you said. We will call you back.

[Time noted: 10:24 a.m.]

______________________________

WILLIAM EY, JR.

Subscribed and sworn to before me this _________ day of _________________, 2004.

_________________________

Notary Public