A F T E R N O O N  S E S S I O N

(1:29 p.m.)

Whereupon,

DOUGLAS K. WHITE

having been duly sworn, was called as a witness and was examined and testified as follows:

THE COURT: All right. Please have a seat while we wait for everybody.

Before I forget, I need to reflect that this morning with the agreement of the parties we did a site visit at the Otisville FCI, met the warden at the A-1 building, and he escorted us through the public and employee entrance there at the A-1 building and showed us the chitboard for people reporting for work and took us out the first sallyport doors.

And then we walked over to the control center where we had our brief demonstration of how chits are exchanged for keys and equipment and put on the board there. We went through the second sallyport doors and walked down to the lieutenant's office and spoke briefly with Cpt. White and walked around the lieutenant's office briefly, and then exited the facility. On the way out, we drove past the training center and the remote camp. What was the camp called?

MS. HEISER: Satellite camp.

out. If there are no grievances, then the roster is sent around for signature, reviewed by the union, and then signed off by myself, the AW, and then finally approval of the warden. Then it's posted.

Q What information does the quarterly roster provide to the lieutenants?

A For the lieutenants, it tells them the assignments for the quarter they'll be working.

Q Does it provide their shift starting and stopping times?

A It doesn't provide the time. It provides the shift by day watch, evening watch, morning watch.

Q Does the roster tell the operations lieutenant where in the institution he must be at the start of his shift?

A No.

Q Please turn in the exhibit books starting with Exhibit 21. All right. Captain, I'm going to take you through a series of exhibits and ask you to identify them. Please direct your attention to Exhibit 21. What's Exhibit 21?

A Exhibit 21 is FCI Otisville's quarterly roster assignment for the lieutenants from June 18, 2000, to September 16, 2000; for the officers July 2, 2000, to September 30, 2000.

overtime, or do you want to work the overtime?

THE COURT: Well, you said the warden authorizes overtime, but it sounds like you're the one making the call to have somebody to come in to work overtime.

THE WITNESS: Yes, we have that authority to man our shifts, and then I inform the AW and the warden of my actions.

THE COURT: Afterwards?

THE WITNESS: Yes, and then the overtime sheet is signed off, prepared and signed off by the lieutenant. I as the supervisor sign off on it. The AW reviews it, and the warden signs the approval of that overtime.

BY MS. KIRCHNER:

Q Under the procedures that you established for the period beginning March 27, 2005, did the day watch operations lieutenant receive pertinent information and keys and equipment from the morning watch?

A He received keys and equipment and information that lieutenant passed on to him that things that happened on his shift on the morning watch.

Q How long did that take?

A I can only speak for myself when I was a lieutenant. That could take 30 seconds to a minute, and it also depends on the events that happened on that shift.

THE COURT: Well, you're in that office at what time of day normally? What shift do you work?

THE WITNESS: My hours are 7:30 to 4:00 p.m.

THE COURT: So you're there at the beginning of the day shift?

THE WITNESS: Yes.

THE COURT: Now, was your question directed to his observation of what happens during that changeover?

MS. KIRCHNER: I was asking first of all about the period beginning March 27, 2005, when the operations lieutenant had a shift starting at 8:00, and I asked, under the procedures you established for the period beginning March 27, 2005, how long did it take the operations lieutenant day watch shift to receive pertinent information, keys, and equipment from the morning watch?

THE COURT: If you're able to answer based on your observation of what was happening between the officers that I saw this morning.

THE WITNESS: The reason it's difficult for

MR. BANOV: Objection, foundation.

MS. KIRCHNER: He's already told us that he saw it.

THE COURT: I'll permit him to answer based on his prior testimony that he saw it on a few occasions.

THE WITNESS: Again, it depends on the events of that day. The lieutenant takes a few seconds to take the keys, hand it to him, take the radio and hand it to the lieutenant that's coming on, say to him, this is what happened on my shift, read the logs, you could see 583 packet on the desk, 30 seconds to a minute.

Now, for what I observe is I look in the lieutenant's log to see the activities for that day, and I see that at the relief at 4 p.m. there's annotations that they were relieved of duty by the lieutenant, and they received pertinent information passed on, and none of it indicates past their duty times.

BY MS. KIRCHNER:

Q And are you looking at Exhibit 52?

A 52, page 2.

Q And can you read into the record what you're referring to on page 2 of Exhibit 52?

A On Tuesday, May 31, 2005, where the operations lieutenant was P. Shea, his ending shift ended at 4 p.m., and his entry was relieved of duty by Lt. Carluzzi and Hill, and evening watch and all pertinent information passed on.

Q Now, when you served as an operations lieutenant, did you pass on keys and equipment and pertinent information to your relief?

A Yes.

Q How long did that take you?

A It took me, depending on that day, 30 to a minute, maybe two minutes.

THE COURT: I guess you're going to have to tell us 30 what?

THE WITNESS: Thirty minutes. Thirty seconds -- excuse me -- to a minute and sometimes two minutes.

THE COURT: Is there a coffee pot in that suite of offices?

THE WITNESS: Yes.

THE COURT: Does that tend to be a gathering point for people?

THE WITNESS: Actually, in Otisville, we kind of discouraged other staff coming in there. At one time, they had the unit team boxes in the

THE COURT: That's not normally where they're assigned?

THE WITNESS: Yeah, they used to be assigned there. Part of their area is that front part of the lieutenant's office, and also we assigned them to the metal detector.

