IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JOSE L. ACEBAL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 01-47C |
| | ) | Senior Judge Bruggink |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF LINDSEY BLEDSOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND THEIR OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. The Court Should Stay Further Proceedings Pending the Decisions by the Court of Appeals in *Carlsen* and *Shea*

The Court should stay further proceedings pending the decisions by the Court of Appeals in *Carlsen* and *Shea* for the purpose of judicial economy, to conserve party resources, and to avoid inconsistent decisions by piecemeal litigation.

The Court, of course, has the power to stay further proceedings. *See Clinton v. Jones*, 520 U.S. 681 (1997) ("broad discretion to stay proceedings"); *Landis v. North American Co.*, 299 U.S. 248, 254 (1936); *The Cherokee Nation of Okla. v. U.S.*, 124 F.3d 1413, 1416 (Fed. Cir. 1997) ("The power of a federal trial court to stay its proceedings, even for an indefinite period of time, is beyond question."); *Chempower v. McAlpine, Ltd.*, 849 F.Supp. 459 (S.D.W.Va. 1994). "In considering a motion for stay, courts consider both the interest of judicial economy and the potential prejudice or hardship to the parties." *Walker v. Merck & Co., Inc.*, 2005 U.S. Dist. LEXIS 13693 *5 (S.D. Ill. 2005) (citing *Bd. Of Trs. of the Teachers' Ret. Sys. of the State of Ill. v. WorldCom, Inc.*, 244F. Supp.2d 900, 905-06 (N.D. Ill. 2002)). In considering whether to grant a stay until determination of a related case in another court, courts will consider such factors as

"issues of docket control and principles of abstention," *Lisa, S.A. v. Mayorga*, 232 F.Supp. 2d 1325, 1326-27 (S.D. Fla. 2002), aff'd, 2003 U.S. App. LEXIS 27168 (11th Cir. 2003) (citing *Ortega Trujillo v. Conover & Co. Communications, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000)), and avoiding piecemeal litigation, *Lisa, S.A.*, 232 F.Supp. 2d. at 1327. Finally, a stay may not be "immoderate," unless "so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description." *Landis*, 299 U.S. at 256, 57 S. Ct. 163, 167.

Here it is plainly in the best interest of the parties, as well as in the public interest, to stay further proceedings in these cases until the Court of Appeals resolves the *Carlsen* and *Shea* appeals. As the Court is aware, plaintiffs in these consolidated cases have appealed the Court's decisions in *Carlsen v. United States*, 72 Fed. Cl. 782 (2006) [*Bishop II*], appeal pending, Fed. Cir. No. 2007-5011, and *Bishop v. United States*, 72 Fed. Cl. 766 (2006) [*Bishop I*] and *Bishop v. United States*, 74 Fed. Cl. 144 (2006) [*Bishop II*], appeal pending *sub nom. Shea v. United States*, Fed Cir. No. 2007-5099, to the United States Court of Appeals for the Federal Circuit. The parties have prepared opening briefs in *Carlsen*; appellants' reply brief in *Carlsen* is due to be filed by May 29, 2007; and Appellant's opening brief in *Shea* is due to be filed by June 29. Considering the status of the appeals, it is reasonable to expect decisions by the Court of Appeals this year. The instant case involves essentially the same issues which the Court decided in those cases, including the applicability of *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ["*Doe II*"], cert. denied, 544 U.S. 904 (2005); the compensability of preliminary and postliminary overtime pursuant to post orders; and the compensability of time spent in lieutenants' meetings and department head-lieutenants' meetings at times when the employees were not otherwise scheduled to work; the extent to which overtime is de minimis and not compensable. However

the Court of Appeals rules on the above-referenced appeals, it will dispose of all material legal issues in this case and in virtually all other pending cases. There will be no prejudice to defendant because it has always been in possession of almost all the documents which are relevant to these cases and because in its worst case scenario, a delay would merely postpone the time the Court would order it to pay overtime pay to plaintiffs. *See Lisa, S.A.*, 232 F.Supp. 2d at 1327 ("Stay relief has been found to be appropriate whether or not "the issues in such proceedings are necessarily controlling of the action before the court.'") (quoting *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983)). A court may stay proceedings even where the subject matter is uncertain, *Walker*, 2005 U.S. Dist. LEXIS 13693. See also *Cooley, Archuleta, Ashby*, 219 Ct. Cl. 587, 1979 U.S. Ct. Cl. LEXIS 13 (1979) (stay pending decision on overtime claims by Civil Service Commission).