THE COURT: Okay. Where in those suite of offices is the operations lieutenant assigned or where do they keep their desks or do they have a desk?

THE WITNESS: Yes, they work out of that office to the right of my office.

THE COURT: Okay. So it that the first one you see when you walk in the door on the right?

THE WITNESS: No, they don't use that area. They always use the area where my office is at off to the right.

THE COURT: All right. And what information is kept physically there that would allow one lieutenant to learn what's happened the preceding shift?

THE WITNESS: They have access to the computer on the O drive and on the groups, on the correctional services lieutenant's log file he has.

THE COURT: I'm sorry. The lieutenant's log is what we've been looking at?

question is yes. Is that right that if that debriefing, if one took place, would either be on somebody's outgoing shift and the other person is there early or that person is staying late, and do you have two people there?

THE WITNESS: Two people there, yes.

THE COURT: And there's no overlap?

THE WITNESS: Right.

THE COURT: Okay. What's the longest you ever spent debriefing somebody as a lieutenant?

THE WITNESS: The longest I've stayed is two, three minutes.

THE COURT: All right. If you had a real disaster in some of your prior assignments, that wouldn't have required a longer period of debriefing?

THE WITNESS: If I'm staying past 15 minutes, I was compensated for my overtime. I had to do the 583 and continue on, and I've had occasions when I've worked overtime in Brooklyn because of that, and I was compensated.

THE COURT: Now, would that have been possible under your captainship at Otisville?

THE WITNESS: Yes, if the lieutenant informed me that he stayed past his duty time, then he would be entitled to overtime, and I would compensate him.

there, a lot of the staff lived in PA, Pennsylvania, and up near the Scranton area.

THE COURT: Well, it would be fairly hard for them to time their arrivals, wouldn't it? I mean, they'd be cutting it close. They'd be taking a big risk, wouldn't they, if they didn't plan on arriving early?

THE WITNESS: I could tell you from living in Brooklyn my shift started at 7:30 or 7:45. I new I had to get in the tunnel before 6:30, and I would sit out in my vehicle in the parking lot until it was time. I read the newspaper or catch me some Zs before that. When I first arrived at Otisville, I had that same practice, and people thought I was spying on their time, so I had to adjust my drive time to be there.

THE COURT: Okay. Go ahead.

BY MS. KIRCHNER:

Q At the change of shift between the morning watch operations lieutenant and the day watch operations lieutenant, what type of information is typically conveyed?

A The information that is normally conveyed is, how are you doing; this is what happened on the shift; here's your keys; here's your radio; and then

sometimes they would have personal conversations with each other.

Q At the change of shift between the operations lieutenants, were any documents conveyed?

A There could be the lieutenant's log, the roster, maybe some memorandum that I gave the day watch lieutenant to pass on to the evening watch or to give to the morning watch, maybe we're having some vehicles coming in early at the very date that the morning watch lieutenant needed to know about.

Q Is much of the information about the prior shift contained in written document?

A The prior shift would normally be covered in the lieutenant's log. If there's a report of incident, there are packets of the 583 or 586.

Q And where is the 583 form kept?

A A hard copy is normally prepared and put in a six-part folder. The other can be pulled off the O drive off the computer.

THE COURT: Who prints that out?

THE WITNESS: Either the lieutenant that generated the 583 or the oncoming could go in and print up a copy of it.

THE COURT: Okay.

//

could take longer in the event of a real disaster. Do you recall that?

A Yes.

Q So were there various factors that would affect the length of a briefing?

A Yes, and again if the lieutenant stayed past their duty time, then they would be entitled to overtime.

Q And if you had a real disaster, would you have all sorts of officials in the prison?

A Yes.

Q Would you be there?

A Yes.

Q Would the warden be there?

A Yes.

Q Would it matter what shift it was?

A Well, it does because then that means if it's at midnight, they would be calling at my home, and I would have to report into the institution the same as the warden.

Q But either way you would be there?

A I would have to come in.

Q Now, you told us earlier that when you came to Otisville, the shifts for the operations lieutenants were 7:30 to 4:00 p.m., 4:00 p.m. to

in the office, or I'm preparing to leave myself at 4:00.

THE COURT: I'm going to sustain. Very rarely is not enough if you want to pursue it.

MS. KIRCHNER: He's already testified that he's seen it.

THE COURT: Well, if by seeing it you mean very rarely, is that what you mean?

MS. KIRCHNER: Can I ask a few more questions, Your Honor?

THE COURT: Yes, go ahead.

BY MS. KIRCHNER:

Q You testified earlier that you have seen the day watch operations lieutenant pass on pertinent information, keys, and equipment to the evening watch and get back his chits, is that correct? Have you seen that occur?

A For that 2004 period or --

Q Okay. Referring to the period when the shifts are 7:30 to 4:00 p.m., 4:00 p.m. to midnight, midnight to 8 a.m., when those are the shifts for the operations lieutenants, have you seen the exchange of information and keys and equipment between the two operations lieutenants, the day watch and the evening watch?

A Yes.

Q And how long did it take when you observed it.

MR. BANOV: Objection, foundation. One is frequency, and the other has to do with no foundation showing he timed it.

THE COURT: Well, if that's going to be the basis for doing anything, we can dump everybody's testimony. No, you're welcome to pursue that on cross-examination. I think it's already in the record that that was infrequent.