Further, the delay resulting from such a stay here would not be "immoderate" (*Landis*, 299 U.S. at. 256), because the duration of the stay would be limited – probably no more than five to seven months. In the meantime, the parties can conserve their resources and avoid spending thousands of dollars of attorney time in briefing issues which should be resolved either way by the appellate decisions.[1]

For these reasons, for purposes of judicial economy, to preserve both parties' resources, and to avoid piecemeal litigation, plaintiffs request that the Court stay further proceedings in this case, pending the decisions of the Court of Appeals in *Carlsen* and *Shea*.

---

[1] During the 13-year life of the "BOP I" cases, *Albright v. United State*s, Nos. 268-84C, 400-84C, 316-85C, and 526-87C, the Court repeatedly stayed proceedings, often with both parties' consent, for extensive periods, pending appellate decisions on important jurisdictional and procedural issues. *See generally Albright v. United States*, 26 Cl. Ct. 1119 (1992), aff'd, *Albright v. United States*, 10 F.3d 3 (Fed. Cir. 1993); *Albright v. United States*, 10 F.3d 3 (Fed. Cir. 1993).

II. The Court Should Not Apply *Doe II* to the Bureau of Prisons

In its Opposition to Plaintiff Bledsoe's Motion for Partial Summary Judgment and Cross-Motion for Summary Judgment ("Def. Br."), at 1-2, defendant argues that Plaintiff Bledsoe has failed to demonstrate a violation of the Federal Employees Pay Act ("FEPA"), 5 U.S.C. § 5542, and has not met the regulatory requirements of the Office of Personnel Management (OPM), 5 C.F.R. § 550.111(c),[2] as interpreted in this Court's recent decisions applying *Doe II*, to the Bureau of Prisons ("BOP"). In those rulings, in *Carlsen, Bishop I, and Bishop II*, the Court held that the four plaintiffs in *Carlsen* and Lt. Patrick Shea in *Bishop I* and *Bishop II* had not demonstrated evidence of explicit, written orders for overtime and dismissed their claims.

As stated in Plaintiffs' Brief in Support of Plaintiff Bledsoe's Motion for Partial Summary Judgment ("Pl. Br.") at 7, *Doe II* is factually distinguishable from this case.[3] There are a multitude of reasons why the Court should not apply *Doe II* to BOP or any other law enforcement agency which require immediate obedience to oral orders to work overtime in a dangerous, high-security environment where the failure to obey orders may, at most, result in the loss of life or injury or, at least, in discipline or the end of a career. They include the following reasons: 1) DOJ attorneys are professionals, who operate independently, unlike BOP employees; 2) BOP employees work in a more secure, dangerous environment; 3) BOP employees' mobility into and around their workplace is restricted; 4) BOP's mission necessitates rigid work scheduling; 5) Congress recognizes that law enforcement employees are unique; 6) BOP employees must follow all orders, whether oral or written, and if they do not, they would suffer

---

[2] 5 C.F.R. § 550.111(c) provides, in relevant part, that to be compensable overtime, it must have been "ordered or approved . . . in writing by an officer or employee to whom this authority has been specifically delegated."

[3] Plaintiffs adopt and incorporate by reference those arguments, which plaintiffs also made in the *Carlsen, Shea*, and *Chalmers* cases.

an even greater penalty than the attorneys in *Doe*; and 7) the BOP discourages requests for overtime.

If the Court does not permit Plaintiff Bledsoe and the other BOP plaintiffs to recover overtime pay here, it would give them a Hobson's choice: to obey oral orders, general BOP personnel policies, and engrained customs to work overtime, without compensation, thereby lose millions of dollars each year, or refuse to work overtime without written orders and run the clear risk of discipline or at least of ruining their careers. In its brief, Defendant does not respond to these arguments. Alternatively, if the Court does apply *Doe II* to Plaintiff Bledsoe (and other BOP employees), it should take a much less restrictive approach as to what documents constitute written orders than it did in *Carlsen* and *Shea* cases, as explained below.

The documents referenced herein and in Plaintiff Bledsoe's motion-- program statements, standards of conduct, training materials, position descriptions, institutional manuals and supplements, e-mail meeting reminders and other instructions to attend off-shift meetings, and government travel – all implicitly compel overtime and satisfy the underlying objective of the regulation -- to provide "a necessary safeguard against subjecting the Government to improper expense" (*Post v. United States*, 121 Ct. Cl. 94, 99 (1951)).