To the extent that you ever saw it, roughly by observation, how long did it take?

THE WITNESS: A few minutes.

THE COURT: Okay. "Few" matters here. Few as in 1 to 2, or 5 to 10?

THE WITNESS: Again, it could take 30 seconds, a minute, two minutes. It's really based on how well that lieutenant wants to pass on information. He actually controls how he passes that information, how long it takes him.

THE COURT: So during this period of time, they would not be exchanging equipment, is that right?

THE WITNESS: No. They would be exchanging chits. I mean, yes. Chits or equipment. The

lieutenant would stop by control center and exchange his chits for the offgoing chits, and the oncoming would carry those chits down to the lieutenant's office and give them his chits, and he would receive the keys and radio.

THE COURT: Okay.

BY MS. KIRCHNER:

Q Can you as captain at FCI Otisville readily time with a stopwatch the exchange of pertinent information and keys and equipment between the two operations lieutenants at the change of shifts?

A No.

Q Why not?

A It's really impractical for me to devote that much time to watching the lieutenants and using a stopwatch to time them because then I wouldn't be able to be there for the exchange for the evening to the morning watch to be fair and consistent.

Q Can you as captain at Otisville assign another lieutenant to watch the two operations lieutenants and time with a stopwatch the amount of time it takes for the two operations lieutenants to exchange information, keys, and a radio?

A I wouldn't want to assign a lieutenant to do that duty because it would be a conflict of interest

as far as another lieutenant supervising that lieutenant and watching him exchange that equipment. And when people know you're watching them, they're going to do it right. It takes away any saying that, hey, it took me five minutes, and I know it didn't take you five minutes because I was watching you.

Q Can you as captain assign a correctional officer to monitor the two operations lieutenants and time with a stopwatch the amount of time it takes them to swap the keys and radio and exchange pertinent information?

MR. BANOV: Objection, relevancy.

THE COURT: On what basis?

MR. BANOV: Relevance.

THE COURT: I'll overrule it. Go ahead.

THE WITNESS: No. It wouldn't be practical for me as the captain to assign an officer to supervise a lieutenant and the time that it takes him to exchange equipment.

BY MS. KIRCHNER:

Q Would it be practical for you to keep track of all these seconds or minutes that are spent in the two operations lieutenants exchanging keys and radio and pertinent information?

A No. It would not be practical for me to

utilize my time in monitoring the exchange between both lieutenants.

Q Now, at Otisville when an operations lieutenant, for example, works 10 minutes after the end of his shift and lets you know that he's worked 10 minutes after the end of the shift and you approve that 10 minutes, how much is he paid?

A He's entitled to 15 minutes of overtime.

Q And why does he get 15 minutes of overtime for 10 minutes of work?

A Because overtime is paid in increments of 15 minutes.

Q Please identify for us Exhibit 38. Could you identify Exhibit 38?

A That is the FCI Otisville quarterly roster for the third quarter of 2004, October, November, and December, 9-26-2004 to 12-25-2004.

Q Please identify Exhibit 43.

A FCI Otisville quarterly roster, second quarter 2005, July, August, and September, 6-26-2005 to 9-24-2005.

//

//

//

//

they would catch each other outside the office and do the exchange there.

THE WITNESS: Outside the office.

THE COURT: Right out in that hallway, that breezeway outside, I gather?

THE WITNESS: That's still the complex of the lieutenant's office.

THE COURT: Okay. I mean in the outer doors there. I don't know where it took place. Somebody said that it didn't take place right in the lieutenant's offices; it took place outside.

THE WITNESS: I didn't testify to that.

THE COURT: Okay. All right.

THE WITNESS: What my testimony was is the lieutenants they do the exchange in the lieutenant's office, or they could do it up in front of control center.

THE COURT: Yes. Is that what you were asking about to compare?

MR. BANOV: Which was more frequent.

THE COURT: Yes, which of those happened more often?

THE WITNESS: Again, it would have been the lieutenant's office.

MR. BANOV: Thank you.

that lieutenants spend in the key line at the control center vary?

A Sometimes they do vary.

Q Right. And doesn't it depend in part on how much staff are in the control center?

A And it also depends on the shift.

Q And does it depend on how many people are ahead of him in line?

A It depends on people in the line. Now, there's times I've observed where the officer would give the lieutenant his chits and there'd be a line and they go up to the front of the line.

MR. BANOV: I move to strike that as not responsive.

THE COURT: No. Given the vagueness of some of these questions, I'll allow it.

I assume these operations lieutenants, incoming and outgoing, were not supposed to meet each other in the key line?

THE WITNESS: The lieutenants have a full reign of the institution, so he's not working a fixed post. So if the lieutenant getting off may have something to do, he could go up to the front of Control and exchange equipment. There wasn't nothing that I mandatoried them that they had to do it in the

lieutenant's office.

THE COURT: But I mean if somebody's leaving, they're in a hurry, they've got a softball game they've got to go to, can they just meet the incoming lieutenant in the key line back before March of last year?

THE WITNESS: (Nonverbal response.)

MS. KIRCHNER: Can we have an oral response on the record?

THE WITNESS: Yes. Excuse me. Yes. I'm sorry.

BY MR. BANOV:

Q Isn't it true that in 2006 the operations lieutenant coming on still had to obtain equipment to do his or her job?

A Can you rephrase that question?