For example, the Court should credit manuals as sources of written overtime orders. In *Carlsen*, 72 Fed. Cl. at 793, the Court found, "A statement in a manual announcing to employees that they must follow the orders of supervisors does not amount to a written order to perform overtime." Dec. 18. However, in *Doe II*, the Court rejected the argument that the U.S. Attorneys' Manual constituted a written order to work overtime because the document stated the opposite! Thus, in *Doe II* the Court pointed to a passage in that Manual which "instructs

attorneys not to expect overtime compensation rather than instructing them to work particular amounts of overtime" and explained:

> The Manual repeatedly emphasizes the following two directives: overtime under 5 U.S.C. §5542 must be approved in writing, in advance, by a person authorized to do so and U.S. Attorneys are not authorized to approve overtime for attorney personnel, . . . indicating, if anything, that the plaintiffs' overtime work was not officially ordered or approved.
>
> 372 F.3d at 1363.

By contrast, in BOP, the Standards of Employee Conduct, as well as other written BOP policies, require BOP employees scrupulously to obey oral and written orders, including orders to work overtime. Plaintiffs have uniformly testified that their managers –principally Wardens, Associate Wardens, and Captains –have directed them orally to perform overtime and that they knew they would be disciplined for insubordination if they refused. See, e.g., App. 6, 64, 73. Also, it is settled that documents, such as collective-bargaining agreements and personnel manuals, take on their meaning from the workplace in which they are applied. See *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 53 (1974) (arbitrators interpret collective-bargaining agreements by considering the "law of the shop"); *Greene v. Howard University*, 134 U.S. App. D.C. 81, 88, 412 F.2d 1128, 1135 (1969) ("Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them").

## III. Improper Reliance on Post-Deposition Affidavits

Defendant has attempted to bolster its defense by producing many affidavits from witnesses which it could and should have prepared and produced before the relevant depositions in this case, including two from Warden Michael Zenk and Associate Warden William Ey.[4]

---

[4] AW Ey covers only part of the time during which Plaintiff Bledsoe claims overtime, since he became AW at MDC-Brooklyn in May 2002, two years after Plaintiff Bledsoe arrived there and left September 2004. Compare Def. App. 1106, Plaintiff Lindsey Bledsoe's Proposed Findings of Uncontroverted Facts, ¶1.

Defendant's recitation of key facts (Def. Br. at 8 *et seq*.) relies heavily on these affidavits, particularly Mr. Ey's. See Deft. App. 1106-1122. These are declarations which defendant's counsel have prepared for its managers well after the discovery period ended. A few examples will illustrate how, three years after his deposition, defendant is trying to alter or put a gloss on AW Ey's prior statements about material facts in this case. For example, AW Ey attempts to minimize the importance of rosters as helping to indicate where lieutenants were supposed to work (Def. App. 1107), but in his deposition he testified that the quarterly rosters indicate what jobs the employees will have for the upcoming quarter. See Def. App. 1251 (Ey Depo. 45-46). Even more directly, he gave this testimony about the purpose of rosters: "So the people know where their assigned posts are and their hours of work." Def. App. 1251 (Ey Depo. 134). Next Mr. Ey tries to change what he testified about Operations Memorandum 214-95, i.e., how that bulletin liberalized BOP's time and attendance policy on when it would deem employees to be on time. Compare Def. App. 1107 with Def. App. 1251 (Ey Depo. 39, 42-44). Further, Mr. Ey states in his Declaration (Def. App. 1121), "During my tenure at MDC Brooklyn, Lieutenants were not required to attend the Department Head/Lieutenants' meetings or subsequent, closed Lieutenants' meeting at times when they were not on their scheduled shift," but in his deposition, he testified that he directed or required employees to attend department head meetings and that other managers did so with e-mails. See Def. App. 1251 (Ey Depo. 140-141).

Many of the other declarations contain conclusory assertions that all of plaintiffs' walking times within the subject institutions are de minimis. For example, the Declarations of Lt. Kristie Theel, dated March 8, 2007 (Deft. App. 43); Tammy Cressinger, dated March 6, 2007 (Deft. App. 44); Justin Andrews dated February 19, 2007 (Deft. App. 46); and Judd L. Clemens,

dated February 14, 2007 (Deft. App. 53) assert that the walking times from various locations at either MDC Brooklyn or USP Lewisburg are all far less than ten minutes.