Q Isn't it true there's still an exchange of equipment despite the change in the practice for where it's done?

MS. KIRCHNER: Can I ask that he repeat it? I'm sorry. I just didn't hear, Mr. Banov.

BY MR. BANOV:

Q Okay. Isn't it true that there is still an exchange of equipment between incoming and outgoing lieutenants?

line..." Do you see that paragraph?

A Yes, sir.

Q I don't know if there's a number there or not, and then it says, "If an employee arrives at the key line in a reasonable time to get equipment prior to the shift but does not receive the equipment/keys by the beginning of his shift, this employee is not to be considered late." Do you see that?

A Yes, sir.

Q Is that the current policy of the Bureau of Prisons?

A That was the policy at that time, and, yes, it is current as of this date when you're referencing standing in the key line in front of the control center.

Q Now, isn't it true that when an outgoing lieutenant gives information in a packet to the incoming lieutenant, that can take a few minutes?

A Seconds.

Q Seconds? It's not a few minutes?

A It would be seconds. You said "handing to him." Handing is just giving it to him.

Q Isn't it true that the outgoing lieutenant may give the incoming lieutenant a packet with information, right?

Douglas K. White

| | |
|---|---|
| 05/90-08/93 | USP Leavenworth, GS-6/7 Correctional officer |
| 08/93-12/94 | MDC Brooklyn, GS-8 Senior Officer Specialist |
| 12/94-12/95 | MDC Brooklyn, GS-9 Lieutenant |
| 12/95-08/02 | MDC Brooklyn, GS-11 Lieutenant |
| 08/02-08/03 | MDC Brooklyn, GS-12 Deputy Captain |
| 08/03-present | FCI Otisville, GS-12 Captain |

GOVERNMENT EXHIBIT 66

PENGAD-Bayonne, N.J.

short break?

THE COURT: Yes. Now, who do we have next? Mr. Miraglia is going to be tomorrow. Is that right?

MR. BANOV: Yes, Your Honor.

THE COURT: Capt. Haynes?

MS. KIRCHNER: Right.

THE COURT: Let's take a five minute break.

(Whereupon, a short recess was taken.)

THE COURT: We're back on the record.

MS. KIRCHNER: Your Honor, Ms. Turner will examine this witness.

THE COURT: All right.

Whereupon,

ANTHONY HAYNES

having been duly sworn, was called as a witness and was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TURNER:

Q Good afternoon, Mr. Haynes.

A Hello.

Q Could you please state your name and spell your name?

A Anthony Haynes. That's A-N-T-H-O-N-Y, H-A-Y-N-E-S.

Q And Mr. Haynes, who is your current employer?

shift at FCI Fairton, I would do one of two things. I'd come on shift. I'd go to the control center. Exchange my chits for his chits or her chits. Go down to wherever they were at which normally was the lieutenant's office, but wherever they were at on the compound, et cetera, wherever they were at, exchange equipment, the chits for the equipment. I would receive the equipment and that's how I would relieve them.

The second way I could relieve them is, I could go down straight through the control center sallyport, to the lieutenant's office or wherever the shift lieutenant was at, give them my chits for the equipment, and they could drop my chits off at the control center and get theirs and go home.

Q As an operations lieutenant at FCI Fairton did you have to exchange information and exchange the chit for keys and equipment?

A Yes.

Q Approximately how many times did you as an operations lieutenant exchange your keys and radio for a chit and exchange pertinent information?

A Several times in a 2½ year period.

Q Can you give an estimate of the number of times that you exchanged equipment and information?

A Depending on the roster and the post, it could be five times a week in a five-day period.

THE COURT: Is it routine you would do it every time you would leave somebody that you would do both the equipment/chit exchange and exchange information?

THE WITNESS: Yes, sir. How I would do it is, if I could give an example.

THE COURT: Yes.

THE WITNESS: If I came on and I was relieving you, I would come in with my chits, exchange the equipment. At the same time I was exchanging equipment I'd be asking -- if I was the one that was coming on shift, I'd ask you anything hot, pressing, anything going on? At the same time, I'm exchanging the equipment, getting the keys, and that would be the simple way to do it.

If you were relieving me, you'd come on and I'd say, to give you an example, as we were exchanging equipment I'd say shift was quiet, or I had a couple of fights, locked up some inmates in the special housing unit. Nothing else going on. The lieutenant's log is done, et cetera. So in my timeframe of doing that, I've done it several times.

THE COURT: I'm assuming that it basically

happened every time.

THE WITNESS: Yes, any time depending on what happened during that day. Sometimes it could be as simple as I'm exchanging equipment. It was a quiet shift, nothing going on.

THE COURT: But you'd tell somebody nothing was going on.

THE WITNESS: Yes, I would tell the oncoming or the outgoing nothing's going on. It was a quiet shift. Every time you did an exchange, it would take a couple of seconds to make that transaction as you're doing that.

BY MS. TURNER:

Q Mr. Haynes, were you the captain at FCI Otisville?

A Yes.

Q And when you were the captain at FCI Otisville, who did you report to?

A Associate Warden Joe Wilner.

Q Who was the warden at FCI Otisville when you were the captain there?

A Fredrick Menifee.

Q And what were your most important duties as captain at FCI Otisville?

A The security of the entire facility grounds

for the operations lieutenants to do their jobs?

A Yes.

Q What type of equipment is required in order for the operations lieutenants to do their jobs?