In January 2004 the parties spent a week of depositions of plaintiffs and managers at MDC-Brooklyn, including Mr. Zenk, Mr. Ey, and Anna Scarpone, Human Resources Manager.[5] Before, during, and after the depositions defendant produced many documents relevant to Plaintiff Bledsoe's claims, but no affidavits from any witnesses. Indeed, even after discovery in this case ended on November 1, 2005, defendant continued to produce such documents. To that extent, defendant recognized its obligation under RCFC 26(e)(2) to amend prior discovery responses seasonably when it came into possession of additional information or documents that were responsive to plaintiffs' discovery requests. *See generally Tritek Technologies, Inc. v. U.S.*, 63 Fed. Cl. 740, 746, 2005 U.S. Claims LEXIS 38 (2005); *Precision Pine v. U.S.*, 63 Fed. Cl. 122, 136-37 (2004); quoting *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (CA Fed. 1992), *cert. denied*, 508 U.S. 912 (1993). However, neither during discovery nor during the Brooklyn depositions did defendant produce any of the declarations in its appendix for Lt. Kristie Theel of MDC-Brooklyn (Def. App. 43); Tammy Cressinger of USP-Lewisburg (Deft. App. 44); Justin Andrews of MDC-Brooklyn (Def. App. 46); Judd L. Clemens of MDC-Brooklyn (Def. App. 53); Warden Tracy Johns (Def. App. 55); Warden Carlyle I. Holder (Def. App. 58); Warden Zenk (Def. App. 84); James F. Sherman (Def. App. 124); and Associate Warden Ey (Def. App. 1106). Defendant did not produce any of those affidavits until April 4, 2007, when it served its Opposition to Plaintiff Bledsoe's Motion for Partial Summary Judgment

[5] The Court will recall that because Ms. Scarpone gave evasive answers and because defendant's counsel repeatedly interrupted the flow of plaintiff's depositions with patently invalid objections, plaintiffs were not able to complete their depositions of Warden Zenk and Associate Warden Ey. Later, on Plaintiffs' Motion to Compel Continuation of MDC-Brooklyn Depositions by Telephone, the Court on March 24, 2004, ordered defendant to produce Mr. Ey for a telephone deposition of one more hour.

and Cross-Motion for Summary Judgment. Once defendant obtained those signed affidavits, they became discoverable. Moreover, defendant could easily have obtained these affidavits long ago, since all of the affiants are current BOP managers and employees. Indeed, of all defendant's affiants, except for Lt. Theel, have been employed by BOP since the initial deposition. See Deft. App. 43.

Also, it is improper for a party to bolster its witness's deposition testimony with an affidavit of the deponent prepared after the deposition for summary judgment purposes. "[The circuit courts] have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Management Systems Corp*., 526 U.S. 795, 806 (1999) (collecting cases, including *Sinskey*. In *Sinskey*, 982 F.2d at 498, the Federal Circuit declared:

> A party cannot create an issue of fact by supplying an affidavit contradicting his prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity. See, e.g., *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). Where, as here, a party has been examined extensively at deposition and then seeks to create an issue of fact through a later, inconsistent declaration, he has the duty to provide a satisfactory explanation for the discrepancy at the time the declaration is filed. To allow him to preclude summary judgment simply by contradicting his own prior statements would seriously impair the utility of Federal Rule of Civil Procedure 56.

See also *Halperin v. Abacus*, 128 F.3d 191 (4th Cir. 1997), and cases cited; *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). As the Fourth Circuit has stated, "A genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of the [party's] testimony is correct." *Barwick v. Celotex Co.*, 736 F.2d 946, 960 (4th Cir. 1984) (noting also the conclusory and artificial nature of the affidavits at issue).

The reason for this rule is simple: “If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.” *Barwick*, 736 F.2d at 960.

It is especially inappropriate when, as here, the witness is a 30(b) (6) witness. See *United States v. Taylo*r, 166 F.R.D. 367, 361 (M.D. N.C. 1996) (corporation has an affirmative duty to adequately prepare its designees; the designee "presents the corporation's 'position' on the topic). “Unless [the corporation] can prove that the information was not known or was inaccessible, a corporation cannot later proffer new or different allegations that could have been made at the time of the 30(b)(6) deposition.” *Ieradi v. Lorillard, Inc.*, 1991 U.S. Dist. LEXIS 11320 (E.D. Pa.); *Taylor*, 166 F.R.D. at 362. In *Rainey v. American Forest and Paper Ass’n*, 26 F.Supp 2d 82 (D.D.C. 1998), the court refused to consider as evidence an affidavit that an employer created in an attempt to resist plaintiff's motion for summary judgment addressing overtime claims under the Fair Labor Standards Act. The court held that a court is required under 30(b)(6) to disregard an affidavit which revises the company's theory, or which asserts facts the company did not know during its deposition. Id. at 95 (“the Rule aims to prevent a corporate defendant from thwarting inquiries during discovery, then staging an ambush during a later phase of the case.”).

In short, defendant has prejudiced plaintiffs by obtaining these affidavits and producing them after the end of the discovery period,[6] and the Court should ignore or strike those affidavits.