A They need a radio and keys.

Q And where in the institution were the operations lieutenant's duties accomplished?

A Throughout the whole prison grounds, inside the secure walls to include outside.

Q And were the operations lieutenants required to be mobile when they accomplished their job duties?

A Most definitely.

Q What were the primary duties of the operations lieutenant?

A That's the person who would be in charge of the operations, the orderly running of the institution and the daily events. So that's the person that was the key security enforcer to enforce policies, et cetera during that shift.

Q What were the shifts of the operations lieutenants when you were at FCI Otisville?

A They had a morning watch shift from midnight to 8 a.m., a day watch shift from 7:30 to 4:00 and an evening watch shift from 4:00 to 12:00.

Q And were the shifts of the operations

Q Why not?

A When I was a lieutenant, and I speak for myself, again my exchange of information, et cetera would take me a couple of seconds to change over the keys and equipment, give them my briefing, and again if there was something that needed to be passed on, I would tell them -- lieutenant's log is done; we had a fight and the inmates are locked up in the special housing unit, the packet is on the desk, it's completed; or we had a couple of incident reports left I didn't get to, if you could take care of that, or whatever it may be, depending on what's going on that day. But it doesn't take long to do that exchange. It didn't take me long.

Q Did the briefing between the day watch operations lieutenant and the evening watch operations lieutenant have to be verbal?

A It didn't have to be verbal but you're going to say something about the shift, you know. But they could look at the lieutenant's log. They could look at the box where they had incident reports, et cetera, but they're going to have documents there they could read if they had to.

Q At the end of the day watch operations lieutenant shift, did he have to exchange equipment

for a chit with the incoming lieutenant?

A Yes, during my tour they did.

Q How long should that take?

A I didn't time it, but probably two or three seconds. Maybe five seconds because they do need to exchange and count the keys, so depending on who you are.

Q When you were the captain at FCI Otisville did Mr. Shea ever ask you for compensation for staying late to brief the evening watch lieutenant when he worked the day watch shift?

A No, he did not.

Q When you were the captain at FCI Otisville did Mr. Shea ever ask you for compensation for staying late to exchange chits for equipment when he worked the day watch operations lieutenant shift?

A No, he didn't.

Q Did Mr. Shea ever ask you for compensation for staying late to complete lieutenant logs when he worked the day watch operations lieutenant shift?

A No.

Q If the evening watch operations lieutenant arrived late, did the day watch operations lieutenant have to stay until he was relieved?

A He or she would have to notify me if they

Q As the evening watch operations lieutenant walked to the lieutenant's office at 4:00 from the control center, did inmates normally approach him?

A Let me go back to that other question you asked.

Q Sure.

A Because in the post orders, I believe that some of the post orders that I'd written -- it says go to the lieutenant's office and exchange your equipment and stuff like that. That was a guideline under my tour and I didn't say if I caught them exchanging equipment out in front of the lieutenant's office or at the control center or in the front lobby that they were going to be penalized by me. So I want to make sure that is clear.

Q So when you were the captain at FCI Otisville were there various locations where lieutenants exchanged information and equipment?

A It would ordinarily be in the lieutenant's office.

Q Okay. As the evening watch operations lieutenant walked from the control center to the lieutenant's office at 4 p.m., did inmates normally approach him?

A I would say no. There should not be any

inmates having a problem.

Q Why not?

A They should be secured in their cells being counted.

Q When you were the captain at FCI Otisville did you ever observe the exchange of information and equipment in front of the control center?

A I cannot say I recall that. It's possible. I just can't honestly say if I have or not.

Q When you were the captain at FCI Otisville, were you aware of any lieutenants who exchanged information and equipment in front of the control center?

MR. BANOV: Objection.

THE COURT: I think he's answered that one.

MS. TURNER: Never mind then.

BY MS. TURNER:

Q When you were the captain at FCI Otisville did you ever observe lieutenants exchanging information and equipment?

A Yes.

Q How long did that take?

A It could be anywhere from, again as I stated earlier, 30 seconds to a minute to two minutes depending what else was going on.

Q What kind of factors impact how long it takes to convey pertinent information at the end of a shift?

A From my experience as operations lieutenant, again if you're talking just Bureau transactions, if you're talking about you're coming in, you're exchanging equipment for the keys, you're stating that something happened on the shift or if it didn't, you're using the logs and you're giving examples of things that you have, I can do an exchange in 30 seconds or less to pass on the information. That's my experience.

Things that can change the times on that is each individual person. I mean, are you talking straight job info or are you throwing in stuff about the ball game last night? Are you talking about events and stuff like that? So if you're coming in -- some staff are talkative, some aren't.

Q When you were the captain at FCI Otisville did the Bureau of Prisons have any policies prohibiting chatting during the exchange of information and equipment?

A Not that I'm aware of.

Q Do some lieutenants convey more information than other lieutenants?

A Most definitely.

Q When you were the captain at FCI Otisville would it have been practical for you to assign a lieutenant the responsibility of following around the other lieutenants on a daily basis with a stopwatch to time the exchange of equipment and information?

A No, it would not be practical.

Q Why not?

A Because here is how you look at it. Number 1, you'd have to have somebody assigned to every shift 24 hours a day, seven days a week. Number 2, it would disrupt orderly running of the institution when you have a fellow employee spying on another employee. That's going to bring down morale. That's going to bring down all kinds of disruption in my opinion of emotions, et cetera in the correctional environment. It would not be practical.