---

[6] The prejudice is accentuated by the fact that the Court allowed plaintiffs only one more hour to depose AW Ey after January 2004. Therefore, it would have been futile to ask the Court for additional time to depose AW Ey after the discovery period ended and after defendant provided his affidavit in support of its cross-motion.

IV. Defendant's Motion Raises Genuine Issues of Material Fact

Another very significant reason why the Court should deny defendant's motion for summary judgment is that it raises genuine issues of material fact, particularly with regard to the nature of the orders to Plaintiff Bledsoe to work overtime and the amounts of time he spent outside his regular hours of work in preliminary and postliminary overtime and other overtime activities.

A. Plaintiff Bledsoe's USP Lewisburg Claims

Plaintiff Bledsoe did not move for summary judgment on his USP-Lewisburg claims because, even though the undisputed evidence showed that the BOP ordered or approved his attendance off the clock at certain meetings there, plaintiffs did not depose Lewisburg management or receive all relevant Lewisburg records from defendant.

Nonetheless, defendant moves to dismiss Plaintiff Bledsoe's claims at USP Lewisburg. The Court should reject its arguments, for the reasons set forth above and below.

Defendant's motion raises genuine issues of material fact about Plaintiff Bledsoe's claims at USP Lewisburg. Thus, defendant asserts, "He claims overtime in attending Department Head/Lieutenants' meetings and subsequent, closed Lieutenants' meeting at times outside of his scheduled shift, but, does not specify particular meetings for which he allegedly was not compensated." Deft. Br. 3 citing Def. App. 8 (Dep. 27). However, Plaintiff Bledsoe did testify, referring to his Supplemental Backpay Questionnaire [App. 8], "I missed one meeting at Lewisburg [a]t Lewisburg from August 3rd, '98 to May 20th, 2000." Bledsoe Depo. 85 [Def. App. 22].

In denigrating Plaintiff Bledsoe's overtime claims at USP Lewisburg, defendant asserts that "Lt. Bledsoe claims 5.5 minutes post-shift overtime, including walking out of the institution,

but he did not drop off anything at the Control Center on his way out." Deft. Br. at 8-9, citing Def. App. 4, 6 (Dep. 10-12, 19). However, it is clear that Plaintiff Bledsoe spent about 5.5 minutes at the beginning of the Day Watch (shift 8) as an Activities Lieutenant in waiting in the key line, picking up batteries and other items at the Control Center, and in walking to the Lieutenants' office. Def. App. 1109, 1130 (Dep. 13-15, 18-19). Likewise, at the end of the Evening Watch (Shift 17), Plaintiff Bledsoe also spent about 5.5 minutes as an Activities Lieutenant in walking from the Lieutenants' office to the Control Center, waiting in the relieved duty key lines, and turning in batteries and other items at the Control Center. (Deft. App. 1109, 1136, 1142). In Bishop I, 2006 U.S. Claims LEXIS 266, *47, the Court agreed with plaintiffs that "the picking up and dropping off of keys is an indispensable part of the principal activity for which these employees were hired " and that "[t]he act of picking up and dropping off keys or chits is a principal activity" within the meaning of the Portal to Portal Act, 29 U.S.C. § 251 *et seq.* (2000); 5 C.F.R. §550.112(b); and the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 126 S.Ct. 514 (2005).

Defendant also argues that the time Plaintiff Bledsoe "spent 'walking out of the institution after a shift is not an 'integral and indispensable part of the principal activities' of a lieutenant, and thus [is] not compensable as overtime." Deft. Br. at 9, quoting Carlsen, 74 Fed. Cl. at 148, and citing Bishop I, 72 Fed. Cl. at 46-47. But defendant misstates Plaintiff Bledsoe's testimony and his claims. When he was on Day Watch as Activities Lieutenant and he picked up a battery, he did have to relinquish it before leaving; he had to wait until he was relieved before leaving; when he left, he was slowed down by a crowd at the Control Center; and he did not testify that he was claiming overtime for time he spent outside the prison. See Def. App. 5-6 (Dep. 14-20).

Defendant argues that Plaintiff Bledsoe could not claim overtime for the 5.5 minutes he spent before his shift, waiting at the key line, picking up keys and a radio at the Control Center, and walking through gates to his duty post because he "was to be in the key line at the Control Center the start of his shift as Day Watch Activities Lieutenant, and was not required to work any pre-shift overtime." Def. Br. at 9, citing Def. App. 1111. Aside from the facts that the record reference is one of defendant's self-serving, post-deposition affidavits and that its denial that plaintiff "was not required to work any pre-shift overtime" is conclusional, defendant misstates the facts and misconstrues its liability. The fact that the BOP proclaimed that Plaintiff Bledsoe was <u>deemed to be on time</u> when he was in the key line at the start of his shift does not mean that he could not claim overtime for the time in the key line and in retrieving keys and equipment at the Control Center, for when that time is added to the rest of his assigned time for the day, he definitely worked more than 8 hours that day. In fact, he generally worked 11 minutes beyond the 8 hours for which he was paid regular pay.