Q When you were the captain at FCI Otisville, would it have been practical for you to follow the operations lieutenants around on a daily basis to time the exchange of equipment and information?

A No, during my tour as captain -- first of all that operations lieutenant is the right hand person of that captain, the right hand person, as well as the AW and the warden. The have the total control

of that institution. So if I need to follow around an operations lieutenant to watch what time they come to work, what they're doing, et cetera, then I might as well be working the shift. It's all about trust and integrity and also loyalty of what you're getting paid to do. That would not be practical.

Q Is it practical for the operations lieutenants themselves to time each other to figure out how long it takes them to exchange keys, equipment and pertinent information?

A No, it's not.

Q Why not?

A Because again you're talking about staff who work together. If one person can't trust the other person to do their job, you're going to have a lot of disruption within the work force. You're going to have personal issues and problems, et cetera. Staff just needs to do what they're supposed to do.

THE COURT: Ms. Kirchner, speaking of trusting our colleagues, why don't we start going cold turkey on one attorney at a time?

MS. KIRCHNER: Yes, Your Honor.

MR. BANOV: You read my mind, Your Honor.

THE COURT: Okay. Go ahead.

BY MS. TURNER:

compensation for coming in early to receive
information from the day watch lieutenant?

A No.

Q When you were the captain at Otisville did
Mr. Shea ever ask you for compensation for coming in
early to exchange his chit for equipment when he was
the evening watch operations lieutenant?

A No.

Q Did Mr. Shea ever ask you for compensation
for coming in early to read the lieutenant's log when
he was the evening watch operations lieutenant?

A No, he did not.

Q Did Mr. Shea ever ask you for compensation
for coming in early to read the confidential reports
when he was the evening watch operations lieutenant?

A No.

Q Where normally was the evening watch
operations lieutenant at about 12 a.m.?

A Ordinarily in the lieutenant's office
waiting to be relieved.

Q Did the evening watch operations lieutenant
provide information to the incoming lieutenant?

A He or she could have, yes.

Q And how long should that take?

A How long should --

Q How long did that take?

A Again speaking for myself as the operations lieutenant, it would take me anywhere from 30 seconds to two minutes depending on what was going on.

Q Did the evening watch operations lieutenant have to exchange equipment for a chit at the end of a shift?

A Yes.

Q How long would that take?

A I would say a couple seconds to exchange the radio and equipment. I'd say, you know, it would take five seconds. It depends on the employee. You do have to count your keys and get the radio so, you know, you're looking at five seconds. Three, five, 10 seconds. It depends on who the person is.

Q Should it take more than 30 seconds?

A No.

Q Did Mr. Shea ever ask you for compensation for staying late to brief the incoming lieutenant when he was assigned to the evening watch operations lieutenant shift?

A No.

Q Did Mr. Shea ever ask you for compensation for staying late to exchange chits for equipment when he worked the evening watch operations lieutenant

get, sir, would be during the exchange of the keys and equipment if there was just anything to pass on. Other than that, he can look at the evening watch operations lieutenant's log. The lieutenant's log could give any pertinent information. So he could exchange or look at the log.

THE COURT: Can one operations lieutenant tell another operations lieutenant what has to be done?

THE WITNESS: No, sir. They're talking about what may have occurred on the shift before, any pertinent information.

THE COURT: I'm looking at the word instruction.

THE WITNESS: Yes, it could be anything that came down. For instance, if he was going to have a medical trip on that shift, hey the medical trip paperwork is on the clipboard. Make sure you get the guy out at 5:00. You know, certain things like that could have been.

That wouldn't actually be the operations lieutenant on one shift telling the other operations lieutenant what to do. It would just let him know you have a medical trip on that shift. So it's just kind of like a reminder, pertinent information, and also

giving him instructions on some of the things that might take place on their shift.

BY MS. TURNER:

Q Did the receipt of pertinent information and instructions from the evening watch lieutenant have to be verbal?

A No, it did not.

Q Were there written documents in the lieutenant's office that the morning watch operations lieutenant --

THE COURT: I believe he answered that earlier.

MS. TURNER: Okay.

BY MS. TURNER:

Q Did the post orders for the morning watch operations lieutenant require that he check the lieutenant's clipboard for pending releases, furloughs, bus movements, marshall's releases or commitments?

A Yes.

Q Did the post orders for the morning watch operations lieutenant require that he come in early in order to check the lieutenant's clipboard for pending releases, furloughs, bus movements, marshall's releases or commitments?

A No.

THE COURT: What's the capacity of Otisville in terms of prisoners?

THE WITNESS: I believe it's 1,300, 1,400.

THE COURT: Okay.

THE WITNESS: They triple bumped it. So I don't know if the number has gone up.

THE COURT: Usually it's pretty full?

THE WITNESS: Yes.

BY MS. TURNER:

Q Was it necessary for Mr. Shea to come in half an hour early as the morning watch operations lieutenant to drop off his chits at the control center, walk to the lieutenant's office and receive information and equipment?

A No.

Q Why not?

A The morning watch shift you don't have as much traffic anyway as you do on the day shift, number one. Number two, you come in and you do the exchange again 30 seconds to two minutes depending on the person. It's not necessary to come in 30 minutes early before your shift.