Defendant quotes the Court's ruling in *Bishop I*, 72 Fed. Claims at 777, that overtime is required by tasks "at the beginning or end of each shift which inherently require the presence of two employees, one of whom is off-duty." Def. Br. at 10. Nevertheless, defendant disallows Plaintiff Bledsoe time to pick up a radio battery. If a radio does not work due to the lack of a charged battery, both employees and inmates are unsafe.

Defendant mentions that Plaintiff Bledsoe could pick up a radio battery during his shift. Def. Br. at 10. That occurred, he testified, when there "might be a crowd out there, too long of a crowd." However, he "would have to" pick up a battery, sooner or later, since he needed it for his radio. Def. App. 5 (Dep. 16-17).

It should also be pointed out that in deposing Plaintiff Bledsoe, defendant hardly asked him any questions about whether he was ordered in writing to work his claimed overtime and that his deposition predated *Doe II* by half a year.

Defendant acknowledges that there was no overlap between the Day Watch Activities Lieutenant's shift and the Evening Watch Activities Lieutenant's shift. Def. Br. at 12. Accordingly, to comply with their post orders, either the outgoing lieutenant or incoming lieutenant would have to work overtime.

In arguing that Plaintiff Bledsoe preliminary and postliminary overtime as Evening Watch (shift 17) Activities Lieutenant was de minimis, defendant inappropriately tries to extrapolate a factual finding regarding a different plaintiff in a different prison (Plaintiff Tucker at MCFP-Springfield) to Plaintiff Bledsoe's case. Def. Br. at 13. However, this magician-like sleight of hand does not cover up for the fact that there is a genuine issue about this material fact. Defendant again relies improperly on AW Ey's post-deposition declaration in attempting to minimize Plaintiff Bledsoe's overtime, Def. Br. at 13, but AW Ey did not supervise plaintiff during the normal course of his duties at MDC-Brooklyn during a material portion of his claims period from August 2, 1998 to May 1999.[7]

Defendant attempts to argue that Plaintiff's overtime as Evening Watch Activities Lieutenant was de minimis because the Court should count only his 5.5 minutes of preliminary overtime and not his 5.5 minutes of postlinmary overtime. Def. Br. at 13-14. The Court should reject the argument. As explained above, Plaintiff Bledsoe performed his postliminary overtime in the institution, in required activities at his duty post and between it and the Control Center, not

---

[7] AW Ey was Captain at USP Lewisburg from May 1999 to May 2002. Deft. App. 1106. AW Ey was Associate Warden at MDC-Brooklyn from May 18, 2002, to September, 2004. Deft. App. 1106.

in walking outside the institution. Where, as here, if the daily overtime is ten minutes or more, it is not de minimis. In *Bull v. United States*, 2005 U.S. Claims LEXIS 284, *39-40 (Fed. Cl. Sept. 27, 2005), the Court pointed out:

> Adopting the OPM standard, "[d]ecisions of this court construing the FLSA have developed a rule of thumb that [10] minutes of preliminary or postliminary work that would otherwise be compensable because it is closely related to principal activities will nonetheless be treated as non-compensable if it totals less than [10] minutes per day." [*Riggs v. United States*, 21 Cl. Ct. 664, 682 (1990)] (citing *Amos*, 13 Cl. Ct. at 450) (footnote added); *Int'l Bus. Invs., Inc. v. United States*, 11 Cl. Ct. 588, 593 (1987); *Whelan Sec. Co. v. United States*, 7 Cl. Ct. 496, 499 (1985); and *Graham v. United States*, 3 Cl. Ct. 791, 796 (1983)); accord *Cobra Constr. Co. v. United States*, 14 Cl. Ct. 523, 531 (1988) ("[The employer] argues that 15–20 minutes of extra work performed as part of a continuing work regimen is de minimis. The case law holds otherwise."); *Abrahams v. United States*, 1 Cl. Ct. 305, 311 (1982) ("[P]laintiffs . . . must show that they performed some significant work . . . . In addition, the work must involve a substantial period of time of at least 10 minutes or more.").

"Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim." *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984).