Q Did Mr. Shea ever ask you for compensation for coming in early to receive information as the

Q Where normally was the morning watch operations lieutenant at 8 a.m.?

A Probably the lieutenant's office.

Q What was he doing in the lieutenant's office?

A Probably waiting to be relieved.

Q Did he provide information to the incoming lieutenant?

A Yes.

Q And how long should that take for the morning watch operations lieutenant to provide information to the incoming lieutenant?

A Well, I would say all shifts would be the same timeframe, 30 seconds to -- it depends on the person.

Q Did Mr. Shea ever ask you for compensation for staying late to brief the incoming lieutenant when he worked the morning watch operations lieutenant shift?

A No, he did not.

THE COURT: Let's short circuit this. Did he ask voluntarily for post or preliminary work to your recollection?

THE WITNESS: Never, sir.

BY MS. TURNER:

do that?

THE WITNESS: No, sir. However, your presence -- that shift operations lieutenant comes on shift, I might even come in through the control center second sallyport door, and I see you on the compound. I approach you on that compound and I've made my presence known because I'm there.

THE COURT: I misunderstood the question. Which language were you referring to?

MS. TURNER: Your Honor, the language that states, "Establish your presence with the shift lieutenant."

THE COURT: Okay. Sorry. Go ahead.

BY MS. TURNER:

Q Mr. Haynes, how long would it take a lieutenant to place a chit on the accountability board at FCI Otisville?

A A second or two.

Q Mr. Haynes, how long would it normally take an operations lieutenant to count the keys?

A It depends on that person -- a couple of seconds to count the keys. It just depends on who that person is.

MS. TURNER: I have nothing further, Your Honor.

ANTHONY HAYNES

| | | |
|---|---|---|
| July 1992 - Aug 1994 | GS-6/7 | Correctional Officer, FCI Tallahassee, FL |
| Aug 1994 - Oct 1996 | GS–8 | Correctional Officer, Fort Dix, NJ |
| Oct 1996 - Jun 1999 | GS-9/11 | Lieutenant, FCI Fairton, NJ |
| Jun 1999 - Nov 2000 | GS-12 | Regional Special Investigator Supervisor |
| Nov 2000 - Jul 2003 | GS-12/13 | Captain, FCI Otisville, NY |
| Jul 2003 - Aug 2005 | GS-14 | Associate Warden, USP McCreary, KY |
| Aug 2005 - Present | GS-14 | Associate Warden, USP Atlanta, GA |

GOVERNMENT EXHIBIT 72

PENGAD-Bayonne, N.J.

(Witness excused.)

MS. KIRCHNER: Your Honor, can we take a short break to reorganize?

THE COURT: Let's take a five minute break.

(Whereupon, a short recess was taken.)

THE COURT: Let's go on the record.

Whereupon,

BILLY ROMERO

having been duly sworn, was called as a witness and was examined and testified as follows:

DIRECT EXAMINATION

BY MS. HEISER:

Q Good afternoon, Mr. Romero.

A Good afternoon.

Q Could you please state your name and business address for the record?

A Billy H. Romero, United States Penitentiary, Atlanta, Georgia.

Q And who is your current employer?

A The Federal Bureau of Prisons.

Q How long have you been working for the Bureau of Prisons.

A Approximately 19 years.

Q Can I ask you to turn to Exhibit 73 in the notebooks, please? Can you identify Exhibit 73,

Q And did that relief proceed similarly to what you just described?

A Yes.

Q How long did this exchange of keys, equipment and information take when you were an operations lieutenant?

A Ordinarily two to three minutes.

Q Did you work a variety of shifts as the operations lieutenant?

A Yes.

Q And would you say that the exchange of equipment, keys and information took the same amount of time regardless of what shift you were working?

MR. BANOV: Leading.

THE COURT: Did it vary depending on the shift?

THE WITNESS: No, it was pretty much the same.

BY MS. HEISER:

Q Mr. Romero, you were captain at FCI Otisville from October of 1996 to July of 2000?

A Yes.

Q If you could turn to Exhibit 74 in the notebook, please. Can you identify Exhibit 74, please?

up the chits at the control center and report to the lieutenant's office, and he or she would exchange chits and information with the outgoing lieutenant.

Q As the captain at Otisville, did you have the opportunity to observe the exchange of chits for equipment and the passing on of information between the operations lieutenants at the shift change?

A Yes, from time to time.

Q And did you have the opportunity to observe this during the various shifts?

A More so as the day watch relieved the morning watch and as the evening watch relieved the day watch.

Q How long did it take for the outgoing operations lieutenant to exchange chits for equipment and pass on pertinent information to the incoming operations lieutenant?

A Barring any unusual circumstances, two to three minutes.

Q Did you require that the passing on of information be verbal?

A No.

Q Why not?

A Well, there is a number of ways that they could share that information or obtain that

information. For example, if one lieutenant was running a little late or one had to leave early that they could not actually see each other face to face, then they could simply review the lieutenant's log which basically contained the pertinent issues that occurred during the day.

Q Between April 19 and July 30, 2000, when you were the captain at FCI Otisville, was there an afternoon count of inmates?

A Yes.

Q What time was the count?

A 3:45.

Q And what type of count was the 3:45 p.m. count?

A It was an official stand-up count.

Q Did the inmates in the institution have to go to any particular location for the 3:45 p.m. count?

A They went to various locations.

Q Where were those various locations?