Defendant disputes Plaintiff Bledsoe's claims for attending "mandatory" lieutenants' department head-meetings at Lewisburg (App. 3, 20). See Def. Br. at 14-5. One of defendant's arguments is that the BOP did not order him in writing to attend these meetings outside his scheduled shift. Id. Defendant is mistaken. Besides giving Plaintiff Bledsoe oral orders to attend those meetings on his off hours, the BOP also directed him in writing. App. 8.[8] While it is true that written orders to Plaintiff Bledsoe would be the best evidence of the written orders, in their absence, his testimonial recollection of the orders is the best evidence he can produce, so it should be considered by the Court. *See* FED R. OF EVID 1004 (stating exceptions to Best

---

8 That Plaintiff Bledsoe no longer has the written orders (id.) should not be held against him. At the time he was working overtime at USP Lewisburg (1998-2000) this Court still followed the nearly 40-year old precedent that overtime required by oral orders was compensable. See *Baylor v. United States*, 198 Ct. Cl. 331, 337-38 (1972).

Evidence Rule). Evidence other than the original is admissible under certain exceptions applicable here. Thus, other evidence is allowed to prove the contents of a writing if all originals are lost. *See* FED. R. OF EVID 1004(1); *Cooley v. Director of Revenue, State of Missouri*, 896 S.W.2d 468, 470 (Mo. App. 1995) ("proof of the mere existence, execution, delivery, or identity of a document is not considered proof of the terms of the document, and may be given without producing the original document or accounting for its absence. McCormick on Evidence § 233 (4th ed. 1992); 2 Jones on Evidence § 7:5 (6th ed. 1972)."). Rule 1002 does not "require production of a document simply because the document contains facts that are also testified to by a witness." *Allstate Insurance Co. v. Swann*, 27 F.3d 1539 (11th Cir. 1994) (quoting *United States v. Finkielstain*, 718 F. Supp. 1187, 1192 (S.D.N.Y. 1989)). "[N]o evidentiary rule . . . prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation." *Jinks-Umstead v. England*, 2005 U.S. Dist LEXIS 34547, 14-15 (D.D.C. 2005)(quoting *R&R Associates, Inc. v. Visual Scene, Inc*., 726 F.2d 36, 38 (1st Cir. 1984)). At one time Mr. Bledsoe possessed and followed these orders and, therefore, has personal knowledge of their existence. "[A]ny witness with knowledge of facts that exist independent of the contents of a writing . . . may testify without raising an issue under Rule 1002." *Jinks-Umstead*, at *15 (quoting 31 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure, §7184 (2000); *see also Cooley*, 896 S.W.2d at 470 ("the best evidence rule does not exclude evidence based on personal knowledge even if documents or other writings would provide some of the same information.").

### B. Plaintiff's MDC-Brooklyn Claims

Defendant contends that at MDC-Brooklyn Plaintiff Bledsoe did not obtain his keys and radio from the Control Center. Def. Br. at 16, citing Def. App. 310, 1120-21. However, the Post

Order for Operations Lieutenant on the morning watch required Plaintiff Bledsoe to "carry an institutional radio at all times" (App. 86); all post orders required that he carry a radio (and other equipment); and the Post Order for the Day Watch ordered him, *inter alia*:

> 7:45 AM Report for duty in the proper uniform. Draw a radio, then proceed to the Lieutenant's Office. Receive any pertinent information from the Morning Watch Lieutenant and pass on any relevant information to the oncoming shift at roll call. Monday through Friday, ensure the Dayton Manor and Ft. Hamilton work details have departed from the institution. Then check with the ACT LT and the Control Center Officers to ensure the Inmate Work Call has been completed. [emphasis added]

See also App. 92, which required him to draw a radio, among other things, at "4:00 PM," which was also the very start of the Evening Watch (4 p.m.-12 a.m.); App. 26-27, 29. Further, Lt. Bledsoe testified that he did have to pick up a battery for his radio at the Control Center, and his claim to 5.5. minutes of preliminary overtime includes the time he spent at the Control Center obtaining a radio. Def. App. 9-10 (Dep. 34-37).

Defendant argues that the "only" post orders which required overtime are those listing tasks 'at the beginning or end of each shift which inherently require the presence of two employees, one of whom is off-duty.'" Def. Br. at 17-18, quoting *Bishop I*, 72 Fed. Cl. at 777. In making that finding, the Court did not take into account plaintiffs' reasonable and experienced interpretations of other post orders, which similarly required them to perform certain tasks before or at the beginning of their shift and/or at or after the end of their shifts. See, e.g., App. 55, 73-74, 86, 88, 89, 91, 92, 94. To comply with post orders and other directives to be at work on time, Plaintiff Bledsoe arrived at the institution before his shifts began. App. 25-29.