A For the most part, the greater portion of the inmates would have been in the housing units. However, there were inmates that were outcounted that may have been in the food service area or maybe in mechanical services working on, you know, special problems with the facility itself. But wherever they

Q When you were an operations lieutenant, what would be the information that you'd want to know about when you started your shift?

A Well, whether there was any significant incident that occurred prior to my getting there, any fights, any significant staff issues, family illnesses, whether or not we had any inmates currently being disruptive in four-point restraints, in ambulatory restraints, anything that happened throughout the Bureau that might affect my institution or my shift.

Q Would you say that it's important for an operations lieutenant to know as much as possible about what went on in the institution before he or she arrived before his or her boss learned about it?

MS. HEISER: Objection, compound.

THE COURT: I don't think that's compound.

MR. BANOV: It's generic, neutral. It applies to his or her.

THE COURT: I don't think that's her objection.

MS. HEISER: The objection was not about his or her.

THE COURT: Well, go ahead if you understand the question, you can answer it.

# Billy H. Romero

My BOP positions and duty locations are as follows:

| | |
|---|---|
| Sept 1987 - Oct 1990 | Correctional Officer, FCI Memphis, TN (GS-6, 7, & 8) |
| Oct 1990 - Sept 1992 | GS-9 Lieutenant, FMC Ft. Worth, TX |
| Sept 1992 - May 1995 | GS-11 Lieutenant, FCI Oakdale, LA |
| May 1995 - Oct 1996 | GS-12 Correctional Service Specialist, NERO, PA |
| Oct 1996 - Jul 2000 | GS-13 Captain, FCI Otisville, NY |
| Jul 2000 - Aug 2003 | GS-14 Associate Warden, MDC Guaynabo, PR |
| Aug 2003 - May 2005 | GS-14 Assistant Correctional Services Admin., SERO, GA |
| May 2005 - Present | GS-14 Associate Warden, USP Atlanta, GA |

GOVERNMENT EXHIBIT 73

PENGAD-Bayonne, N.J.

IN THE UNITED STATES OF FEDERAL CLAIMS
Case Nos. 00-315C, 00-454C, 00-617C,
01-47C, 01-313C, 01-314C, 01-480C, 02-35C,
03-446C, 03-2363C
Senior Judge Bruggink

---------------------------------------------x

GARY L. AARON, et al.,

Plaintiffs,

- against -

UNITED STATES,

Defendant.

---------------------------------------------x

August 6, 2004
12:50 p.m.

DEPOSITION of Defendant, by FREDERICK MENIFEE, taken by Plaintiffs, pursuant to Notice, held at the Otisville Correctional Facility, Two Mile Drive, Otisville, New York, before Reva Weiss, a Shorthand Reporter and Notary Public of the State of New York.

MENIFEE

was an order you would say it was a guideline?

A. No.

Q. Since when did you regard post orders as mere guidelines?

A. They are guideline for employees to follow them. We expect them to follow the post orders. It's a guideline, not all-inclusive.

Q. 47, for example, Operations Lieutenant, 12 a.m. to 8 a.m. shift.

A. Okay.

Q. What if a lieutenant straggled in at 12:30 without a good excuse? Wouldn't that employee be in violation of this post order?

A. He would be in violation of -- he would be late, yes.

Q. And subject to discipline, right?

A. Subject to, possibly.

Q. So for that employee it's not just a guideline, it's a requirement, isn't it, to do certain things at 12 a.m.?



MENIFEE

It says that.

A. It doesn't mean you have to do everything right at 12 a.m. It's a guideline of what is expected to be occurring within the confines of this shift.

Q. Were you an AW here in June 2001 --

MR. BANOV: Strike that.

A. No. I was Warden here.

Q. I'm sorry.

At that time were there inmate counts?

A. I beg your pardon?

Q. What times of the day were there inmate counts in June 2001?

A. We have a 3:00, 5:00, 3:45.

Q. Better put "a.m." and "p.m." on those.

A. We have a 3 a.m., 5 a.m. count. We have a 3:45 count. There's five counts in the day.

Q. So this has 12 a.m. And there's a paragraph of things next to 12 a.m.



MENIFEE

A. Uh-huh.

Q. Was this just a suggestion about what the Operations Lieutenant might want to do if he chose to do it?

A. No. It's the guidelines -- these are the things they're expected to do.

Q. So he's expected to do those things?

A. Right.

Q. Was the Operations Lieutenant on the 12 a.m. to 8 a.m. shift selected to do all these things at midnight?

MS. KIRCHNER: Objection. Ambiguous.

Q. All these things on the first page of Exhibit 47.

MS. KIRCHNER: Objection. Ambiguous, compound.

A. Are you asking me can he do all these things at 12 a.m.?

Q. Did the Bureau expect Ops Lieutenants to do all these things at 12 a.m.?



MENIFEE

MS. KIRCHNER: Objection. Ambiguous, compound.

A. No.

Q. It's impossible, right?

A. Yeah.

Q. That employee had to get a radio, handcuffs and a key ring or key rings.

At the top it says key ring [redacted]. What does that mean?

A. He had to get those key rings.

Q. Three different key rings and there's names to those key rings?

A. Yes.

Q. And that employee also had to get a radio and handcuffs?

A. Correct.

Q. What does that mean, "issued" here?

A. Issued means he's issued those items.

Q. At the time he goes to the Control Center?