As with its attempt to extrapolate the alleged experiences of another institution (MCFP-Springfield) to Plaintiff Bledsoe's overtime work at Lewisburg, defendant tries to impose its putative Springfield model on Plaintiff Bledsoe's overtime as Day Watch Operations Lieutenant.

Def. Br. at 18-19. This is sheer guess-work and not a substitute for producing actual evidence. Therefore, the Court cannot grant summary judgment on this issue.

Next, defendant tries to increase the amount of time held to be *de minimis* by the courts and even OPM. See Def. Br. at 19. Thus, defendant deviously asserts, "In any event, Lt. Bledsoe's claimed total amount of overtime for Day Watch is about 10.5 minutes, which is comparable to the amount of overtime determined to be *de minimis* in *Carlsen*, 72 Fed. Cl. at 799 (overtime ranging from 11.5 to 6.5 minutes was *de minimis*)." *Id*. However, as explained above (p. 15), it is established that if overtime is more than ten minutes on a given day, it is not *de minimis* and is compensable.

Defendant repeatedly suggests that exchanging chits for keys or other equipment is not "'an integral and indispensable part of the principal activities' of a Lieutenant." Def. Br. at 21, 27, purportedly quoting *Carlsen*, 74 Fed. Cl. at 148. Actually it appears that defendant means to quote the Court in *Bishop II,* 74 Fed. Cl. at 148. In any event, defendant misrepresents the Court's rulings. In *Bishop I*, 72 Fed. Cl. at 47, the Court stated:

> Safety is such an integral function of the institution's mission that it is impossible to deny that protecting the keys is part of the principal activity. The act of picking up and dropping off keys or chits is a principal activity, and therefore the place where this occurs becomes the "relevant place of performance" for the beginning and end of the workday.

Defendant refers to Warden Zenk's June 2003 memo directing staff not to work overtime without approval or compensation. Def. Br. at 24. Clearly Mr. Zenk wrote the memo because of this suit and directions from his regional office and the fact that his employees constantly needed to work overtime to perform their required duties. See Zenk Depo. 9, 12, 25.

Defendant acknowledges that it did not pay Plaintiff Bledsoe for attending six meetings in 2000-2003. Deft. Br. at 29. However, it attempts to excuse its violation of FEPA by stating that Plaintiff "Bledsoe failed to certify on an Overtime Authorization Form that he attended such

meetings on overtime." *Id*. The law does not require such certification. Defendant ordered plaintiff to attend those meetings; he attended them at times when he was not regularly scheduled to work; and defendant owes him overtime pay for those hours.

Defendant tries to minimize the value of Warden Hasty's memoranda which directed staff to attend combined Department Head/Lieutenants' meetings at certain times, because he did not require the attendance of lieutenants to attend such meetings. Deft. Br. at 32. That is a deceitful reading of the memos. They definitely required subordinates to attend meetings at certain dates and times; when the warden directed staff to do something in writing, it was an order to be obeyed. While plaintiffs do not concede that FCI-Otisville Institution Supplements do not meet the conditions set forth in Doe II, it cannot be denied that Warden Hasty's memos are much more specific in their direction than the Institution Supplements.

Defendant attempts to minimize the value of the overtime authorization forms which managers completed after lieutenants attended required meetings. Deft. Br. at 32. However, those forms definitely comported with the legal requirement that the overtime be "authorized <u>or approved</u> in writing," as defendant also recognizes. *Id*. There is no question that written approval, even after the overtime is performed, complies with the *Doe II* requirements, and the Court should not hold otherwise.

Despite defendant's attempts to obfuscate the issue, there are genuine issues about the material fact of the amount of overtime Plaintiff Bledsoe worked for each of his claims. As with *Shea*, the Court should hold a mini-trial on those issues.

For the remainder of plaintiffs' opposition, they rely on and incorporate by reference their Brief in Support of Plaintiff Bledsoe's Motion for Partial Summary Judgment and their other summary judgment briefs in these cases.

V. CONCLUSION

For the reasons set forth above, Plaintiff Lindsey Bledsoe respectfully requests that the Court stay a decision on this case, pending the appellate decisions in *Carlsen* and *Shea*. Alternatively, he requests that the Court grant him partial summary judgment on the claims he described in his motion and, in any event, deny defendant's motion for summary judgment.

Respectfully submitted,

_/s/ Alan Banov_____________________

ALAN BANOV
Alan Banov & Associates
1819 L Street, N.W.
Suite 700
Washington, D.C. 20036-3830
(202) 822-9699
Fax: (202) 842-9331
ab@banovlaw.com
Attorney for Plaintiffs